# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ANDREW KRIVAK, JR.,<br><br>      Plaintiff,<br><br>v.<br><br>PUTNAM COUNTY; Putnam County Sheriff's Department Sheriff ROBERT THOUBBORON, in his individual capacity; Putnam County Sheriff's Department Officers HAROLD TURNER, DANIEL STEPHENS, PATRICK CASTALDO, WILLIAM QUICK, JOHN DANIEL REES, WILLIAM ASHER in their individual capacities; Putnam County District Attorneys ROBERT V. TENDY and KEVIN WRIGHT, in their individual capacities; Putnam County Assistant District Attorneys LARRY GLASSER; CHANA KRAUSS; and CHRISTOPHER YORK, in their individual capacities; District Attorney Investigator RALPH CILENTO in his individual capacity; and DENISE ROSE,<br>      Defendants. | Case No. _____<br><br><br>**COMPLAINT AND JURY DEMAND** |

Plaintiff ANDREW KRIVAK, JR. by and through his attorneys Newirth Law PLLC, Cuomo LLC, and JEFFREY DESKOVIC, alleges as follows upon information and belief based upon the files maintained in our offices:

## INTRODUCTION

1.    This is a civil rights action brought by Plaintiff Andrew Krivak, Jr. ("Mr. Krivak") who spent more than 26 years in prison and otherwise detained for a horrendous crime that he did not commit—the rape and murder of 12-year-old Josette Wright.

1

2.      The Defendants' egregious misconduct and failure to conduct a constitutionally adequate investigation by following multiple leads pointing to the true perpetrator – serial rapist Howard Gombert – allowed Mr. Gombert to remain at large, continuing to rape other women and young girls, all while an innocent Mr. Krivak spent his adult life wrongly imprisoned.

3.      Mr. Krivak asserts claims against Putnam County based on and arising out of the wrongful acts and omissions of the Putnam County Sheriff's Department and the Putnam County District Attorney's Office and certain of the employees and agents of these offices, and against named individual employees and agents of these offices, seeking relief for the violation of his rights secured by 42 U.S.C. § 1983, 1985(3), and 1986 of his rights secured by the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, Article 1 §§ 1, 5, 6, 11 and 12 of the New York State Constitution, New York state law, and federal and state common law.

4.      Mr. Krivak's conviction was the direct result of serious official misconduct orchestrated and carried out by Defendants Robert Thoubboron, Harold Turner, Daniel Stephens, Patrick Castaldo, William Quick, John Rees, William Asher, and others within the Putnam County Sheriff's Department (PCSD) who framed an innocent Mr. Krivak by fabricating, manufacturing, and planting evidence; coercing vulnerable teens to adopt manufactured statements inculpating Mr. Krivak; and providing perjured testimony in judicial proceedings dating back to 1996.

5.      Mr. Krivak's conviction was also the result of the misconduct of Putnam County District Attorney's Office (PCDA) employees including Defendants Robert Tendy, Kevin Wright, Larry Glasser, Chana Krauss, Christopher York, and Ralph Cilento during the investigative phases of the case and continuing through the trial and retrial phases of the case.  This misconduct – which shocks the conscience – includes, but is not limited to, hiding and suppressing favorable

2

evidence; suborning perjury; attempting to intimidate and/or pressure witnesses to provide false testimony; and making patently false public statements designed to infringe Mr. Krivak's right to a fair trial.

6.     The prosecution's purported theory of the case was that Mr. Krivak acted in concert with his best friend, Anthony DiPippo, to rape and kill Josette Wright.  Mr. DiPippo was also wrongly convicted in a separate trial and incarcerated for nearly 20 years; he was finally acquitted in 2016.  After he was acquitted, Mr. DiPippo filed a claim with the State of New York for wrongful conviction and imprisonment, and a federal and state civil rights lawsuit asserting that he was maliciously prosecuted, among other claims.  The State of New York settled Mr. DiPippo's claim for wrongful conviction and imprisonment for $2.9 Million and, in 2020, Putnam County settled his Section 1983 lawsuit for $12 million.

7.     After Mr. Krivak's conviction was vacated in 2019, PCDA insisted on retrying him despite the emergence of new evidence of Mr. Krivak's innocence and official misconduct. This new evidence emerged during a reinvestigation of the case by the New York Attorney General at the request of former PCDA District Attorney Adam Levy; prior to and during Mr. DiPippo's criminal prosecution; and during the litigation of Mr. DiPippo's Section 1983 lawsuit.  PCDA justified its decision to retry Mr. Krivak because, unlike Mr. DiPippo, Mr. Krivak had signed a police-drafted inculpatory statement.  But the statement itself was fabricated by Defendants Stephens, Castaldo, and Quick, and was signed by eighteen-year-old Mr. Krivak.  Mr. Krivak only signed the false, fabricated statement because his will was overborn by hours of unconstitutional psychological coercion applied during an interrogation by Defendants Stephens, Castaldo, and Quick.  The interrogation was designed not to elicit the

truth of what occurred but to elicit a "confession" from Mr. Krivak – regardless of its truth or falsity – so that they could close the Josette Wright case.

8.     This was not the first false confession obtained by Defendant Stephens because of his misconduct and evidence fabrication.  In 1990, six years before he participated in the interrogation of Andrew Krivak, Defendant Stephens used nearly identical tactics to coerce a false confession from another innocent teenager, Jeffrey Deskovic.  Mr. Deskovic's innocence was finally established in 2006 through post-conviction DNA testing, which also demonstrated that the rape and murder in that case had been committed by a lone sexual predator who had gone on to commit additional violent offenses while Mr. Deskovic was wrongly incarcerated for sixteen years.

9.     Here, as in the Deskovic case, and consistent with Defendant Stephens's practice, Defendant Stephens and his subordinates Defendants Castaldo and Quick used unlawful coercion and sham polygraphs to wear subjects down, fed non-public details to make false statements appear reliable, and misrepresented that the details had originated with the subject not the police. Here, as in Deskovic, and consistent with Defendant Stephens's practice, Defendant Stephens and his subordinates manipulated vulnerable teenagers into adopting false inculpatory statements instead of properly investigating the case. And here, as in Deskovic, the lone adult sexual predator responsible for the child's rape and murder went on to kill again.

10.     In 2014, a federal jury awarded $42,650,000, the largest wrongful conviction jury award in U.S. history, solely against Defendant Stephens, in a federal civil rights case brought by Jeffrey Deskovic.  The jury found that Defendant Stephens violated Mr. Deskovic's constitutional rights by fabricating evidence, conspiring to coerce his false confession, and maliciously prosecuting him.

4

11.     In this case, Defendants Stephens, Castaldo, and Quick, fabricated an unsupported and unsupportable theory of the crime and then coerced vulnerable teens to adopt their theory.  They began with Dominick Neglia, a friend of Mr. Krivak's, who they spent months harassing, coercing, threatening and physically assaulting before he agreed to adopt their story. Defendants moved on to three other vulnerable teenagers – all of whom used drugs and had criminal exposure in other matters – and, using the same improper tactics, coerced them to adopt statements corroborating Defendants' fabricated theory. Finally, Defendants coerced Mr. Krivak to sign a false, police-drafted statement purporting to confess to his involvement in the crimes against Josette Wright.

12.     Three of the individuals coerced to implicate Mr. Krivak by Defendants PCSD investigators Stephens, Castaldo, and Quick subsequently recanted.  These individuals have testified repeatedly that they adopted false statements provided by Defendants Stephens, Castaldo, and Quick under threat of prosecution, real or threatened physical violence, or both. Only one, Denise Rose, stands by her false story today.  To make Rose's false statements appear reliable at trial, Defendants fed her non-public details about the way they believed the crime occurred, and misrepresented that those details originated with Rose, when in fact they were supplied by the police.

13.     Defendant Rose has not only given multiple objectively false and conflicting statements but has repeatedly admitted to perjuring herself in judicial proceedings relating to this matter. In 2015, Defendant Rose admitted to members of PCDA and the New York Attorney General's Office reinvestigating the case that her statement incriminating Mr. Krivak was manufactured by the police.  In 2019, Defendant Rose admitted to Defendant Glasser that she intentionally perjured herself in her sworn deposition in Mr. DiPippo's civil rights case by creating an

elaborate set of detailed lies about Josette Wright's murder and repeating those lies multiple times.  This admission of intentional perjury was made to Defendant Glasser during Glasser's work reinvestigating Rose's ongoing reliability as a witness.

14.   On information and belief, after Defendant Rose told Defendant Glasser she had intentionally perjured herself, Defendant Glasser fabricated a false justification for Defendant Rose's perjury and fed that to her.  Defendants Tendy and Glasser hid Defendant Rose's perjury admission from Mr. Krivak by lying about it to Mr. Krivak's lawyers and courts presiding over Mr. Krivak's criminal case.  Then, when Defendant Glasser was forced to finally admit Defendant Rose's perjury admission, he presented his own false justification for it as originating with her.

15.   Defendants Turner, Stephens, Castaldo, Quick, Rees, and others also repeatedly conducted illegal searches of Mr. Krivak's van while it was in their sole custody and control, and then misrepresented that they had found jewelry belonging to the victim in Mr. Krivak's van – which they falsely claimed was the place she was raped and killed. In fact, at the time Ms. Wright went missing and was killed, the van was on cinderblocks and not even functional.

16.   Finally, Defendants Castaldo and Quick used improper coercion to get other witnesses to provide false testimony or change their previously given truthful accounts in order to make their fabricated story, coerced statements, and false evidence appear trustworthy.

17.   Defendants acted with the direct participation, knowledge and acquiescence of supervisors and policymakers in Putnam County, and pursuant to its policies, customs, or patterns and practices.

18.   The individual Defendants in this case, along with the named governmental entities intentionally, willfully, maliciously, and recklessly harmed Mr. Krivak from July 1, 1996, the

date of his unlawful and malicious arrest, through his acquittal of all charges on February 27,

2023. Mr. Krivak's entire life was derailed; his freedom lost; all the rights, privileges,

enjoyment, and experiences of being a human being were taken from him without just cause;

his reputation and relationships were shattered; his civil and Constitutional rights were trod

upon and ignored with impunity by those who were entrusted with their protection; he was

subjected to an investigation and judicial proceedings where the government, through its agents

including Defendants Thoubboron, Turner, Rees, Stephens, Castaldo, Quick, Rees, Asher,

Tendy, Wright, Glasser, Krauss, York, Cilento, and witnesses including Defendant Rose

committed fraud; fabricated evidence, suborned perjury; withheld and concealed evidence;

misrepresented or ignored exculpatory evidence; and failed to conduct a constitutionally

adequate investigation, including by pursuing credible leads and suspects all of which shattered

Mr. Krivak.

19.    Mr. Krivak seeks compensatory damages caused by Defendants, including other

employees and agents of PCSD and PCDA, and Putnam County's violation of Mr. Krivak's

federal and state constitutional due process and other civil rights; common law and statutory

rights; privileges and immunities; including to be free from false arrest; false imprisonment;

malicious prosecution; fraud and misrepresentation; perjury and subornation of perjury; cover-

up; suppression and concealment of exculpatory evidence; fabrication of evidence; conspiracy

to cover up and suppress and conceal exculpatory evidence; failure to intervene; supervisory

liability; having a pattern and practice of misbehavior and due process violations; negligence in

hiring, training, disciplining and retaining police officers and detectives and other County

employees and agents, including assistant district attorneys, and deliberate indifference to the

conduct of those officers and attorneys and/or their lack of competence.  Mr. Krivak also seeks

punitive damages against Defendants for their actions which shock the conscience of the public and which consist of a pattern and practice of violations of civil and Constitutional rights.

20.     On February 27, 2023, following a seven-week retrial, a jury deliberated for only six hours before acquitting Andrew Krivak.  Despite his vindication, Mr. Krivak continues to suffer the ramifications and consequences of the actions and omissions of the Defendants named in the complaint.  Mr. Krivak spent his entire adult life wrongly imprisoned and convicted for the rape and murder of a child – he was 18 years old when he was imprisoned and 45 at the time of his release.  Mr. Krivak now seeks accountability and redress for the misconduct that cost him his entire adult life, and a public record to help protect others from wrongful conviction.

## JURISDICTION AND VENUE

21.     Jurisdiction is conferred on this Court by 28 U.S.C §§ 1331 and 1343(a)(3) and (a)(4).

22.     Supplemental jurisdiction is conferred upon this Court by 28 U.S.C. § 1367(a) over any and all state law claims that are so related to the federal claims that they form part of the same case or controversy.

23.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2), as this is the judicial district in which the events giving rise to Plaintiff's claims took place.

## JURY DEMAND

24.     Mr. Krivak demands a trial by jury in this action and each and every one of his claims for which a jury trial is legally available.

## PARTIES

25.     Plaintiff **ANDREW KRIVAK, JR.** is a resident of the County of Dutchess, in the State of New York.  At all times relevant to this complaint, Mr. Krivak was a resident of Putnam or Dutchess County in the State of New York.  Mr. Krivak is innocent of the rape and murder of

Josette Wright.  Despite this, on July 1, 1996, he was arrested and charged with acting in concert with Anthony DiPippo to rape and murder her.  He was wrongly convicted by a jury of these crimes on April 16, 1997, spent more than twenty-six years wrongly incarcerated and otherwise detained for these crimes, and was finally freed when a second jury acquitted him on February 27, 2023.

26.     Defendant **COUNTY OF PUTNAM**, New York, is and was at all times relevant to this complaint, responsible for the policies, practices, and customs of the Putnam County Sheriff's Department (PCSD) and the Putnam County District Attorney's Office (PCDA).  PCSD along with New York State Police provide primary law enforcement services for the County of Putnam, except for the towns of Carmel and Kent and the villages of Brewster and Cold Spring, which have their own police departments. For the times relevant to this complaint, the PCSD has employed policies, practices, and customs that regularly violated civil rights. In 2000, as citizen complaints skyrocketed, Governor George E. Pataki called for a state investigation and the Legislature voted unanimously to authorize an independent state investigation of the PCSD due to the growing number of allegations that the department had abused its power and violated civil rights. That investigation led to the publication in 2002 of scathing report of PCSD's deficiencies, including the abuse of office by Defendant Thubborron and a pervasive lack of adequate record keeping relating to criminal investigations.  PCDA is the prosecuting agency for the County of Putnam.  For the times relevant to this complaint, the PCSD has employed policies, practices, and customs that regularly violated the civil rights of criminal defendants.

27.     Defendant former **SHERIFF ROBERT D. THOUBBORON** led PCSD for 16 years, from 1986 to 2001. Defendant Thoubboron was intimately acquainted with the policies, practices and customs at PCSD. He was its final policymaker from 1986 to 2001, including during the

Josette Wright investigation and Andrew Krivak's first trial in 1997. He is sued in his individual capacity.

28.     Defendant Thoubboron had significant input into whether to arrest Mr. Krivak and Mr. DiPippo; to assess the strength and weakness of the cases; to assess the credibility and reliability of witnesses, including police personnel and experts; to supervise police personnel and those working under him at the PCSD; to institute policy and procedures with respect to the treatment of witnesses and the taking of statements; to institute policy and procedures with respect to the handling of evidence; to assure that there was probable cause in arresting suspects and commencing and maintaining prosecutions; and to make sure that there was sufficient reliable and credible evidence to find a person guilty beyond a reasonable doubt.

29.     Defendant Thoubboron was defeated in the 2001 election, following allegations of his abuse of office which caused a state commission to investigate PCSD under his tenure.  The commission's report was published in 2002, and, as relevant here, found that Defendant Thoubboron abused his office by using it to punish enemies and improve his own standing with the citizens of Putnam County.  The report also documented PCSD's "serious deficiencies" in record keeping practices during Sheriff Thouborron's tenure, "particularly with respect to the documentation that was created and kept to open a case."

30.     Defendant **HAROLD TURNER** was a duly appointed and acting investigator of PCSD, acting under color of law pursuant to statutes, ordinances, regulations, policies, customs, and usage of Putnam County and the State of New York for the times relevant to this complaint.  He is being sued in his individual capacity.

31.     From 1986 to 2001, Defendant Turner was PCSD's Chief Criminal Investigator, with supervisory responsibility over many of PCSD's departments, including the Bureau of Criminal

Investigation (BCI), Identification Bureau, and the Narcotics Division.  As such, Defendant Turner was a policymaker and decision maker for the PCSD during the relevant period. Defendant Turner had direct oversight over and supervisory responsibility for the Josette Wright investigation.

32.     Defendant Turner had significant input into whether to arrest Mr. Krivak and Mr. DiPippo; to assess the strength and weakness of the cases; to assess the credibility and reliability of witnesses, including police personnel and experts; to supervise police personnel and those working under him at the PCSD; to institute policy and procedures with respect to the treatment of witnesses and the taking of statements; to institute policy and procedures with respect to the handling of evidence; to assure that there was probable cause in arresting suspects and commencing and maintaining prosecutions; and to make sure that there was sufficient reliable and credible evidence to find a person guilty beyond a reasonable doubt.

33.     Defendant Turner assigned Defendants Stephens, Castaldo, and Quick to the Wright investigation despite their utter lack of experience and training and Defendants Castaldo and Stephens's documented histories of misconduct.  Defendant Turner then provided little to no oversight over their work.  Defendant Turner also hid or directed subordinates to hide favorable and exculpatory evidence and conspired with others to deprive Mr. Krivak of his constitutional rights.

34.     Defendant **DANIEL STEPHENS** was a duly appointed and acting investigator of PCSD, acting under color of law pursuant to statutes, ordinances, regulations, policies, customs, and usage of Putnam County and the State of New York for the times relevant to this complaint. Defendant Stephens is sued in his individual capacity.

11

35.     Until 2000, Defendant Stephens was supervisor for PCSD's Bureau of Criminal Investigation and oversaw the investigation into the rape and murder of Josette Wright. Defendant Stephens supervised and directly participated in the investigation by, including but not limited to, interrogating suspected witnesses and administering coercive polygraph tests to Adam Wilson and Mr. Krivak.  In 1990, Defendant Stephens administered a coercive polygraph test to another innocent teen, Jeffrey Deskovic, which caused Mr. Deskovic to adopt a false confession to the rape and murder of a teenage classmate.  In 2006, after 16 years of wrongful incarceration, Mr. Deskovic was exonerated by DNA and, in October 2014, a jury found Defendant Stephens liable for violating Mr. Deskovic's civil rights and awarded him $42,650,000.

36.     As a Senior Investigator with the PCSD, Defendant Stephens had significant input whether to arrest and prosecute Mr. Krivak and Mr. DiPippo; to assess the strength and weakness of the cases; to assess the credibility and reliability of witnesses, including police personnel and experts; to supervise police personnel and those working under him at the PCSD; to institute policy and procedures with respect to the treatment of witnesses and the taking of statements; to institute policy and procedures with respect to the handling of evidence; to assure that there was probable cause in arresting suspects and commencing and maintaining prosecutions; and to make sure that there was sufficient reliable and credible evidence to find a person guilty beyond a reasonable doubt.

37.     Defendants Turner, Stephens, Castaldo, and Quick conspired together and with others to coerce Mr. Krivak to adopt a false, police-drafted "confession" and to cover up their misconduct, thereby falsely presenting the fabricated "confession" as truthful and originating with Mr. Krivak.  In so doing, Defendants Turner, Stephens, Castaldo, and Quick fabricated powerful

evidence of Mr. Krivak's guilt.  Defendant Turner, Stephens, Castaldo, and Quick also conspired to coerce other witnesses to adopt the same PCSD-generated false narrative of the crime and conspired to suppress these witnesses' exculpatory statements.  In this way, Defendants Turner, Stephens, Castaldo, and Quick manufactured evidence and statements that created the appearance of probable cause to arrest Mr. Krivak when, in fact, there was none.

38.     Defendant **PATRICK CASTALDO**, at all times relevant to this complaint, was an officer with PCSD acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of Putnam County and the State of New York.  He is sued in his individual capacity.

39.     Defendant Castaldo was the lead investigator on the Josette Wright missing person case and one of the lead investigators on the Josette Wright homicide case.  As one of the lead investigators on the Josette Wright case, it was Defendant Castaldo's practice to coerce statements from supposed witnesses and suspects, threaten and manipulate supposed witnesses and suspects, use physical violence against witnesses and suspects, fabricate inculpatory evidence, and conceal exculpatory information to secure a conviction.

40.     At the time Ms. Wright went missing, Castaldo was a rogue officer with numerous disciplinary infractions arising from a documented history of misconduct, sloppy police work, abuse of civilians and suspects, mishandling of evidence, and inadequate investigations during his tenure at PCSD.  As such, his misconduct in this case was not just entirely foreseeable, it was to be expected.

41.     Defendant Castaldo and others, including Defendants Turner, Stephens, Quick, and Rees, conspired to frame Mr. Krivak by, *inter alia*:  fabricating statements and evidence implicating Mr. Krivak and Mr. DiPippo in Josette Wright's rape and murder; coercing vulnerable teenagers,

13

including Mr. Krivak himself, to adopt fabricated statements written by the police; planting

inculpatory evidence and conspiring with others, including Defendants Turner, Stephens, Quick,

and Rees, to lie about the source of that evidence; and making repeated, sworn false statements

and repeatedly offering sworn false testimony during the investigation and prosecution of Mr.

Krivak.  To coerce Mr. Krivak and others to adopt the false narrative of the crime, Defendant

Castaldo and others used psychological pressure, physical violence, threats of physical violence,

threats of imprisonment, and lies. Defendant Castaldo and others, including Defendants Turner,

Stephens, Quick and Rees, fabricated and planted inculpatory evidence, suppressed exculpatory

evidence, and provided witnesses – including but not limited to Defendant Rose – with

undisclosed improper benefits in exchange for their cooperation with the scheme to obtain the

wrongful conviction of Mr. Krivak.

42.     Defendant Castaldo retired from PCSD in 2014 during an internal investigation by PCSD

into Defendant Castaldo's failure to disclose his use of force on a person in his custody and

offering sworn false misrepresentations relating to that incident. Soon after Defendant Castaldo's

retirement, in February 2015, Defendant Castaldo was indicted on a felony charge in relation to

that incident. In February 2017, Defendant Castaldo pleaded guilty to harassment in the second

degree to resolve the criminal case against him.

43.     Defendant **WILLIAM QUICK** was, at all times relevant to this complaint, an officer

with PCSD acting under color of law pursuant to statutes, ordinances, regulations, policies,

customs, and usage of Putnam County and the State of New York. He is sued in his individual

capacity.

44.     Along with Defendant Castaldo, he was a co-lead officer in the Josette Wright

investigation, and it was his practice to coerce confessions from supposed witnesses, threaten

and manipulate supposed witnesses, fabricate inculpatory evidence, and conceal exculpatory information to secure a conviction.

45.     At the time of Mr. Krivak's arrest, Defendant Quick had an aversion to handling sex crimes cases involving minors and had specifically refused to be trained in the handling of those cases.  Prior to Ms. Wright's murder, Defendant Quick failed to follow up on the sex crime complaints of another minor against Howard Gombert – a minor who was a close friend of Ms. Wright's 's and through whom Ms. Wright met Gombert – and ignored the evidence pointing to Gombert as the sole perpetrator of the crimes against Ms. Wright.

46.     Defendant Quick and others, including Defendants Turner, Stephens, Castaldo, and Rees, conspired to frame Mr. Krivak by, *inter alia*:  fabricating statements and evidence implicating Mr. Krivak and Mr. DiPippo in Josette Wright's rape and murder; coercing vulnerable teenagers, including Mr. Krivak himself, to adopt fabricated statements; planting inculpatory evidence and conspiring with others, including Defendants Turner, Stephens, Castaldo, and Rees, to lie about the source of that evidence; and making repeated, sworn false statements and repeatedly offering sworn false testimony during the investigation and trials of Mr. Krivak.  To coerce Mr. Krivak and others to adopt the false narrative of the crime, Defendant Quick and others used psychological pressure, physical violence, threats of physical violence, threats of imprisonment, and lies.  Defendant Quick and others, including Defendants Turner, Stephens, and Castaldo fabricated and planted inculpatory evidence, suppressed exculpatory evidence, and provided witnesses – including but not limited to Defendant Rose – with undisclosed improper benefits in exchange for their cooperation with Quick's scheme to obtain the wrongful conviction of Mr. Krivak.

15

47.     Defendant **JOHN DANIEL REES** was a duly appointed and acting investigator of PCSD, acting under color of law pursuant to statutes, ordinances, regulations, policies, customs, and usage of Putnam County and the State of New York for the times relevant to this complaint. Rees, a senior member of PCSD's identification unit was principally responsible for the collection, examination, and maintenance of physical evidence in the Josette Wright investigation.  Defendant Rees conspired with others, including Defendants Turner, Stephens, Castaldo, and Quick, to plant purportedly inculpatory evidence in Mr. Krivak's van during an illegal search of the van.  Defendant Rees then fabricated documents and repeatedly testified falsely about the illegal search, the state of Mr. Krivak's van, and the source of the planted evidence.  The purpose of this misconduct was to falsely implicate Mr. Krivak in the rape and murder of Ms. Wright.  He is sued in his individual capacity.

48.     Defendant **WILLIAM ASHER** was a duly appointed and acting investigator of PCSD, acting under color of law pursuant to statutes, ordinances, regulations, policies, customs, and usage of Putnam County and the State of New York for the times relevant to this complaint. Defendant Asher, a member of PCSD's narcotics unit, conspired with others to fabricate documents and evidence and repeatedly testified falsely in order to falsely implicate Mr. Krivak in the rape and murder of Ms. Wright.  He is sued in his individual capacity.

49.     Since 2016, **ROBERT TENDY** has been the duly elected District Attorney of Putnam County, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances regulations, policies, customs, and usage of Putnam County and the State of New York. As such he is the ultimate policymaker and decision maker for the Putnam County District Attorney's Office.  He is being sued in his individual capacity.

50.     Defendant Tendy's role in the wrongful and malicious prosecution of Mr. Krivak is pervasive.  From the time he took office, he was responsible for the reinvestigation and reprosecution of Mr. Krivak's case.

51.     Defendant Tendy's predecessor, District Attorney Adam Levy, had commenced a reinvestigation of Mr. Krivak's case with the assistance of the Conviction Review Bureau (CRB) or the Office of the New York Attorney General (OAG).  DA Levy commenced this reinvestigation in light of new information undermining the trustworthiness of Defendant Castaldo, one of the lead case investigators.

52.     When Defendant Tendy took office in 2016, the reinvestigation was ongoing and Defendant Tendy was advised that the reinvestigation team believed that Mr. Krivak and Mr. DiPippo were likely innocent.  The reinvestigation team recommended specific, detailed, further investigatory steps, including additional witness interviews.  Rather than conduct a constitutionally adequate investigation, Defendant Tendy summarily terminated the reinvestigation.

53.     Defendant Tendy, acting on his own behalf or through subordinates, then took steps to maintain Mr. Krivak's wrongful conviction and, when Mr. Krivak's conviction was vacated and PCDA's appeals unsuccessful, Defendant Tendy sought to re-prosecute and reconvict Mr. Krivak. Defendant Tendy did this by violating Mr. Krivak's constitutional rights, including *inter alia* to due process and a fair trial, all while knowing that Mr. Krivak's arrest was without probable cause because he was in fact innocent and further knowing that the original investigation and prosecution had been marred by official misconduct, including but not limited to fabrication of evidence; suppression of favorable evidence; coercion of Mr. Krivak and witnesses; subornation of perjury; and witness intimidation and tampering.  Defendant Tendy

continued this illegal course of action even as evidence of Mr. Krivak's innocence, Howard Gombert's guilt, and additional instances of official misconduct continued to accrue.

54.     As the lead prosecutor of Mr. Krivak's 2023 retrial, Defendant Tendy – through acts and omissions of his own or his subordinates – repeatedly failed to meet his obligations not to elicit or manufacture false or unreliable "evidence," to make timely disclosure of exculpatory evidence to the defense, to refrain from offering false or misleading evidence, testimony and argument during pretrial, trial, and post-conviction proceedings, and to correct such false or misleading evidence, testimony, and argument when he became aware of it.  Defendant Tendy also failed to intervene as other members of PCDA, including but not limited to Defendants Glasser, Krauss, and Cilento, engaged in similar misconduct and PCDA's witnesses committed perjury.

55.     As the District Attorney of Putnam County, Defendant Tendy had the ultimate discretion whether to prosecute Mr. Krivak and Mr. DiPippo; to assess the strength and weakness of the cases; to assess the credibility and reliability of witnesses, including police personnel and experts; to supervise police personnel and those working under him at the District Attorney's Office; to institute policy and procedures with respect to the treatment of witnesses; to institute policy and procedures with respect to the handling of evidence; to institute policy and procedures with respect to the discovery process in matters his office was handling; to assure that there was probable cause in commencing and maintaining prosecutions; and to make sure that there was sufficient reliable and credible evidence to find a person guilty beyond a reasonable doubt.

56.     Despite the foregoing responsibility, Defendant Tendy engaged in the intentional, reckless, and malicious behavior set forth in the following paragraphs, the direct effect of which was Mr. Krivak's malicious prosecution and the violation of his constitutional rights.

57.     From 1992 until 2007, Defendant **KEVIN L. WRIGHT** was the duly elected District Attorney of Putnam County, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances regulations, policies, customs, and usage of Putnam County and the State of New York. As such he was the ultimate policymaker and decision maker for the Putnam County District Attorney's Office.  He is being sued in his individual capacity.

58.     Defendant Wright's involvement in the investigation into the Josette Wright murder and wrongful and malicious prosecution of Mr. Krivak in 1996-1997 was pervasive.  Defendant Wright knew or should have known that the investigation and prosecution of Mr. Krivak had been marred by official misconduct, including but not limited to fabrication of evidence; suppression of favorable evidence; coercion of Mr. Krivak and witnesses; subornation of perjury; and witness intimidation and tampering.

59.     As the lead prosecutor in charge of the Josette Wright investigation and Mr. Krivak's prosecution, Defendant Wright – through acts and omissions of his own or his subordinates – repeatedly failed to meet his obligations not to elicit or manufacture false or unreliable "evidence," to make timely disclosure of exculpatory evidence to the defense, to refrain from offering false or misleading evidence, testimony and argument during pretrial, trial, and post-conviction proceedings, and to correct such false or misleading evidence, testimony, and argument when he became aware of it.  Defendant Wright also failed to intervene as members of PCDA and PCSD engaged in similar misconduct and PCDA's witnesses committed perjury.

60.     Defendant Wright suppressed numerous pieces of exculpatory evidence, including evidence of police misconduct and evidence pointing to Gombert as the actual, lone perpetrator.

For example, Defendant Wright suppressed four important pieces of favorable and/or exculpatory information from Mr. Krivak:

      a.   A November 1995 PCSD memorandum documenting Susan Wright's accusation that Howard Gombert killed her daughter.

      b.   A December 1995 PCSD memorandum documenting Susan Wright's statement that rings purportedly found in Mr. Krivak's van definitively did not belong to Josette Wright and were too large for Josette.

      c.   A surreptitiously made recording in which Adam Wilson, a friend of Mr. Krivak's who had been coerced to adopt PCSD's false narrative but then recanted, explains to a friend (who was a confidential informant for PCSD) how Defendants Stephens, Castaldo, and Quick fed him details of the crime and forced him to sign a fabricated statement blaming Mr. Krivak.

      d.   Official PCSD documents that reflect false statements by Defendants Stephens and Castaldo to another law enforcement agency that there was no connection between the disappearance of Josette Wright and another missing girl, when in fact there were connections between the two.

61.     As the District Attorney of Putnam County, Defendant Wright had the ultimate discretion whether to prosecute Mr. Krivak and Mr. DiPippo; to assess the strength and weakness of the cases; to assess the credibility and reliability of witnesses, including police personnel and experts; to supervise police personnel and those working under him at the District Attorney's Office; to institute policy and procedures with respect to the treatment of witnesses; to institute policy and procedures with respect to the handling of evidence; to institute policy and procedures with respect to the discovery process in matters his office was handling; to assure that there was

probable cause in commencing and maintaining prosecutions; and to make sure that there was

sufficient reliable and credible evidence to find a person guilty beyond a reasonable doubt.

62.    Despite the foregoing responsibility, Defendant Wright engaged in the intentional,

reckless, and malicious behavior set forth in the following paragraphs, the direct effect of which

was Mr. Krivak's malicious prosecution, the violation of his constitutional rights, and ultimate

wrongful conviction, imprisonment, and detention for more than 26 years.

63.    From 2016 until his demotion and subsequent departure in 2023, **LARRY GLASSER**

was an Assistant District Attorney of Putnam County, acting under color of law and in his

individual capacity within the scope of employment pursuant to the statutes, ordinances

regulations, policies, customs, and usage of Putnam County and the State of New York. He is

being sued in his individual capacity.

64.    From 2020 through the conclusion of Mr. Krivak's retrial in 2023, Glasser was PCDA's

First Assistant District Attorney.  As such he was a policymaker and decision maker for the

Putnam County District Attorney's Office when he was First Assistant District Attorney.

65.    Defendant Glasser's role in the wrongful and malicious prosecution of Mr. Krivak is

pervasive.  From the time he joined PCDA, he was responsible for the investigation and

prosecution of Mr. Krivak's case.  Defendant Glasser took steps – including by making

fraudulent representations to courts adjudicating the case – designed to maintain Mr. Krivak's

wrongful conviction.  When Mr. Krivak's conviction was ultimately vacated and PCDA's

appeals unsuccessful, Glasser sought to reprosecute and reconvict Mr. Krivak by violating Mr.

Krivak's constitutional rights, including *inter alia*, to due process and a fair trial.  Defendant

Glasser did this intentionally and maliciously because he knew Mr. Krivak's arrest was without

probable cause because he was in fact innocent and the investigation and prosecution of Mr.

Krivak had been marred by official misconduct, including but not limited to the fabrication of evidence; the suppression of favorable evidence; coercion of Mr. Krivak and witnesses; subornation of perjury; and witness intimidation and tampering.  Defendant Glasser continued this illegal course of conduct even as additional information of Mr. Krivak's innocence, Howard Gombert's guilt, and official misconduct continued to accrue.

66.     As the prosecutor assisting Defendant Tendy during Mr. Krivak's 2023 retrial, Defendant Glasser repeatedly failed to meet his obligations not to elicit or manufacture false or unreliable "evidence," to make timely disclosure of exculpatory evidence to the defense, to refrain from offering false or misleading evidence, testimony and argument during pretrial, trial, and post-conviction proceedings, and to correct such false or misleading evidence, testimony, and argument when he became aware of it. Defendant Tendy also failed to intervene as other members of PCDA, including but not limited to Defendants Glasser, Krauss, and Cilento, engaged in similar misconduct and PCDA's witnesses committed perjury.

67.     As First District Attorney of Putnam County, Defendant Glasser had significant discretion whether to prosecute Mr. Krivak; to assess the strength and weakness of the case; to assess the credibility and reliability of witnesses, including police personnel and experts; to supervise police personnel and those working under him at the District Attorney's Office; to institute policy and procedures with respect to the treatment of witnesses; to institute policy and procedures with respect to the handling of evidence; to institute policy and procedures with respect to the discovery process in matters his office was handling; to assure that there was probable cause in commencing and maintaining prosecutions; and to make sure that there was sufficient reliable and credible evidence to find a person guilty beyond a reasonable doubt.

68.     Despite the foregoing responsibility, Glasser engaged in the intentional, reckless, and malicious behavior set forth in the following paragraphs.

69.     Beginning in 2008, **CHANA KRAUSS** was an Assistant District Attorney of Putnam County. Since 2020, Defendant Krauss has been the Chief District Attorney in the Putnam County District Attorney's Office. As such she was a policymaker and decision maker for the Putnam County District Attorney's Office during the relevant period.  At all times relevant to this action, Defendant Krauss was acting under color of law and in individual capacity within the scope of employment pursuant to the statutes, ordinances regulations, policies, customs, and usage of Putnam County and the State of New York. She is being sued in her individual capacity.

70.     In or about 2014, Defendant Tendy's predecessor Adam Levy promoted Defendant Krauss to First Assistant District Attorney.  In that role, Defendant Krauss participated in the joint PCDA-OAG reinvestigation and was fully aware of the findings thereof.  Once Defendant Tendy took office, Defendant Krauss refused to cooperate with the reinvestigation, despite knowing that the reinvestigation had uncovered significant evidence demonstrating  Mr. Krivak and Mr. DiPippo's innocence as well as official misconduct, including by Defendants Wright, Stephens, Castaldo, and Quick.  Together with other members of PCDA, including Tendy, Krauss conducted a constitutionally inadequate investigation of Mr. Krivak's case when she refused to continue the reinvestigation once Tendy took office.

71.     From 2016 on, Defendant Krauss was regularly updated and informed as to the progress of the reinvestigation, prosecution, and retrial of Mr. Krivak's case.

72.     Although Defendant Krauss was aware that others in PCDA, including Defendants Tendy, Glasser, and Cilento, repeatedly failed to meet their obligations not to elicit or manufacture false or unreliable "evidence," to make timely disclosure of exculpatory evidence to

the defense, to refrain from offering false or misleading evidence, testimony and argument during pretrial, trial, and post-conviction proceedings, and to correct such false or misleading evidence, testimony, and argument when they became aware of it, Defendant Krauss failed to intervene.

73.    As Chief Assistant District Attorney of Putnam County, Defendant Krauss had significant input whether to prosecute Mr. Krivak and Mr. DiPippo; to assess the strength and weakness of the cases; to assess the credibility and reliability of witnesses, including police personnel and experts; to supervise police personnel and those working under her at the District Attorney's Office; to institute policy and procedures with respect to the treatment of witnesses; to institute policy and procedures with respect to the handling of evidence; to institute policy and procedures with respect to the discovery process in matters his office was handling; to assure that there was probable cause in commencing and maintaining prosecutions; and to make sure that there was sufficient reliable and credible evidence to find a person guilty beyond a reasonable doubt.

74.    Despite the foregoing responsibility, Krauss engaged in the intentional, reckless, and malicious behavior set forth in the following paragraphs.

75.    At the time of the first DiPippo retrial in 2012, **CHRISTOPHER YORK** was PCDA's Chief Assistant District Attorney. Defendant York was the trial prosecutor on Mr. DiPippo's 2012 retrial. Defendant York is currently an attorney in private practice in Putnam County, New York.  Defendant York conspired with members of PCDA including Defendants Tendy and/or Glasser, by meeting with and attempting to improperly influence the judge presiding over Mr. Krivak's retrial by exploiting their past professional relationship in order to make a wrongful conviction of Mr. Krivak more likely.  As a member of the Bar, and as a former PCDA Chief Assistant District Attorney, Defendant York knew that it was improper to have a discussion of

this nature with the presiding judge of Mr. Krivak's retrial.  In fact, because it was improper, the presiding judge formally advised the parties of Defendant York's contact.

76.     Beginning in at least 2022 and during the reinvestigation, prosecution and retrial of Mr. Krivak, **RALPH CILENTO** was an investigator employed by PCDA.  As a PCDA Investigator, Defendant Cilento was acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of Putnam County and the State of New York. He is being sued in his individual capacity.

77.     Defendant Cilento directly engaged in the withholding of exculpatory evidence from Mr. Krivak and the intimidation of witnesses, thereby violating Mr. Krivak's rights.  As just one example, while acting in his investigatory capacity together with Defendant Tendy, Defendant Cilento conspired to defraud Mr. Krivak and the court, by attempting to intimidate and change the truthful testimony of defense witness Adam Wilson by threatening to negatively impact the then-incarcerated Mr. Wilson's chances for parole.  Thereafter, Defendant Cilento hid and directed others, including but not limited to Defendant Glasser, to hide evidence of this meeting, including favorable, exculpatory evidence, thereby violating Mr. Krivak's constitutional rights.

78.     Defendant **DENISE ROSE** is a resident of the State of Florida.  Defendant Rose conspired with others, including but not limited to Defendants Turner, Stephens, Castaldo, Quick, Wright, and Glasser, to fabricate evidence, repeatedly provide sworn false testimony, and suppress favorable and exculpatory evidence in order to ensure the false arrest, malicious prosecution, and wrongful conviction and incarceration of Mr. Krivak.

79.     To make her fabricated evidence and false testimony appear truthful, Defendant Rose adopted details fed to her by Defendants Castaldo and Quick of the purported crime and agreed to provide false testimony to match the narrative they created, even though she witnessed no

crime.  At the direction of Defendants Castaldo and Quick, Defendant Rose also fed false information to William MacGregor and prosecution witnesses Gary Kempter and Lisa Murphy, to have them provide false testimony in Mr. Krivak's trials, in a further effort to ensure Mr. Krivak's wrongful conviction.  At Mr. Krivak and Mr. DiPippo's retrials, Defendant Rose continued her lies testifying again as an "eyewitness," that Mr. Krivak and Mr. DiPippo raped and murdered Josette Wright.  Defendant Rose's testimony was patently false.

## FACTS

***Twelve-Year-Old Josette Wright Goes Missing and PCSD Does Not Investigate***

80.      In October 1994, Josette Wright was a 12-year-old resident of Carmel, New York.  She attended the local public school – George Fisher Middle School – and was the youngest of three sisters.  Ms. Wright and her sisters lived with their mother and sole caregiver, Susan Wright.

81.      On October 3, 1994, Ms. Wright was upset that her mother had not come home as they had agreed; the two argued on the phone and Ms. Wright told her mother that she was going to a friend's house in Putnam Lake.  Ms. Wright had previously told others that she intended to run away from home.  Ms. Wright did not return home that night.

82.      Ms. Wright did not show up to school on October 4, 1994.  Her mother reported her missing on that date to a PCSD officer assigned to the school where Susan Wright worked. While this report was reduced to a formal writing and filed with PCSD, it has never been disclosed.

83.      A missing person's investigation was opened by the PCSD and Castaldo was assigned by Defendant Thoubboron, Turner, and/or Stephens to the case.

84.      Other than speaking to Susan Wright on October 5, 1994, creating and distributing missing persons flyers, sending an electronic report to the Center for Missing and Exploited

Children, and providing Josette Wright's dental records to the State, neither Defendant Castaldo nor any other member of PCSD did anything of substance to investigate her disappearance.

85.    Defendant Castaldo and PCSD's total failure to investigate Ms. Wright's disappearance included the failure to follow up on two credible reports from highly reliable sources that Ms. Wright was alive after October 4, 1994.

86.    On October 11, 1994, Allyson Clokey, a friend and summer school classmate of Josette, reported seeing and speaking to Ms. Wright at the Danbury Mall on October 7, 1994.  On October 11, 1994, Lorraine McLaughlin, who had been Ms. Wright's sixth grade English teacher during the prior school year, reported seeing and speaking to Josette at the Poughkeepsie Galleria on October 8, 1994.  It took Defendant Castaldo three weeks to take Ms. McLaughlin's statement, despite Ms. McLaughlin promptly reporting her sighting to PCSD as soon as she returned to school and learned of Ms. Wright's disappearance on October 11, 1994.

87.    Despite this highly credible information that Josette was alive and in the area of Carmel, New York after October 3, 1994, Defendant Castaldo did nothing to follow up on either sighting.

88.    In fact, there is no evidence that Defendant Castaldo or anyone else at PCSD did anything during the missing person phase of the case (October 3, 1994 to November 22, 1995) other than that described in ¶ 84 *supra.*

***Josette Wright's Remains Are Found More Than A Year After She Is Reported Missing***

89.    On November 22, 1995, a hunter found a human skull in the woods off of Fields Lane, in Patterson, New York.  The hunter took the skull home and then reported it to PCSD.  The hunter then took PCSD investigators to the approximate location where he found the skull.

90.    PCSD investigators including Defendants Turner, Rees, Stephens, and Castaldo went to the general location where the hunter found the skull.  A child's skeletal remains were discovered in the area where the skull had been found.  It was later determined that the skull and

the skeletal remains were those of Josette Wright.  PCSD employees searched the area but did not conduct a formal grid search, take any steps to protect the integrity of the crime scene or accurately document persons or activities at the crime scene.

91.     Other items found with Ms. Wright's remains included a coat with a photograph in the pocket; white ASICS sneakers which were still tied but were located at a distance from her remains with no biological material inside of them; a necklace with a hologram eye pendant; a pink Bic lighter; and some change.  Initial review of the remains revealed that Ms. Wright had been tied with a rope and gagged with underwear.  The underwear found in Ms. Wright's mouth was size seven.

92.     Defendant Rees, the lead forensic investigator for PCSD, relayed to Defendant Castaldo that it appeared Ms. Wright's hands had been tied in front of her body.  Defendant Castaldo made a written note of this purported fact at the crime scene.  Later, the prosecution's forensic anthropologist determined that Ms. Wright's hands had, in fact, been tied behind her back, with a rope that then went around her neck, down her back and connected to her ankles in a "hog-tied position."

93.     PCSD never called in the FBI or New York State Police to assist in the investigation of Josette Wright's murder.

94.     In the days following the discovery of Ms. Wright's remains, officers from the Carmel Police Department (CPD) investigating the disappearance of another missing teen, Robin Murphy, decided to conduct their own search of Fields Lane.  They sought the assistance of other, more sophisticated law enforcement agencies including the FBI and the New York State Police.  CPD also invited PCSD to participate in the search.

95.     On November 26, 1996, CPD together with the FBI, NYSP, and other agencies

conducted a second search of the woods off of Fields Lane where Ms. Wright's remains had

been found.  Defendant Rees participated in the search on behalf of PCSD.  That search resulted

in the discovery of faded size 7 jeans and an 8-inch knife and sheath within the vicinity of

where Ms. Wright's remains had been found.  Defendant Rees vouchered these items as part of

the Josette Wright case.

***Pressure Builds to Solve the Josette Wright Murder***

96.     Ms. Wright's murder shocked the safe community of Putnam County, which prided itself

on having among the lowest crime rates in the nation. The murder attracted significant public

attention in the following weeks and months.

97.     Then-Sheriff Defendant Thoubboron wanted to reassure the public by solving the case

before his next election. Thoubboron placed Defendant Turner, PCSD's Chief Criminal

Inspector and Defendant Stephens, then-Supervisor of the Bureau of Crime Investigations, in

charge of staffing the investigation and solving the crime. Defendant Thoubboron knew that

Defendant Turner and Stephens would secure a quick conviction to quell anxiety and reassure

the public, even if they and others at PCSD had to use coercive and unlawful tactics to do so.

98.     Defendant Stephens had a reputation in Putnam County for being able to obtain a

confession from anyone. He had conducted hundreds of interrogations and knew the physical,

psychological, and emotional pressure points that would cause suspects to confess—regardless

of guilt.

99.     Defendants Thoubboron, Turner, and Stephens turned to investigators Defendants

Castaldo and Quick to do the groundwork on the case. Defendant Castaldo and Quick were

more than willing to adopt Defendant Stephens's approach to investigation—to obtain a

conviction without regard to the truth or the constitutional rights of the suspect.

29

100.    Defendants Thoubboron, Turner, and/or Stephens assigned Defendant Castaldo to be the lead investigator in this case despite his never before having handled a murder investigation and his documented history at PCSD of sloppy police work; mishandling of evidence; abuse of civilians; and failure to follow proper departmental protocol.

101.    Defendants Thouborron, Turner, and/or Stephens assigned Defendant Quick to assist Defendant Castaldo as the co-lead investigator.  Defendant Quick had also never handled a murder case before and had not ever wanted to work a child sex crime. In fact, Defendant Quick had turned down an opportunity to receive specialized training in child sex crimes because of his aversion to such cases.

102.    Upon information and belief, Defendant Turner and/or Stephens updated Defendant Thoubboron about all major investigatory developments. Thoubboron and Turner were either aware of the misconduct committed by Defendants Stephens, Castaldo, and Quick, or were willfully blind to it.

103.    Defendant Wright and PCDA were involved in the Josette Wright investigation prior to Mr. Krivak's arrest.  Defendants Thubboron, Turner, Stephens, Castaldo, and/or Quick updated Defendant Wright about all major investigatory developments.  Defendant Wright was either aware of the misconduct committed by Defendants Turner, Stephens, Castaldo, Quick, Rees, and Asher or he was willfully blind to it.  Defendant Wright ultimately directed Defendants Stephens, Castaldo, and Quick to arrest Mr. Krivak despite the fact that he knew or should have known that all the evidence that appeared to inculpate Mr. Krivak was false and fabricated, planted, and/or coerced.

***PCSD Ignores Serial Pedophile Howard Gombert As A Suspect And Instead Focuses On Andrew Krivak and Anthony DiPippo, Two Innocent Teens***

**Howard Gombert Was Known to PCSD as a Serial Sexual Abuser of Girls and Women in Putnam County Before Josette Wright Went Missing**

104.    At the time of Ms. Wright's disappearance, Howard Gombert was known to the PCSD as a serial abuser of young girls and women in Putnam County, NY and specifically in the town of Carmel, New York.  He was nevertheless ignored as a suspect throughout the Josette Wright investigation.

105.    For example, prior to Ms. Wright's disappearance, PCSD was involved in the investigation of Howard Gombert for raping the minor daughter of Gombert's then-girlfriend Christine Winnie, EW.  Ms. Wright was close to Christine Winnie and EW.  Ms. Wright spent time at the Winnie house, where she met Howard Gombert.

106.    PCSD was also aware that as of April 1995, Gombert was the lead suspect in the disappearance of another girl from Carmel, Robin Murphy.  The Robin Murphy case was being investigated by the Carmel Police Department (CPD).

**Stephens, Castaldo, and Other Members of PCSD Obstruct CPD's Robin Wright Investigation, Where the Lead Suspect was Howard Gombert**

107.    On April 9, 1995 – just six months after Ms. Wright disappeared – teen Robin Murphy disappeared from the Carmel, New York parking lot in the shopping center where Gombert worked.  Gombert was friends with Robin Murphy; was the last person to see her alive; and attempted suicide shortly after her disappearance. Ms. Murphy has never been found and Gombert remains the lead suspect in Ms. Murphy's disappearance. While the Robin Murphy case was and continues to be investigated by the CPD, PCSD was aware of Ms. Murphy's disappearance and the fact that Gombert was a suspect.  PCSD even provided some assistance to CPD in the Robin Murphy investigation by interviewing at least one witness to Ms. Murphy's disappearance.  This witness had seen Ms. Murphy in the parking lot of the shopping center where Gombert worked, a fact known at that time to PCSD.

108.    In or about June 1995, PCSD received a tip that Robin Murphy's body could be found in the area of Field's Lane.  PCSD did not share this tip with CPD.  Rather, PCSD alone searched the area but did not find Ms. Murphy's remains – or Ms. Wright's.  CPD only learned about the tip and the June 1995 search of Fields Lane from a later newspaper report.

109.    Then, on November 27, 1995, in the course of CPD's investigation of the Robin Murphy disappearance, CPD made a formal inquiry to PCSD asking whether there was any known connection between the Josette Wright and Robin Murphy cases.  PCSD, through Defendant Stephens and others, falsely responded that there was no known connection between the Josette Wright and Robin Murphy cases. Defendant Stephens made this false representation despite knowing, (i) that an earlier tip had indicated that Ms. Murphy could be found in the same location where Ms. Wright had been found just days earlier; (ii) PCSD had interviewed an eyewitness who last saw Ms. Murphy in the parking lot where Gombert worked; and iii) PCSD had interviewed Gombert's ex-girlfriend, Stephanie Hoopes, who provided information connecting Gombert to both Ms. Wright and Ms. Murphy along with information about Gombert's sexual predation.

110.    This information, despite being exculpatory, was not disclosed to Mr. Krivak prior to his first trial.  Instead, it was disclosed a decade later to Mr. DiPippo by former District Attorney Adam Levy.

111.    DA Levy disclosed this information because he recognized its exculpatory nature and because he could find no evidence that it had previously been disclosed.

**PCSD Do Not Pursue Gombert As A Suspect, Despite Abundant Information Pointing to Him as the Likely Perpetrator**

112.    Based on prior, unrelated investigations, PCSD knew that Howard Gombert had a unique modus operandi that was present in the Josette Wright case.  This m.o. included targeting young

girls for sexual abuse; taking them to wooded areas; raping them; tying their hands behind their backs; and gagging them with clothing, including their own undergarments. PCSD also knew that Gombert had threatened to kill his victims and that he regularly carried a hunting knife. Finally, PCSD knew that Gombert frequented Fields Lane, using it as a shortcut to get to his father's house.

113.   Even when Ms. Wright's mother told PCSD, on the very day she was informed that her daughter's remains had been found, that Howard Gombert committed the crime, PCSD did not seriously investigate him.

114.   On November 26, 1996, PCSD called Stephanie Hoopes née Conway to the PCSD. When asked if she knew why she had been called down to PCSD, Ms. Hoopes said she believed it was in relation to the Josette Wright case.  Ms. Hoopes was interviewed for several hours by PCSD investigators about her ex-boyfriend Howard Gombert, Josette Wright, and Robin Murphy, who Ms. Hoopes also knew.  This interview is the only police interview to have been recorded during the entire Josette Wright case investigation.

115.   Ms. Hoopes reported that Gombert knew Ms. Wright, that Ms. Hoopes and Gombert had socialized with Ms. Wright at the Winnie home and that Ms. Wright was good friends with Christine Winnie's daughter EW.  As described *supra*, PCSD already knew that EW had been raped repeatedly by Gombert from the time she was a child.  Ms. Hoopes further reported that she and Gombert had seen Ms. Wright the summer before she disappeared and that Gombert had spoken to Ms. Wright about babysitting at that time, an offer to which she was receptive.  Ms. Conway also reported to PCSD that Gombert frequently used Fields Lane as a shortcut between Carmel, New York and his father's home in Connecticut.

116.    Ms. Hoopes informed PCSD that soon after Ms. Wright disappeared, Gombert told her that the last time he had contact with Ms. Wright , he had seen her walking alone on Route 52 near the courthouse and gave her a ride in Ms. Hoopes' red Pontiac Sunbird – a car that bore Connecticut license plates.  Ms. Hoopes was so concerned by Gombert's admission that she told no one about it at the time, fearing that Mr. Gombert would become a suspect in Ms. Wright's disappearance.  PCSD knew at the time Ms. Hoopes was interviewed that a witness had reported seeing Ms. Wright get into a red car with Connecticut license plates and that, when shown a photo array including Howard Gombert, this witness had identified Gombert as looking most like the person she saw driving the car.

117.    Ms. Hoopes reported that during their relationship, Gombert repeatedly and violently raped and sexually abused Ms. Hoopes and that she had previously reported him to the police and obtained an order of protection against him.

118.    Nevertheless, PCSD did little to follow up on Ms. Hoopes' information.  While they did locate Ms. Hoopes' red car in a Connecticut salvage yard and search and retain some of its contents, they never tested any of the material they removed from the car for biological evidence.  Rather, they threw away the material they recovered without ever having tested it.  PCSD never interviewed Howard Gombert, never sought any information regarding his whereabouts at the time Ms. Wright went missing, never sought search warrants for his home, and never took any other expected police investigatory action relating to Gombert.

***PCSD Instead Focus on Two Innocent Teens, Andy Krivak and Anthony DiPippo***

**An Unrelated Traffic Stop Causes PCSD to Focus on Mr. Krivak and Mr. DiPippo**

119.    Instead of investigating Gombert's involvement in Ms. Wright's disappearance and murder, PCSD decided to follow a different path.  On November 25, 1995, PCSD officers conducted a traffic stop of a car driven by Mr. Krivak, in which Mr. DiPippo and their friend,

34

Dominick Neglia, were passengers.  PCSD discovered drugs on each of these individuals.  This was the first arrest for Mr. Neglia, a special education student who was only 17 years old. The arresting officers pulled Mr. Neglia aside during the traffic stop and asked if he had any information to give them to help him get out of what they said was a felony drug case he was facing.  In an effort to help himself, Mr. Neglia told PCSD officers that Mr. DiPippo and Mr. Krivak had been talking about the newspaper account of Ms. Wright's remains being found days earlier.

120.    This innocuous piece of information from a teenager desperate to minimize his own criminal exposure led PCSD to focus exclusively on Mr. Krivak and Anthony DiPippo as the perpetrators of this crime, despite there being no evidence connecting them to Ms. Wright's disappearance.  For decades, PCDA has asserted that Mr. Krivak and Mr. DiPippo did not become suspects until months later and that the traffic stop did not cause PCSD to focus on Mr. Krivak and Mr. DiPippo.

121.    However, on February 22, 2023, the night before PCDA was scheduled to present its rebuttal case, Defendant Tendy revealed for the very first time that Michael TenEyck, one of the PCSD officers who conducted the November 25, 1995, traffic stop, accused Mr. DiPippo and Mr. Krivak of killing Josette Wright based on Mr. Neglia's statements at the traffic stop. Moreover, Defendant Tendy revealed, Officer TenEyck told his superior officers, including Defendant Quick, that Mr. DiPippo and Mr. Krivak were Ms. Wright's killers.

122.    From that moment on, Defendants Thoubboron, Turner, Stephens, Castaldo, Quick, Rees, and Asher's tunnel vision focused only on Mr. DiPippo and Mr. Krivak, despite no evidence tying them to the crime and all of the evidence pointing to Gombert as the true perpetrator – or at the very least – the most plausible suspect.

**PCSD and PCDA Ignore Evidence of the Impossibility of Mr. Krivak and Mr. DiPippo Raping and Murdering Josette Wright on October 3, 1994 in Mr. Krivak's Van, as PCSD Theorized**

123.    Prior to March 1995, including throughout the fall of 1994 when Ms. Wright disappeared, Mr. Krivak's van was inoperable.  It was on blocks in Mr. Krivak's father's yard and did not have an alternator or battery.  The alternator and battery had been removed and placed into another vehicle.  Mr. Krivak's van was only made operable in March 1995, at which time Mr. Krivak obtained the title for the van, insured it, and began driving it.

124.    According to the medical examiner, Josette Wright was killed before March 1995.

125.    Had Defendants Wright, Turner, Stephens, Castaldo, Quick, Rees or any other employee of PCDA or PCSD conducted an adequate investigation, they would have learned that Mr. Krivak's van was inoperable on October 3, 1994 and therefore could not have been used in the commission of the crimes against Ms. Wright on that or any other date before March 1995.  They would have further learned that Ms. Wright had never, in fact, been in Mr. Krivak's van.

126.    Instead, Defendants Wright, Tendy, Krauss, Glasser, York, Thoubboron, Turner, Stephens, Castaldo, Quick, Rees, Asher and other employees of PCDA and PCSD sought to frame an innocent Mr. Krivak for a crime he did not commit.

***To Frame Mr. Krivak, PCSD Investigators Including Stephens, Castaldo, and Quick Concoct A False Narrative of Josette Wright's Disappearance, Rape, and Murder and Coerce Vulnerable Witnesses to Adopt That False Narrative***

**Castaldo and Quick Harass, Threaten, Abuse, and Coerce Dominic Neglia – A Vulnerable Teen – to Implicate Mr. DiPippo**

127.    Defendants Turner, Stephens, Castaldo and Quick coerce Mr. Neglia into becoming an informant by threatening him with significant jail time if he did not cooperate with them.  PCSD made clear that Mr. Neglia's "cooperation" should be directed towards inculpating Mr. DiPippo.

128.    Defendants Castaldo and Quick gave Mr. Neglia unrecorded money, which they directed Mr. Neglia to use to buy drugs to get Mr. DiPippo high, in an effort to obtain a confession or other inculpatory statement from Mr. DiPippo.  Instead, Mr. Neglia – a teenager – used the unrecorded money to buy drugs including crack cocaine and get high by himself and with others, but not with Mr. DiPippo.

129.    For months, Defendants Castaldo and Quick harassed, threatened, and pressured Mr. Neglia.  Defendants Castaldo and Quick fabricated statements containing false, fantastical, and inconsistent accounts about what Mr. DiPippo purportedly told Mr. Neglia and directed Mr. Neglia to sign those statements.  In truth, Mr. DiPippo never made any inculpatory statements about Ms. Wright's disappearance or murder to Mr. Neglia.

130.    Even the most basic investigation would have revealed that much of what was contained in the statements attributed to Mr. Neglia about Ms. Wright and Mr. DiPippo was false.  But once again, Defendants never examined the veracity of the statements attributed to Mr. Neglia and instead used them to create a fabricated theory of the crimes against Ms. Wright and, ultimately, a criminal case against Mr. Krivak.

131.    Mr. Neglia was so harassed by Defendants Castaldo and Quick that the principal of his high school told the officers not to come to the school any further.  Mr. Neglia also lost his job at the Olive Garden due to Defendants Castaldo and Quick repeatedly showing up and interrogating him there. Neither of these events deterred Defendants Castaldo or Quick from harassing Mr. Neglia, which continued unabated for months.  PCSD's own paperwork reveals that Defendants Castaldo and Quick documented as many as three purported statements from Mr. Neglia in a single day.  These statements were recorded only minutes apart and contained contradictory and demonstrably false information.

132.    When Mr. Neglia told Defendants Castaldo and Quick that he no longer wished to be an "informant," Defendant Castaldo hit Mr. Neglia in the head with his handcuffs wrapped around his hand.  Despite witnessing this abuse, Defendant Quick told Mr. Neglia that he saw Mr. Neglia fall out of a chair and hit his head on the floor, making it clear that Mr. Neglia was entirely unprotected from physical abuse by Defendant Castaldo or any other PCSD official.  Mr. Neglia was thus coerced to continue to serve as an "informant" for PCSD.

133.    Despite the abundant evidence that PCSD used Mr. Neglia as an informant, there are no records reflecting this arrangement.  At Mr. Krivak's 2023 retrial, Defendant Castaldo testified – falsely and contrary to the records that he, Defendant Quick, and others produced – that Mr. Neglia was an informant for just one day and then terminated because Defendant Castaldo found him not to be trustworthy.

134.    Part of what PCSD asked Mr. Neglia to provide were the names of people Mr. DiPippo hung around with besides Mr. Krivak.  Mr. Neglia gave PCSD the names of Defendant Rose; Adam Wilson; Bill MacGregor; and Mr. Krivak – individuals he believed socialized with Mr. DiPippo. PCSD then focused on crafting a story of a crime that involved those individuals together with Mr. DiPippo and Mr. Krivak.

**Castaldo and Quick Next Target Denise Rose, A Troubled Young Women With a History of Serious Drug Abuse and Criminal Conduct, Who Had Recently Been Scorned By Mr. DiPippo**

135.    To that end, PCSD called in Defendant Rose for questioning on April 2, 1996. At the time, Defendant Rose was a 19-year-old high school dropout with a serious drug problem.  She was also a very close friend of Anthony DiPippo and sometimes had consensual sexual relations with him.  In or about April 1996, Mr. DiPippo had ended the romantic part of their relationship and distanced himself socially from Defendant Rose, causing her to feel rejected and angry at him.

136.    On April 2, 1996, Defendant Rose was interrogated by Defendants Castaldo and Quick

for nearly an entire day, purportedly about who she spent time with and when she last saw

Josette Wright alive.  When Defendant Rose named friends she spent time with, Defendants

Castaldo and Quick redirected her attention to Mr. DiPippo and Mr. Krivak.  At the end of this

interrogation, Defendant Rose had given PCSD no information about any criminal activity.

137.    In her first April 2, 1996, account to police, memorialized in notes taken by Defendant

Quick, Defendant Rose stated that the last time she saw Ms. Wright was a night in the fall of

1994 when she, Mr. DiPippo; Mr. Krivak; Adam Wilson; and a friend named Jason Gray were

driving around in Mr. DiPippo's gray Ford Bronco and hanging out at the Carmel Diner.

138.    Defendants Castaldo and Quick quickly determined that Mr. DiPippo did not have a Ford

Bronco in the fall of 1994 and that Jason Gray was incarcerated until his release on October 4,

1994.  Unbeknownst to Defendant Rose, Defendants Castaldo and Quick had already

predetermined the date of Josette's murder – October 3, 1994 – the night she went missing.

Defendant Castaldo and Quick then provided Rose with the date of October 3, 1994 – the date

Josette Wright went missing and the day before Jason Gray got out of jail – as the date for her to

use in her evolving story about the last time she saw Ms. Wright.

139.    As Defendant Rose later reported to members of PCDA and the Attorney General's

Office reinvestigating the case, Defendants Castaldo and Quick not only fed Defendant Rose the

alleged date, but also told her to say that she remembered the date because it was the day before

Mr. Gray got out of jail.  Finally, as Defendant Rose later reported to members of PCDA and the

Attorney General's Office reinvestigating the case, Defendants Castaldo and Quick provided

Defendant Rose with other details to use in her story:  She was in Mr. Krivak's brown van

instead of Mr. DiPippo's gray Bronco; she was at the Citgo gas station instead of the diner; and

Mr. Gray was not in the van.  Defendant Rose told attorneys and investigators from PCDA and the Attorney General's Office that all of the details she included in her statements, including her April 2, 1996, statement, were provided to her by Defendants Castaldo and Quick.

140.    The statement ultimately produced on April 2, 1996, and signed under penalty of perjury by Defendant Rose asserted, in substance, that on October 3, 1994, she was in Mr. Krivak's van with Mr. DiPippo; Mr. Wilson; Josette Wright; and an "unknown male," that they went to the diner and then to the Citgo station, and that Defendant Rose was then dropped off at home.  The statement was written by Defendant Quick.

141.    PCSD's own documents from April 2, 1996, reveal that after signing this statement, Defendant Rose was shown jewelry and clothing collected from Fields Lane and found with Ms. Wright's remains.  Defendant Rose had not previously included reference to the items she was shown in her prior statements to PCSD on that date but did include them in subsequent statements.

142.    Finally, after the April 2, 1996 statement was produced by Defendants Castaldo and Quick and signed by Defendant Rose, Defendant Rose was released from PCSD.  Defendant Castaldo told Defendant Rose to call him if she ever was in trouble.

143.    The very next day, Defendant Rose was arrested for Reckless Endangerment and other charges related to her pursuit and harassment of a rival, Elena Leahy, while both were driving their cars.  Defendant Rose pursued Ms. Leahy in her car, rammed her car from behind, and followed Ms. Leahy into a gas station where Defendant Rose or a passenger in her car used a bat from Defendant Rose's car to damage Ms. Leahy's vehicle.

144.    While in custody, Defendant Rose demanded to speak with Defendant Castaldo.  Jail employees allowed her to call him.  Defendant Castaldo came to see her in jail, purportedly to

serve her with an order of protection relating to Ms. Leahy.  This was not a task that Defendant

Castaldo would normally undertake and Defendant Castaldo was not involved in the Leahy

investigation, which was being handled by an entirely different police agency.  After an

unrecorded and undocumented meeting with Defendants Castaldo, Rose was thereafter released

on her own recognizance.  According to Defendant Rose, Defendant Castaldo told her during this

visit that she had to identify the "unknown male" in her April 2, 1996, statement.

145.    According to Defendant Rose, the day after she was visited in jail by Castaldo, she

happened to see William MacGregor – the purported "unknown male" in her April 2 statement –

in Brewster, New York, for the first time since October 3, 1994.  Defendant Rose claimed she

learned Mr. MacGregor's name when a friend she was with happened to identify Mr. MacGregor

by name. In an April 10, 1996, statement allegedly made by Defendant Rose to PCSD,

Defendant Rose then purportedly identified William MacGregor as the "unknown male" who

was purportedly in the van on October 3, 1994.  This statement was written by Defendant Quick

and signed by Defendant Rose under penalty of perjury.

146.    Defendant Rose was then called back to PCSD on April 24, 1996, for further

interrogation.  At some point prior to this interrogation, Defendants Castaldo and Quick told

Defendant Rose that she could be facing 25 years in prison as an accessory to Ms. Wright's

disappearance and murder.  After being interrogated by PCSD officers including Defendants

Castaldo and Quick but before providing a statement inculpating Mr. Krivak and Mr. DiPippo,

Defendant Rose was driven to the alleged crime scene at Fields Lane by Defendant Castaldo and

others from PCSD.  PCSD's own documentation and photographs prove that Defendant Rose

was driven to the crime scene on April 24, 1994 *before* her statement inculpating Mr. Krivak was

produced – a fact Defendant Castaldo falsely denied during his sworn testimony at Mr. Krivak`'s trials.

147.    PCSD documents show that Defendant Rose was Mirandized at 5 pm on April 24, 1996, after which Defendant Rose's statement inculpating Mr. Krivak was crafted by PCSD, written by Defendant Quick, and signed – but not sworn to under penalty of perjury – by Defendant Rose.

148.    In addition to being the only statement in the entire case that was not sworn to under penalty of perjury, the April 24, 1996, statement is also unique in that it is the only purported witness statement that contains a written and signed *Miranda* warning.  Defendant Rose having been *Mirandized* is consistent with Defendant Rose's testimony that she was told prior to providing the April 24, 1996, statement that Defendants Castaldo and Quick had threatened her with facing 25 years in prison as an accomplice to Ms. Wright's murder.

149.    The words contained in Defendant Rose's purported April 24, 1996, statement were not Defendant Rose's but were crafted by Defendants Stephens, Castaldo, and Quick and written down by Defendant Quick.

150.    The April 24, 1996 statement fabricated by Defendants Stephens, Castaldo, and Quick falsely alleged:

    a.  On October 3, 1994, Defendant Rose was picked up by Mr. Krivak and Mr. DiPippo at her home in Mr. Krivak's van;

    b.  Defendant Rose got into Mr. Krivak's van through the sliding side door and saw Josette Wright in the back;

    c.  Ms. Wright was wearing jeans, a t-shirt, a brown jacket, a crystal necklace, and a lizard earring;

d. The four eventually drove to the Citgo gas station, where they saw other teenagers including Adam Wilson, William MacGregor, John Ulicky, and James DiSalvo;

e. Adam Wilson and William MacGregor asked Mr. Krivak for a ride home;

f. Mr. Krivak then drove Defendant Rose, Ms. Wright, Mr. DiPippo, Mr. Wilson, and Mr. MacGregor to Fields Lane where some or all of these individuals got drunk and/or high;

g. The group then played a brief game of spin the bottle, after which Mr. Krivak made sexual advances towards Ms. Wright and, when he was rebuffed, began to violently rape Ms. Wright;

h. Mr. Krivak tied Ms. Wright's hands together in front of her body and stuffed her underwear into her mouth;

i. Mr. DiPippo then raped Ms. Wright, who died during the course of that rape;

j. Defendant Rose could see what was occurring in the van from the interior van lights;

k. Mr. DiPippo and Mr. Krivak took the deceased Ms. Wright out of the van through the rear doors and then returned without her within 10-20 minutes;

l. Ms. Wright was wrapped in her jacket and her sneakers were tied to her feet when she was taken out of the van.

151. Much of the April 24, 1996, statement's contents were refuted by objective evidence available at the time the statement was taken.  This includes information that was either obtained by Defendants or their agents, or that could easily have been obtained through minimal investigation by PCSD or PCDA.  For example:

a. Mr. Krivak's van was inoperable and on blocks in October 1994, having had the battery and alternator removed and placed into another vehicle sometime before then. The van was not operational until the end of March 1995;

b. Mr. Krivak's van had a fixed bench seat that spanned the entire back of the van, blocking the rear doors and making it impossible for Ms. Wright's body to have been removed in the manner alleged;

c. The sliding side door of the van was broken and would fall of its tracks when opened;

d. The interior van lights described in the April 24, 1996, statement did not exist;

e. Dr. Albert Harper, a forensic anthropologist hired by PCSD to examine Ms. Wright's remains determined that in fact her hands had been tied behind her back, with the rope then proceeding up her back, around her neck and down to her right ankle which was then tied up to the knot at her hands. He would later describe Ms. Wright as having been "hogtied";

f. John Ulicky had moved out of the town of Carmel months before October 1994 and did not return to the town for many years – he was definitively not at the Citgo Station at any time in fall 1994;

g. James DiSalvo never saw Denise Rose, Josette Wright, Mr. Krivak, Anthony DiPippo, Adam Wilson and Bill MacGregor together at the Citgo Station;

h. Ms. Wright's remains were located more than 675 feet from the location where Defendant Rose's statement alleged the van was parked. Due to the distance of the remains from the van, the conditions of the woods, the fact that there was no moon out at the time of the alleged occurrence and no claim that Mr. DiPippo or

> Mr. Krivak had a flashlight, it would have been impossible for either or both of them to have carried Ms. Wright's body from the van to the location in 10-20 minutes;
>
> i. Ms. Wright's remains were found at a significant distance from her sneakers, which were still tied but had no bones or other genetic material inside of them, such that they had to have been removed prior to her death.

152.    Defendant Rose purportedly explained to Defendants Castaldo and Quick on April 24, 1996, that she had never before told anyone about what she had witnessed on October 3, 1994, due to her fear of Anthony DiPippo. Defendant Rose claimed Mr. DiPippo had threatened that she would be "next" if she told anyone what he and Mr. Krivak had done to Ms. Wright.  This claim – if ever made by Defendant Rose – was contradicted by the fact that Defendant Rose had remained close friends and consensual sexual partners with Mr. DiPippo between October 3, 1994, and April 1996, voluntarily spending time with him both in the presence of others and alone during that period of time.  Indeed, according to the testimony of Defendant Rose and her friend Gary Kempter (a prosecution witness), on the morning of October 4, 1994 – supposedly the day after witnessing Mr. DiPippo rape and murder Josette Wright – Defendant Rose suggested that she and others go to Mr. DiPippo's house to hang out, which they did.

153.    Defendant Rose had a long history of severe drug abuse that predated October 3, 1994. Defendant Rose's drug history would have made it difficult if not impossible for her to remember a specific date after 18 months, or the kinds of specific details contained in her statement such as the route purportedly taken on the night in question, the date Jason Gray was released from jail, and the clothing worn by different individuals.

154.     As a result of their failure to conduct an adequate investigation, Defendants Castaldo and Quick and others at PCSD were unaware of Defendant Rose's ongoing relationship with Mr. DiPippo or Defendant Rose's serious drug history.  Neither Defendants Castaldo nor Quick conducted any investigation of Defendant Rose's credibility or sought to verify any of the information contained in the statements attributed to her.

155.     In exchange for Defendant Rose adopting PCSD's fabricated narrative of the crime and agreeing to testify falsely against Mr. Krivak and Mr. DiPippo, Defendant Rose's felony charges relating to the Elena Leahy incident were resolved favorably with no criminal liability.

156.     Defendant Wright appointed a special prosecutor to handle to matter, creating the illusion of neutrality with respect to Defendant Rose, who by then was PCSD and PCDA's key witness against Mr. Krivak and Mr. DiPippo.  In fact, however, the special prosecutor was anything but neutral, having been directed to "speak to [DA Wright] prior to any dispo[sition]" of the matter. Defendant Wright and others including Defendant Turner, took steps to suppress the *quid pro quo* relationship between the favorable resolution of Rose's criminal charges and Rose's agreement to serve as a false witness against Mr. Krivak and Mr. DiPIppo.

157.     Once Defendants Castaldo and Quick obtained Defendant Rose's April 24, 1996 statement inculpating Mr. Krivak and Mr. DiPippo, PCSD then sought to coerce corroborating statements from teens Adam Wilson and William MacGregor.

**Stephens, Castaldo, and Quick Then Threaten and Coerce Adam Wilson, A Teen on Probation, to Adopt PCSD's False Narrative of the Crime Against Josette Wright; Mr. Wilson Immediately Recants**

158.     On or about May 28, 1996, Adam Wilson was brought to PCSD on the false pretense that PCSD wanted his help in solving the Josette Wright case.  Mr. Wilson was then interrogated for over ten hours by members of the PCSD including Defendants Castaldo, Quick, and Stephens.

During this time, Mr. Wilson continually denied any knowledge of or involvement in the disappearance, rape, or murder of Ms. Wright.

159.    Mr. Wilson was then given a polygraph examination by Defendant Stephens. Throughout the polygraph examination, Mr. Wilson continued to deny knowing anything about what happened to Josette Wright.  At the conclusion of the polygraph examination, Defendant Stephens told Mr. Wilson that he had failed the polygraph.  Falsely telling people they failed the polygraph is a technique Defendant Stephens frequently used to coerce false admissions or confessions from them.

160.    As a result of the duration of his interrogation and the psychological pressure exerted upon him – including by being told that he failed the polygraph examination – Adam Wilson was coerced by Defendants Stephens, Castaldo, and Quick to sign a statement implicating Mr. DiPippo and Mr. Krivak.

161.    The statement was written entirely by Defendant Quick and was formulated by Defendants Stephens, Castaldo, and Quick – not by Adam Wilson.  It contained many of the same details and instances of similar or identical language as Rose's April 24, 1996 statement. The statement attributed to Adam Wilson did not contain Mr. Wilson's words but the words of Defendants Stephens, Castaldo, and Quick. Mr. Wilson was coerced to sign it under penalty of perjury, which he did.

162.    As with Defendant Rose, Defendants Castaldo and Quick took Mr. Wilson to Fields Lane and showed him allegedly important locations relating to Ms. Wright's rape and murder.  At that time, Defendants Castaldo and Quick told Mr. Wilson to make sure he relayed these fabricated details accurately to others, including PCDA.

163.    As soon as Mr. Wilson got home after his interrogation, he told his mother that PCSD investigators had made him sign a false statement implicating his friends in a heinous crime.

164.    Mr. Wilson was on probation at the time, so he called his probation officer, Putnam County Probation Officer Debra Matrigali, and left her a message that he needed to see her in the morning.

165.    The next morning, Mr. Wilson presented himself to Ms. Matrigali and reported that PCSD had coerced him to sign a false statement and that he did not in fact witness any crime.

166.    By telling Ms. Matrigali this, Mr. Wilson was admitting to his probation officer the crime of making a sworn false statement under penalty of perjury to a police officer, yet he did so because he did not see Mr. DiPippo or Mr. Krivak commit any crime involvingMs. Wright.

167.    Soon thereafter, Defendants Castaldo and Quick visited Mr. Wilson at his home and expressed anger about his recantation.  Defendants Castaldo, Quick, Rees, Asher, and others, including members of PCSD's Narcotics Unit, then wired for audio and video recording the car of an informant, Scott Olivieri, who was also a friend of Mr. Wilson.  Defendants Castaldo, Quick, and others directed Olivieri to discuss Mr. Wilson's statement and recantation while surreptitiously recording him in an attempt to create evidence against Mr. Krivak.

168.    During that surreptitiously recorded conversation on June 10, 1996, Mr. Wilson denied having witnessed a crime and repeatedly told Mr. Olivieri that Defendants Castaldo and Quick "fed" him information about the alleged offense and coerced him to sign the false statement that they had written.  This exculpatory recording was suppressed by Defendants Stephens, Castaldo, Quick, Rees, Asher and others.

169.    Mr. Wilson never went back on his recantation.  Indeed, Mr. Wilson has testified repeatedly under oath, including in the Grand Jury, that he never witnessed Ms. Wright's rape

and murder and had no knowledge of what happened to her, and that Defendant Stephens, Castaldo, and Quick coerced him into signing a statement they fabricated blaming Mr. Krivak and Mr. DiPippo for Ms. Wright's death.  Mr. Wilson testified specifically that he had no choice but to sign the false statement or himself be charged with the crimes against Ms. Wright – a threat made to him by Defendant Stephens, Castaldo, and Quick.

**Castaldo, Quick, and Others from PCSD Coerce William MacGregor, Another Vulnerable Teen, To Adopt Parts of Their False Narrative of Josette Wright's Murder**

170.    In or about June 1996, PCSD employees including Defendants Castaldo and Quick began looking for William MacGregor, a teen from Brewster, New York, claiming that they wanted to speak to him about a car accident he had witnessed.  Although he did not believe he had witnessed any car accident, Mr. MacGregor – who was then living in Manhattan – agreed to meet with Defendants Castaldo, Quick, and others from PCSD. On or about June 4, 1996, Defendants Castaldo and Quick together with members of PCSD and the New York City Police Department (NYPD), met William MacGregor and brought him to the NYPD's Seventh Police Precinct.  Mr. MacGregor was interrogated at the Seventh Police Precinct and/or at PCSD, where he was transported by Defendants Castaldo, Quick, and others from PCSD.

171.    Mr. MacGregor was interrogated for hours by Defendants Castaldo and Quick, who told him their fabricated story of the crimes against Josette Wright.  Mr. MacGregor repeatedly denied any knowledge of any crime against Ms. Wright.  Defendants Castaldo and Quick conspired with Defendant Rose, whom they placed in the same room at PCSD Mr. MacGregor, to feed Mr. MacGregor false facts about the crime.

172.    To make Mr. MacGregor adopt their fabricated version of events, Defendants Castaldo and Quick falsely told Mr. MacGregor that there was forensic evidence tying Mr. DiPippo and Mr. Krivak to the crime, which they promised to show him at a future time.  Then, to increase

the pressure on Mr. MacGregor, Defendants Castaldo and Quick told him that Mr. DiPippo and Mr. Krivak were blaming him (Mr. MacGregor) for the rape and murder of Ms. Wright, going so far as to show him fabricated statements purportedly given by Mr. DiPippo and/or Mr. Krivak – even though no such statements existed.  Finally, Defendants Castaldo and Quick threatened that Mr. MacGregor would be charged with the rape and murder of Ms. Wright if he did not provide PCSD with a statement that instead blamed Mr. Krivak and Mr. DiPippo.

173.    After hours of coercive interrogation, Mr. MacGregor agreed to sign under penalty of perjury a statement PCSD crafted and wrote only if it stated that he was asleep during the commission of the crime.

174.    A statement to this effect was formulated by Defendants Castaldo and Quick and written out by Defendant Quick in its entirety.  Mr. MacGregor then signed it under penalty of perjury; he did so only in response to PCSD's coercion and false and misleading statements.

175.    When Defendant Rose testified at each trial of Mr. DiPippo and Mr. Krivak in 1997 and thereafter, her testimony contained the false fact that Mr. MacGregor was asleep in the van during the commission of the crime, a fact never alleged in any of Defendant Rose's prior written statements.  Defendant Rose thus conspired with Defendants Castaldo, Quick, and others to provide false written statements to the police, and also conspired with these and other Defendants to provide additional false testimony at each of Mr. Krivak and Mr. DiPippo's trials

176.    In or about 2010, Mr. MacGregor recanted his statement and prior testimony inculpating Mr. Krivak and Mr. DiPippo.  Beginning with Mr. DiPippo's 2012 trial and continuing through Mr. Krivak's 2023 retrial, Mr. MacGregor testified that he never witnessed any crime against Josette Wright and that he only signed the false, fabricated police-drafted statement implicating

Mr. Krivak because he was coerced to do so by the improper tactics of Defendants Castaldo, Quick and others.

***To Strengthen their Manufactured Case, PCSD Fabricates Evidence and Coerces Additional Witnesses to Adopt Their Narrative While Hiding Their Misconduct and Favorable Evidence***

### Castaldo, Quick, Rose and Others Conspire to Coerce Gary Kempter and Lisa Murphy to Provide Corroborating Testimony

177.    Defendants Castaldo, Quick, Rose and others from PCSD conspired to coerce other vulnerable teens to falsely corroborate the fabricated version of events manufactured by Defendants Stephens, Castaldo, and Quick.

178.    Gary Kempter and Lisa Murphy were among Defendant Rose's closest friends and teens who abused drugs and had criminal histories.  As with William MacGregor, Defendants Castaldo and Quick conspired with Defendant Rose to manufacture evidence corroborating aspects of the story fabricated by Defendants Stephens, Castaldo and Quick and adopted by Rose.  These Defendants did this by agreeing to have Defendant Rose feed false facts to Mr. Kempter and Ms. Murphy and have them agree to provide sworn false testimony adopting those false facts at Mr. Krivak's trials.

### Two Rings Are Purportedly Found During the May 11, 1995 Inventory Search

179.    On May 11, 1995 – seven months after Ms. Wright went missing and six months before her remains were found – Mr. Krivak was arrested by PCSD on unrelated drug charges while driving the 1979 Brown Ford van he had purchased from his father about six weeks earlier. PCSD seized his van – the same van PCSD later theorized was used in connection with Ms. Wright's rape and murder – and held the van at a private, unsecured lot PCSD used for seized vehicles.  On May 11, 1995, Defendant PCSD officer William Asher conducted an inventory search of the van.

180.    During the May 11, 1995 inventory search of Mr. Krivak's van, Defendant Asher purportedly found two rings. These rings are adult-sized, costume jewelry – one resembling a diamond and the other a ruby.

181.    According to Defendant Asher, he took contemporaneous notes of his inventory search and then entered the items found on PCSD's standard inventory form via a word processing program.  The electronic inventory form was not password protected and could be accessed at any time by any member of PCSD.  After creating the inventory form, Defendant Asher purportedly destroyed the contemporaneous notes.

182.    Defendant Asher allegedly secured the rings in the Narcotics Division's safe.  PCSD maintained no records documenting the contents of the safe or the movements of those items. There are no documents that establish that the rings were in fact secured in the Narcotics Division safe or when, why, or pursuant to whose directive they were removed from the safe.

183.    On December 19, 1995,  PCSD investigator Gary Watkins – a member of BCI who was temporarily assigned to the Josette Wright murder investigation – was instructed to take the rings allegedly found during the May 1995 inventory search and show them to Susan Wright, Ms. Wright's mother.

184.    Investigator Watkins took copious notes of his interview with Susan Wright.  According to Investigator Watkins' notes, Susan Wright affirmatively stated that the rings did not belong to Josette Wright and would have been too big for her.

185.    These exculpatory notes were suppressed from Mr. Krivak by Defendants Thoubboron, Turner, Stephens, Castaldo, Quick and others.

186.    PCSD and PCDA falsely maintained that, as a narcotics officer, Defendant Asher had no role in the Josette Wright investigation. In PCSD and PCDA's story, this makes Defendant

Asher's purported finding of jewelry in Mr. Krivak's van credible.  In fact, however, Defendant Asher and other narcotics officers were directly involved in the Josette Wright investigation when they wired PCSD confidential informant Scott Olivieri's car to record a surreptitious conversation with Adam Wilson.  Defendant Asher and others falsely testified that he and the other narcotics officers had no involvement in the Josette Wright investigation and affirmatively hid their role in making the exculpatory Olivieri-Wilson recording, including at Mr. Krivak's trial and retrial.

**PCSD Coerces False Identification of the Rings as Josette Wright's**

187.    After the December 1995 showing of two rings to Susan Wright, PCSD did not show the diamond or ruby ring to any witness until late March 1996, despite the fact that PCSD was regularly showing witnesses the jewelry found with Ms. Wright's remains.

188.    Thereafter, from March 25, 1996 through April 28, 1996, Defendants Castaldo and Quick showed nine teens, including Ms. Wright's boyfriend, her close friends, and other neighbors the two rings purportedly found in Mr. Krivak's van.  None of these individuals could positively identify the diamond and ruby rings as belonging to Ms. Wright

189.    Then, on April 28, 1996, to fabricate a false identification of the rings found during the May inventory search, Defendants Castaldo and Quick coerced a positive identification of the rings from Tara and Catherine Duffy.

190.    Tara Duffy was a close friend of Josette Wright. Ms. Wright had spent the night of October 2, 1994 at Duffy's house.  Like the other vulnerable teens coerced by PCSD in this case, Tara Duffy had a history of serious drug abuse that had worsened when Ms. Wright went missing.  On April 28, 1996, she was interviewed at PCSD headquarters by Defendants Castaldo and Quick.  Tara Duffy and her mother, Catherine, who was also interviewed at PCSD headquarters, identified the two rings as belonging to Ms. Wright.  Both claimed that the

"diamond" ring was the ring Tara Duffy gave Ms. Wright, identifying a scratch on the ring as having been made by their dog.  But the ring itself had no such mark.

191.    Defendant Turner testified under oath in his deposition in Mr. DiPippo's civil rights lawsuit in 2020 that he and then-District Attorney Kevin Wright had a dispute over the claimed dog bite, because Defendant Wright did not believe that a dog bite had caused a mark on the ring, no matter what the witnesses said.  Defendant Wright told Turner  the mark was a sizing mark. Despite this discrepancy, Defendant Wright allowed the Duffy witnesses to testify before the Grand Jury but did not elicit any testimony about the dog bite.  By the time of Mr. Krivak's 2023 retrial, both Tara and Catherine Duffy had died and their prior testimony was read to the jury.

192.    On May 16, 1996, Ms. Wright's grandmother also told PCSD that the diamond and ruby rings were not Josette's.  Descriptions of Ms. Wright's jewelry from the day she was last seen provided by her sister did not include any reference to these rings, although she did reference other jewelry Josette Wright was wearing when she went missing.  This and other evidence establish that these rings – if they were indeed found in Mr. Krivak's van on May 11, 1995 as alleged – did not belong to Josette Wright.  The false positive identifications of the rings as Ms. Wright's were coerced by Defendants Castaldo, Quick and others.

**PCSD Illegally Searches Mr. Krivak's Van Twice, Manufacturing Additional False Connections Between Josette Wright and Mr. Krivak's Van, Hiding their Misconduct, and Suppressing Exculpatory Evidence**

193.    After the May 1995 inventory search, PCSD conducted two separate illegal searches of Mr. Krivak's van: the first in January 1996 and the second in March 1996.

*The Illegal January 1996 Search*

194.    In January 1996, Defendant Turner directed Rees to conduct an illegal, warrantless search of the van.

195.    The January 1996 illegal search purportedly led to the discovery of additional jewelry – a 0.25 inch lizard stud earring and a tiger's eye ring, both of which purportedly belonged to Josette Wright.

196.    On information and belief, the lizard earring and tiger's eye ring were in fact planted in the van by Defendants Castaldo, Quick, Rees or another PCSD employee for the purpose of fabricating evidence against Mr. Krivak.

197.    During the illegal January 1996 search, PCSD officials, including Defendant Rees, removed the rear seats from Mr. Krivak's van.  Defendant Rees and others then fabricated official documents and testified falsely that the seats were not removed until the subsequent legal search in June 1996.

198.    As with the rings allegedly found during the inventory search, PCSD did not show the jewelry allegedly found during the illegal January search to any witnesses for three months – until late March.

199.    On March 20, 1996, Defendants Castaldo and Quick visited David Chontos, Josette Wright's 13-year-old friend and neighbor.  Using psychologically coercive tactics similar to those used with the other witnesses and Mr. Krivak, Defendants Castaldo and Quick coerced Mr. Chontos to identify the lizard earring purportedly found in Mr. Krivak's van as the earring he had given Josette years before.  Mr. Chontos was so traumatized by Castaldo and Quick that he had had to be hypnotized in order to testify for the prosecution – a fact not disclosed to Mr. Krivak prior to his trial or at anytime before 2022.  In 2022, Mr. Chontos informed Defendants

Tendy and Glasser that he believed he had been coerced to identify the earring by the "awful cops" who had interrogated him, meaning Defendants Castaldo and Quick.

### The Illegal March 1996 Search

200.     The March 1996 illegal search was conducted by Defendants Castaldo and Quick.  No contemporaneous documentation of the search was ever provided to Mr. Krivak.

201.     During this search, Defendants Castaldo and Quick purportedly discovered human hairs that were subsequently sent by Defendant Rees to the New York State Police Crime Lab for forensic testing.  These hairs were later determined by forensic analysis not to belong to Ms. Wright.

### The Absence of Any Biological Material Connecting Josette Wright to Mr. Krivak's Van Further Proves His Innocence and the Pervasive Official Misconduct in his Investigation and Prosecution

202.     In June 1996, Defendant Castaldo submitted a sworn search warrant application that falsely omitted the January and March illegal searches.  This application sought permission to obtain biological material from Mr. Krivak's van.

203.     The search warrant was granted and PCSD removed sections of the van and sent them for forensic testing to the New York State Police Crime Lab, together with the hairs collected during the illegal March 1996 search.

204.     All of the forensic testing conducted by the New York State Police Crime Lab in 1996-1997 and in subsequent rounds of biological testing – the most recent completed just a few years ago – excluded Josette Wright as a contributor of any biological material obtained from Mr. Krivak's van.

205.     The absence of any biological connection between Ms. Wright and Mr. Krivak's van is further proof that no crime occurred in Mr. Krivak's van and that Mr. Krivak is innocent, given

the allegations of a violent struggle and a sexual assault occurring in the van on a shag rug, which was not cleaned after the crime.

206.    Nevertheless, PCDA and PCSD continued their efforts to frame Mr. Krivak for the rape and murder of Josette Wright.

***Stephens, Castaldo, and Quick Coerce Mr. Krivak to Sign a False, Police-Drafted Inculpatory Statement***

207.    On the morning of July 1, 1996, Mr. Krivak was arrested by Defendants Castaldo and Quick for the rape and murder of Josette Wright at the direction of Defendant Wright.  Mr. Krivak's arrest was authorized and directed by Defendants Wright, Thoubboron, and/or Turner, based solely on the fabricated evidence and statements described *supra*.  Because every piece of evidence purportedly implicating Mr. Krivak was fabricated, Mr. Krivak's arrest was without probable cause.

208.    Since Mr. Krivak's interrogation in 1996, a robust body of scientific research from the fields of neuroscience, psychology, sociology, and criminology have identified psychologically coercive police interrogation tactics that increase the risk that an innocent person will falsely confess.  Many of these psychologically coercive police interrogation tactics were used against Mr. Krivak – as well as against Mr. Neglia, Mr. Wilson, Mr. MacGregor, and other coerced trial witnesses.

209.    Before being taken for arraignment at around 9 pm on July 1, 1996, Mr. Krivak was interrogated for approximately eight hours by Defendants Castaldo, Quick, and Stephens.  The sole purpose of this interrogation was to coerce from Mr. Krivak a false statement corroborating the fabricated evidence and false, fabricated statements previously coerced from individuals including Defendant Rose, Mr. Wilson, Mr. MacGregor, Mr. Kempter, Ms. Murphy.

Throughout his lengthy interrogation, Mr. Krivak repeatedly and truthfully denied any involvement in or knowledge of any crime against Josette Wright.

210.    The interrogation of Mr. Krivak was unrecorded, although PCSD had the ability to audio and/or video record the interrogation and did record Stephanie Hoopes's interview and the surreptitiously recorded conversation between Adam Wilson and Scott Olivieri.

211.    According to Defendants Quick and Castaldo, Defendant Turner affirmatively directed them not to audio or video record Mr. Krivak's interrogation.

212.    Defendants Quick and Castaldo repeatedly testified falsely that Defendant Quick documented all of the words spoken between themselves and Mr. Krivak during his interrogation, and Defendant Quick created a detailed timeline purporting to capture all of the events of Mr. Krivak's July 1, 1996 interrogation.  This testimony was false insofar as Defendant Quick failed to document all of the coercive, false, abusive, and threatening statements made by Defendants Castaldo, Quick, and Stephens as well as the physical abuse of Mr. Krivak that occurred during Mr. Krivak's interrogation.

213.    According to Defendant Quick's timeline and other written records of Mr. Krivak's interrogation, for the first hour and a half of the interrogation, Mr. Krivak answered the interrogators' questions and denied any knowledge of or involvement in any crime.  These denials were truthful.  Following that, Defendants Castaldo and Quick intentionally provided Mr. Krivak with false information – that Mr. DiPippo said that Mr. Krivak killed Josette Wright and that other witnesses, including his friend Adam Wilson (who had by then recanted), implicated him in the crime.  Research scientists who study police interrogations and confessions have identified the use of deception or false evidence as increasing the risk that an innocent person will falsely confess.

214.    In response to this false information and to the investigators' refusals to believe his truthful denials, Mr. Krivak requested a lie detector test.  Mr. Krivak believed that a lie detector test would accurately prove his innocence and finally make Defendants Castaldo and Quick believe him.  Defendants Castaldo and Quick brought Mr. Krivak to be polygraphed by Defendant Stephens.  Defendant Stephens's role in using polygraph examinations to coerce false confessions was, at that time unknown to Mr. Krivak, in part because Mr. Deskovic had yet to be exonerated by DNA.

215.    However, Defendant Stephens' history of using the polygraph as a coercive tool to extract confessions, including false confessions, was well known to Defendants Thoubboron, Turner, and others.  In fact, Defendant Stephens openly referred to his approach to polygraphy as "GTC" – Get The Confession.  Defendant Stephens has admitted that he used the polygraph in this case – as in others – not as a truth-finding tool, but rather as a tool to "Get the Confession."

216.    Over the course of the next approximately three hours, Mr. Krivak was polygraphed three times by Defendant Stephens.  Throughout this period, Mr. Krivak consistently and truthfully maintained his innocence of any crime against Josette Wright.  During this time, Mr. Krivak was seen crying and alone by Defendant Quick, who documented this fact but did not intervene.

217.    Although Defendant Stephens was trained in two polygraph methods, he elected to use the Arther Method – the same technique he used on Jeffrey Deskovic – despite the fact that by July 1, 1996 the Arther Method had been entirely discredited within the polygraph community and it was known that the Arther Method is particularly biased *against* innocent suspects.

218.    Defendant Stephens also used physical violence against Mr. Krivak during the polygraph examinations.

219.    After the third polygraph test, Defendant Stephens briefly left the room and purportedly scored Mr. Krivak's polygraph charts. Defendant Stephens returned and falsely told Mr. Krivak that he had failed the polygraph examinations.  Mr. Krivak was shocked, confused, and disoriented by this information, since he knew he was innocent, and he believed that the polygraph was a reliable tool for ascertaining the truth.  False polygraph feedback is a form of deception or false evidence that research scientists who study police interrogations have concluded is a risk factor for eliciting a false confession.

220.    Two polygraph examiners who subsequently reviewed the records of Mr. Krivak's polygraph examinations concluded that Mr. Krivak in fact passed the polygraph examination.  In other words, contrary to Defendant Stephens' purported conclusion that Mr. Krivak "failed," two experts found he was telling the truth when he denied any knowledge or participation in the rape and murder of Ms. Wright.

221.    Defendant Stephens falsely told Mr. Krivak that he failed the polygraph as part of his strategy of using the polygraph to coerce false confessions, including from Mr. Krivak. Defendant Stephens told Mr. Krivak that he failed the polygraph to frighten Mr. Krivak, to increase Mr. Krivak's stress and anxiety, and to convince Mr. Krivak that there was nothing he could do to convince PCSD of his innocence.  These psychologically coercive tactics are shown by research to increase the risk of eliciting a false confession from an innocent suspect.

222.    After telling Mr. Krivak that he failed the polygraph, Defendant Stephens then stated, in substance, that while the polygraph machine was a scientific instrument that could accurately determine that Mr. Krivak's denials were false, it could not tell Defendant Stephens if Mr. Krivak had killed Ms. Wright on purpose, or if he had done so by accident.

223.   This tactic, known by research scientists who study police interrogations as minimization, is designed to offer the subject a way out of a seemingly hopeless situation – here, by offering an innocent Mr. Krivak the "opportunity" to confess falsely to an accidental murder rather than an intentional one.  In response to Defendant Stephens' introduction of the accident theme, Mr. Krivak asked if it would make a difference if Ms. Wright had been murdered accidentally.  This response demonstrated that Defendant Stephens' deployment of minimization was successful. Defendant Stephens told Mr. Krivak that it would make a difference if the murder were accidental.  Defendant Stephens returned Mr. Krivak to Defendants Castaldo and Quick.  All of this was a part of the deliberately coercive interrogation to which Mr. Krivak was subjected by Defendants Stephens, Castaldo, and Quick.

224.   Defendants Castaldo and Quick then capitalized on Defendant Stephens' use of minimization by telling Mr. Krivak that he would face less serious consequences if the crime were something other than just a murder.  This would also match the narrative Defendants Castaldo and Quick had already fabricated – that Ms. Wright had died of suffocation during the course of her rape by Mr. DiPippo but was not deliberately killed by either Mr. DiPippo or Mr. Krivak.

225.   Not only did Defendants Castaldo and Quick use minimization to overbear Mr. Krivak's will but they also used other psychologically coercive strategies that research psychologists who study police interrogation have identified as commonly used risk factors for eliciting false confessions.  These include: subjecting Mr. Krivak to a lengthy and increasingly aggressive interrogation; isolating Mr. Krivak from supportive persons; yelling at Mr. Krivak; threatening him with bodily harm; refusing to accept his denials; repeatedly accusing him of committing a heinous crime; accusing him repeatedly of lying; and, as described *supra*, deliberately lied to him

61

about the existence of inculpatory evidence. Defendants Castaldo, Quick, and Stephens did this despite knowing that they had fabricated the entire theory of the crime and coerced purported witnesses to adopt it and fabricated evidence to support it.

226. The combination of a lengthy, high-pressure interrogation with the presentation of false evidence and the use of minimization, threats, false polygraph feedback, promises of leniency, lies, physical abuse and other psychologically coercive techniques combined to overbear Mr. Krivak's will and cause him to sign the police drafted, false inculpatory statement that purported to take responsibility for the rape and murder of Josette Wright – a crime Mr. Krivak did not commit or have any knowledge of.

227. Moreover, Mr. Krivak's purported statement provided no information that was previously unknown to police and independently verifiable.

228. To the contrary, the statement attributed to Mr. Krivak contained demonstrably false information believed by the interrogators to be true at the time of Mr. Krivak's interrogation, such as Ms. Wright's hands being tied in front of her body and the crime occurring in Mr. Krivak's van. Both of these false facts were also present in Defendant Rose's statement.

229. The statement ultimately signed by Mr. Krivak had numerous other similarities in form and content to the Rose statements. It is clear from analyzing the language in the statements attributed to Mr. Neglia, Defendant Rose, Mr. MacGregor, Mr. Wilson, and Mr. Krivak that they have a common author and are not the product of each individual person's spontaneous, natural speech.

***Loose Ends Are Cleaned Up To Ensure The Conviction of Innocent Andrew Krivak***

230. In the summer of 1996, Defendant Castaldo contacted Melanie Carrier, who had been Andrew Krivak's girlfriend during the fall of 1994. In the summer of 1996, Ms. Carrier lived in Canada, and she was also interviewed by local police at PCSD's request. Local police video

recorded their interview with Ms. Carrier.  Defendant Castaldo's telephone call with Ms. Carrier was audio recorded because it was placed through a PCSD operator.  Defendant Castaldo had been directed to contact Ms. Carrier by Defendant Wright or another employee of PCDA because Mr. Krivak's attorney had averred that Mr. Krivak might have been in Canada with Ms. Carrier at the time of Josette Wright's disappearance.

231.    During Ms. Carrier's interviews with local police and Defendant Castaldo, she repeatedly stated that she had been living with Mr. Krivak at his home during the first two weeks of October 1994 and that they were together every night during that period.  Further, Ms. Carrier stated that she noticed nothing unusual about Mr. Krivak during that time.  Ms. Carrier had also seen the van on blocks and immobile in the fall of 1994, although no one ever asked her about the van. Defendant Castaldo and others hid these exculpatory statements, which were only disclosed in 2022.

232.    Defendants Castaldo and Quick, acting on their own or at the direction of others in PCSD or PCDA, revisited Lorraine McLaughlin and Allyson Clokey, the witnesses who had reported seeing Josette alive after October 3, 1994.  The purpose of these visits was to pressure and/or coerce Ms. McLaughlin and Ms. Clokey to change their accounts to make them consistent with the fabricated narrative of the crime manufactured by PCSD – i.e., that they had last seen Josette alive *before* and not after October 3, 1994.

233.    On October 1, 1996, Defendant Quick returned to George Fisher Middle School and demanded that Lorraine McLaughlin – Josette Wright's English teacher who had seen Josette alive after October 3, 1994 – leave her class to speak to him.  She left her students and went to speak with Defendant Quick in a conference room on a different floor. Defendant Quick told Ms. McLaughlin – who had not been spoken to by anyone from PCSD since she reported seeing Ms.

Wright alive almost two years earlier – that PCSD had developed evidence that proved that Ms. McLaughlin had been wrong about seeing Ms. Wright on October 8, 1994, and that Ms. McLaughlin's prior report did not comport with PCSD's timeline of events.  Defendant Quick told Ms. McLaughlin that she must have confused her dates – mistaking Columbus Day for the Jewish holidays several weeks before – and drafted a statement to that effect.  Trusting Defendant Quick – who did not show Ms. McLaughlin a calendar during this interaction – Ms. McLaughlin signed the PCSD-drafted statement under penalty of perjury.  However, after consulting a calendar, Ms. McLaughlin realized that she had definitely seen Josette Wright in the Poughkeepsie Galleria Mall on October 8, 1994, and that she had only changed her statement because she had been misled by Defendant Quick. Ms. McLaughlin testified to this at Mr. DiPippo's 2012 and 2016 trials and at Mr. Krivak's 2023 retrial.

234.    Prior to Ms. McLaughlin's testimony in Mr. DiPippo's 2012 trial, members of the PCSD followed Ms. McLaughlin from the Putnam County Supreme Court to a private residence where she was staying in Dutchess County.  These PCSD officers asked Ms. McLaughlin about her upcoming testimony and frightened her.  Ms. McLaughlin believed that the PCSD officers were trying to get her to change her truthful testimony that she saw Josette alive after October 3, 1994. The PCSD officers only left when the owner of the private residence threatened to call the Dutchess County police.

235.    Similarly, on November 26, 1995, and October 23, 1996, as well as on other dates in the fall of 1996, Defendants Castaldo and Quick repeatedly visited Allyson Clokey – a teenager – at her job at a local diner.  As with Ms. McLaughlin, Defendants Castaldo and Quick told Ms. Clokey that she, too, had been mistaken when she reported seeing and speaking to Ms. Wright on October 7, 1994, and that they had evidence that showed that her sighting was not possible.

Defendants Castaldo and Quick wrote a statement for Ms. Clokey on October 23, 1996, which purported to reject her prior statement and claimed that she recalled seeing Ms. Wright on September 30, 1995. Later, Ms. Clokey realized that her first statement had been accurate and that she had only changed the date because she was misled by Defendants Castaldo and Quick. Ms. Clokey testified to this at Mr. Krivak's 1997 and 2023 trials and at Mr. DiPippo's 2012 and 2016 trials. At Mr. Krivak's retrial, Ms. Clokey also called into question the veracity of initials purported to be hers on PCSD statements.

236.    Defendants Castaldo and Quick's visits to Ms. McLaughlin and Ms. Clokey were designed to coerce these witnesses to falsely recant their prior truthful statements that they had seen and spoken to Ms. Wright after October 3, 1994. Defendants Turner, Castaldo, Quick, and others knew that Ms. McLaughlin and Ms. Clokey changed their statements due to PCSD's coercion, not because there was any doubt that they had in fact seen Josette Wright alive after October 3, 1994.

***Mr. Krivak and Mr. DiPippo Are Wrongly Convicted and Wrongly Incarcerated for the Rape and Murder of Josette Wright***

237.    Mr. Krivak went to trial in 1997 and was found guilty of the rape and murder of Josette Wright. He was sentenced to 25 years to life imprisonment.

238.    Mr. DiPippo went to trial separately in 1997 and was found also found guilty of the rape and murder of Josette Wright. He was also sentenced to 25 years to life imprisonment.

239.    Mr. DiPippo and Mr. Krivak's direct appeals were denied.

240.    Mr. DiPippo then moved for a new trial based on an actual conflict of interest involving his trial lawyer, Robert Leader. Mr. Leader had previously represented Howard Gombert, a fact he never disclosed to Mr. DiPippo or Mr. Krivak. Based on this, the Appellate Division, Second Department granted Mr. DiPippo a new trial on March 1, 2011.

241.    At Mr. DiPippo's 2012 retrial, Mr. DiPippo sought to present a third-party guilt defense

pointing to Howard Gombert as the sole, true perpetrator of the crime.   The evidence proffered

by Mr. DiPippo included evidence of Gombert's relationship with Josette Wright, his unique

modus operandi and its presence in the crimes against Ms. Wright, reverse *Molineux* witnesses,

and evidence of Gombert's jailhouse confession to the rape and murder of Ms. Wright to another

inmate, Joseph Santoro.   The trial court precluded that evidence and Mr. DiPippo was again

convicted.   Mr. DiPippo appealed the trial court's preclusion of third-party guilt evidence.

***Prior to Mr. DiPippo's 2016 Retrial, Then-Putnam County District Attorney Adam Levy
Requests the Assistance of the Attorney General's Conviction Review Bureau to Investigate
the Convictions of Mr. DiPippo and Mr. Krivak***

242.    In February 2015, Defendant Castaldo was indicted on charges of official misconduct,

assault, and offering a false instrument for filing, after a video emerged showing Defendant

Castaldo beating and performing an illegal chokehold on a subdued, shackled prisoner inside the

Carmel courthouse. *See* https://www.youtube.com/watch?v=dqPm3ha776M.

243.    The video recording of the incident was inconsistent with Defendant Castaldo's sworn

official account of the incident, which did not disclose the use of the illegal chokehold or the fact

that Defendant Castaldo continued to use force on the prisoner once he was subdued.

244.    Defendant Castaldo also created additional false documents in connection with this

incident which were designed to protect him against discipline or criminal charges stemming

from his misconduct.

245.    In light of Defendant Castaldo's indictment, incumbent Putnam County District Attorney

Adam Levy, whose office had retried Mr. DiPippo in 2012, decided to reexamine his case.

246.    On or about October 7, 2014, DA Levy formally requested the assistance of the

Conviction Review Bureau (CRB) of the Office of the New York Attorney General (OAG) to

reinvestigate Mr. DiPippo and Mr. Krivak's convictions collaboratively with his office.

Case 7:23-cv-06960-KMK   Document 18   Filed 08/09/23   Page 67 of 107

247.    The OAG assigned Assistant Attorney General Gail Heatherly and Attorney General Investigator Michael Leahy to the reinvestigation.  The CRB, working together with DA Levy and members of his office, spent months intensively reinvestigating the case.

248.    Working alongside DA Levy and members of the PCDA, AAG Heatherly and Inv. Leahy reexamined the case file, conducted interviews and sought additional DNA testing of evidence gathered from the Fields Lane crime scene and Mr. Krivak's van.  This DNA testing did not connect Mr. Krivak or Mr. DiPippo to the crime scene at Fields Lane and it did not connect Josette Wright to the van.

249.    The reinvestigation team interviewed numerous individuals previously interviewed by PCSD.

250.    In May 2015, the reinvestigation team – together with a member of the Carmel Police Department – interviewed Defendant Rose in Florida.  Defendant Rose informed the team that all of the details contained in her April 24, 1996, statement inculpating Mr. Krivak and Mr. DiPippo had originated with Defendants Castaldo and Quick and not her.

251.    During this interview, the reinvestigation team further learned that Defendant Castaldo had shown Defendant Rose many pieces of evidence and repeatedly met with her to mold aspects of her testimony.  These numerous meetings were unrecorded and never previously disclosed.

252.    Defendant Rose also admitted to DA Adam Levy, AAG Heatherly, and the other members of the reinvestigation team that Defendants Castaldo and Quick had threatened her with criminal prosecution if she refused to adopt their false, fabricated narrative of the crimes against Ms. Wright.

253.     Despite these admissions, Defendant Rose nevertheless insisted that she had witnessed the crime described in that statement.  The reinvestigation team found her claim that she had witnessed the crime not credible.

254.     The reinvestigation team developed this and other evidence that Defendant Castaldo had tampered with witness testimony.  The reinvestigation team also developed evidence that Defendant Stephens and others had withheld information from and provided false information to the Carmel Police Department and the defense.  (*See supra* ¶¶ 107-111).

255.     Additionally, as a result of this reinvestigation, DA Levy turned over to Mr. DiPippo the surreptitiously made recording of Adam Wilson and Scott Olivieri, during which Mr. Wilson affirms that he witnessed no crime against Josette Wright and that he signed a statement fabricated by Defendants Stephens, Castaldo, and Quick as a result of his coercive, lengthy interrogation which included Defendant Stephens falsely telling him that he had failed his polygraph examination.  The recording also included information impeaching Defendant Rose and pointing to PCSD's use of Defendant Rose to feed false information to witnesses including William MacGregor.

256.     While the reinvestigation was ongoing as of November 2015, DA Levy had agreed, based on the foregoing, to vacate Mr. DiPippo's conviction and consent to a hearing for a new trial for Mr. DiPippo under CPL § 440.10.

***Defendant Tendy is Elected Putnam County District Attorney and Summarily Terminates the Attorney General's Reinvestigation of Mr. DiPippo's and Mr. Krivak's Convictions***

257.     In September 2015, DA Levy lost the 2015 Republican primary for District Attorney to Robert Tendy.  In November 2015, Defendant Tendy won the general election, becoming the new Putnam County DA on January 2, 2016.

258.    After the general election but before Defendant Tendy took office, AAG Heatherly and

Mr. DiPippo's appellate counsel, Mark Baker, met with Defendant Tendy, Defendant Krauss,

and others from PCDA to advise them on the reinvestigation's findings, including that set forth

*supra* ¶¶ 250-255.  In addition, AAG Heatherly inquired whether Defendant Tendy intended to

continue the joint reinvestigation with PCDA and/or consent to a 440.10 hearing as Mr. Levy

had planned to do.  Defendant Tendy did not commit to any course of action at that time.

259.    On March 29, 2016, the Court of Appeals vacated Mr. DiPippo's 2012 conviction,

finding that the trial court had violated his right to present a complete defense by precluding

evidence of Howard Gombert's third party guilt. *People v. DiPippo*, 27 N.Y.3d 127, 131 (2016).

260.    Shortly thereafter – on March 31 or April 1, 2016 – AAG Heatherly and Inv. Leahy met

with Defendants Tendy, Defendant Krauss, Defendant Glasser, and other members of PCDA to

discuss the problems the CRB had identified with PCSD's investigation and PCDA's

prosecutions of Mr. DiPippo and Mr. Krivak, as well as their belief that Mr. DiPippo and Mr.

Krivak may in fact be "actually innocent."  AAG Heatherly and Inv. Leahy described to

Defendants Tendy, Krauss, and Glasser the additional reinvestigative steps to be taken.

Defendant Tendy then terminated the reinvestigation.  Since the enabling statute that formed the

CRB requires that the CRB work on cases only where the elected district attorney requests their

assistance, the CRB had to cease its reinvestigation into the DiPippo/Krivak cases.

261.    Defendant Tendy and others from PCDA then unreasonably ceased any further

investigation into the wrongful convictions of Mr. DiPippo or Mr. Krivak.  Instead, PCDA

immediately began its re-prosecution of Mr. DiPippo, based in part on the continuing

misrepresentations of Defendants Stephens, Castaldo, Asher, and others.

***Anthony DiPippo is Finally Acquitted and Files a State Claim and Federal Civil Rights Lawsuit Alleging Violations Relating to His Wrongful Conviction and Imprisonment***

262.    At his 2016 retrial, finally able to fully present evidence of police coercion, evidence fabrication, other official misconduct, as well as evidence of Howard Gombert's third-party culpability, Mr. DiPippo was acquitted by a jury.

263.    Following his acquittal, Mr. DiPippo filed a claim under New York's Court of Claims Act for wrongful conviction and imprisonment, as well as a federal section 1983 civil rights lawsuit alleging claims including malicious prosecution and due process violations of evidence fabrication, suppression of favorable evidence, and deliberately failing to conduct a constitutionally adequate investigation, as well as pattern and practice claims against PCSD.

264.    Soon thereafter, the State of New York settled Mr. DiPippo's 8-b claim for $2.9 million.

265.    The litigation of Mr. DiPippo's civil rights lawsuit resulted in thousands of pages of discovery from Defendants including Putnam County and dozens of depositions of members of PCSD and PCDA, including many of the named Defendants here.  Through this litigation, previously suppressed and hidden favorable and exculpatory evidence was revealed, including but not limited to:

        a.   November 1995 notes of PCSD Investigator Gary Watkins documenting Susan Wright's accusation that Howard Gombert killed Josette Wright;

        b.    December 1995 notes of PCSD Investigator Gary Watkins's documenting Susan Wright's statement that the rings purportedly found in Mr. Krivak's van during the March 1995 inventory search were not Josette Wright's and were too large to fit Josette;

c.  Defendant Castaldo provided confidential informant Scott Olivieri with an undisclosed benefit by allowing him to live for nominal rent in Castaldo's house during the investigation;

d.  Defendant Wright did not believe the Duffys' claim that their dog had marked one of the rings found in Mr. Krivak's van and he asked Defendant Turner to instead report that the mark was in fact a sizing mark;

e.  Defendant Rose admitted to Defendant Glasser that she perjured herself during her sworn deposition in Mr. DiPippo's civil rights case and that Defendant Glasser falsely denied having any *Brady* evidence relating to Defendant Rose's credibility when asked for it and hid this information from Mr. Krivak's counsel and courts for months;

f.  Defendants Castaldo and Quick took no steps to investigate Rose's credibility at any time;

g.  Defendant Turner did not believe it was PCDA's job to collect, document, or disclose favorable or helpful information.

***Mr. Krivak's Conviction Is Finally Vacated, Despite PCDA's Ongoing Misconduct***

266.    Based in part on evidence developed by Mr. DiPippo during his civil rights litigation, on January 23, 2019, the Second Department reversed the trial court's summary dismissal of Mr. Krivak's motion for a new trial pursuant to CPL § 440.10(1)(g) and (h) and remanded the case to New York State Supreme Court Judge David Zuckerman.

267.    Soon thereafter, counsel for Mr. Krivak received the transcript of Defendant Rose's sworn deposition in Mr. DiPippo's civil rights lawsuit and identified numerous inconsistencies with Defendant Rose's prior testimony.  As a result, counsel for Mr. Krivak sought to present this and other newly discovered evidence of Defendant Rose's lack of credibility at Mr. Krivak's

evidentiary hearing.  Defendant Glasser opposed this request and New York State Supreme Court Judge David Zuckerman ordered that the evidentiary hearing would be limited to the presentation of one witness, Joseph Santoro, the prisoner to whom Howard Gombert had confessed his sole responsibility for Josette Wright's rape and murder.  The hearing was scheduled for May 9, 2019.

268.    On May 2, 2019, counsel for Mr. Krivak requested from Defendant Glasser any *Brady* material, including but not limited to "any additional evidence discrediting Rose."  Defendant Glasser than falsely responded ". . . I agree that any new evidence of the type you requested would fall under Brady and it would be my obligation to disclose.  However, I do not know of any such evidence."

269.    In fact, as Defendant Glasser later admitted when he was under oath in his own deposition in Mr. DiPippo's civil rights lawsuit, Defendant Rose had admitted to him in a secret, non-recorded February 2019 meeting that she had intentionally perjured herself in her deposition, lying about weapons Mr. DiPippo and Mr. Krivak purportedly had and used during the alleged crimes against Josette Wright.

270.    On information and belief, in response to Defendant Rose's admission of perjury, Defendant Glasser fabricated an innocent explanation for her perjury which he fed to Defendant Rose and eventually reported to the Court when counsel for Mr. Krivak learned of his suppression of Defendant Rose's admission to perjury.

271.    As a result of Defendant Glasser's false statement to Mr. Krivak's counsel and the Court, Mr. Krivak was prevented from exploring evidence of Defendant Rose's lack of credibility prior to his retrial.

72

272.    Nevertheless, on May 19, 2019, Judge Zuckerman vacated Mr. Krivak's conviction, having found Mr. Santoro credible and concluding that there was a reasonable probability that Mr. Krivak would be acquitted had the jury heard this new evidence pointing to Howard Gombert as the true, lone perpetrator of this crime.

273.    PCDA appealed the vacatur decision.

274.    In September 2020, the Appellate Division, Second Department upheld Judge Zuckerman's ruling in a unanimous decision, paving the way for a retrial for Mr. Krivak.  In December 2020, the Court of Appeals denied PCDA's request for leave to appeal the Second Department's decision.

275.    Defendants Tendy and Glasser opposed bail for Mr. Krivak from the time his conviction was vacated in May 2019.  They did this even though Defendants Tendy and Glasser had offered Mr. Krivak a plea agreement prior to his 440 hearing that would have allowed him to be released from prison without any form of correctional supervision upon a guilty plea to a lesser offense. Finally, on October 23, 2020, PCDA agreed to a bail package.  After more than 24 years wrongly incarcerated, Mr. Krivak was finally released from prison to house arrest with 24 hour daily electronic monitoring when.  Mr. Krivak was permitted to leave his residence only for legal and medical visits with 72-hour approval from his probation officer.  Mr. Krivak was also required to wear an ankle monitor, which caused him severe pain and discomfort.

***Despite the Overwhelming Evidence of Mr. Krivak's Innocence and Rampant Official Misconduct Tainting the Josette Wright Investigation and Mr. Krivak's Prosecution, PCDA Seeks to Maintain Mr. Krivak's Wrongful Conviction at All Costs***

276.    As discussed *supra*, Defendants Tendy, Glasser, Krauss, and others within PCDA began its pattern of violating Mr. Krivak's rights, including by suppressing new, favorable and exculpatory evidence, prior to Mr. Krivak's 440 hearing, when PCDA suppressed Defendant

Rose's confession that she had intentionally perjured herself in her 2019 sworn deposition in Mr. DiPippo's civil rights case.  *See* ¶¶ 267-271, *supra*.

277.    This pattern and practice of violating Mr. Krivak's constitutional rights in an effort to secure, once again, Mr. Krivak's wrongful conviction continued unabated between May 9, 2019, when Mr. Krivak's conviction was vacated, January 9, 2023, when Mr. Krivak's retrial began, and February 27, 2023, when the jury returned a verdict of not guilty.

278.    As the foregoing violations and those discussed *infra* make clear, Putnam County had a de facto policy, custom, or practice amounting to deliberate indifference to the constitutional rights of persons, including Mr. Krivak, subject to prosecution by PCDA.

**Tendy Attempts to Taint the Jury Pool by Issuing an Unprompted "Press Release" Condemning Putnam County's Settlement of Mr. DiPippo's Civil Rights Case**

279.    On August 24, 2020, the Putnam County Executive announced that the County had reached a settlement of Anthony DiPippo's civil rights claims against the County of Putnam and others, including many of the named individual Defendants here.  In accordance with that settlement, the Defendants agreed to pay a total of $12 million to Mr. DiPippo.

280.    In response to the County's settlement of Mr. DiPippo's civil rights case, Defendant Tendy issued an unprompted press release condemning the settlement.  On information and belief, Defendant Tendy further directed that the press release be published in the local newspaper to maximize visibility among potential jurors.  Defendant Tendy did this despite the fact that his office was preparing to retry Mr. Krivak and Defendant Tendy was the lead trial prosecutor.  The purpose of this press release was to undermine Mr. Krivak's right to a fair and impartial jury.

281.    Defendant Tendy's press release condemned the Legislature's decision to settle Mr. DiPippo's civil rights case, stating that he is "astonished and sickened by this [settlement]

decision. It is incomprehensible and indefensible."  Defendant Tendy's press release contained a number of demonstrably false factual representations concerning the validity of Mr. DiPippo's claims, the litigation of Mr. DiPippo's civil rights case, and the evidence adduced prior to and during the litigation.  *See* District Attorney Tendy Condemns DiPippo Settlement (Aug. 14, 2020) at https://www.putnamcountyny.com/district-attorney-tendy-condemns-dipippo-settlement/

282.   Putnam County Executive MaryEllen Odell responded forcefully to Defendant Tendy's press release, describing Defendant Tendy's press release as an emotional reaction "in a case where he did not understand any of the facts."  Further, revealing that Defendant Tendy's press release was factually incorrect, misleading, and issued only for the purpose of improperly influencing potential jurors, the County Executive noted that Defendant Tendy "himself admitted on two separate occasions that if he were sitting in the seat of County Executive or Legislator that he would make the same decision [to settle Mr. DiPippo's civil rights case]."  *See* County Executive MaryEllen Odell, Letter to the Editor:  Tendy Wrong on DiPippo Settlement at: https://patch.com/new-york/southeast/letter-editor-tendy-wrong-dipippo-settlement-odell.

283.   This incident makes clear that Defendant Tendy, Glasser, Krauss and PCDA had plainly inadequate or unlawful policies, procedures, regulations, practices, and customs concerning their duty to refrain from making extrajudicial statements about a pending matter that have a substantial likelihood of heightening public condemnation of the accused and exercise reasonable care to prevent those assisting or associated with the prosecutor in a criminal case from making similar extrajudicial statements.

**PCDA Suppresses Exculpatory Recordings of Joseph Santoro's Jailhouse Communications Showing Gombert Did in Fact Confess to Santoro, Santoro's Prior Testimony Was Truthful, and He Had No Motive to Lie**

284.     As described *supra*, Joseph Santoro was a key witness at Mr. DiPippo's 2016 trial and at Mr. Krivak's 440 hearing.  While not the only evidence of Mr. Gombert's guilt at Mr. DiPippo's 2016 trial – other evidence included testimony of reverse-*Molineux* witnesses who had been raped as children by Gombert in a similar manner as Josette, and the stipulated testimony of Stephanie Hoopes – Mr. Santoro's testimony detailing Howard Gombert's sole responsibility for the crimes against Josette Wright was powerful and credited by fact finders at Mr. DiPippo's 2016 hearing, by Judge Zuckerman, and by the Second Department, which reviewed *de novo* the record of Mr. Krivak's evidentiary hearing.  *People v. Krivak*, 168 A.D. 3d 979 (2d Dep't 2019).

285.     At both Mr. DiPippo's 2016 trial and at Mr. Krivak's 440 hearing, PCDA sought to discredit Mr. Santoro by arguing that he was testifying falsely about Gombert's admissions because (a) he had been compensated, or promised compensation by, Mr. DiPippo and/or Mr. Krivak, (b) had a relationship of loyalty with Mr. DiPippo and/or Mr. Krivak due to a decades-old friendship with a family member, and/or (c) was biased against PCSD because that office had prosecuted him for various unrelated crimes.  At both Mr. DiPippo's 2016 trial and Mr. Krivak's 440 hearing, Mr. Santoro denied each of these allegations and maintained that he had disclosed Gombert's admissions to DiPippo, and appeared to testify, solely as a Good Samaritan.

286.     Beginning on or about December 1, 2020, Joseph Santoro was detained at the Putnam County Correctional Facility (PCCF) on $100,000 bond/$50,000 cash bail on unrelated charges. While incarcerated at PCCF, Mr. Santoro attempted to commit suicide with a razor or similar instrument; when correctional officers sought to intervene, he turned the weapon on them and was arrested and charged with various violent felonies against the correctional officers.  All of Mr. Santoro's criminal charges were being prosecuted by PCDA.

287.    On April 23, 2021, during a one-on-one in person meeting at PCCF with Oscar Michelen, one of Mr. Krivak's attorneys, Mr. Santoro demanded that Mr. Michelen obtain money and goods from Mr. DiPippo in exchange for Mr. Santoro repeating his prior truthful testimony at Mr. Krivak's upcoming trial.  Mr. Santoro threatened that if his demands were not met, he would meet with Defendant Tendy to obtain a favorable plea deal for his pending cases in exchange for either withholding his truthful testimony or falsely recanting his prior truthful testimony that Gombert had confessed to the crimes against Josette Wright.

288.    Mr. Michelen told Mr. Santoro that neither Mr. Krivak, Mr. DiPippo, nor any attorney working on either man's behalf would ever agree to pay him in order to maintain his truthful testimony.  Nevertheless, at the conclusion of the meeting, Mr. Santoro gave Mr. Michelen a pre-written note he brought to the meeting which detailed his extortionate demands and provided delivery details for an initial cash payment, luxury handbag, and vehicle.

289.    Counsel for Mr. Krivak then determined that their ethical obligations as attorneys required them to report Mr. Santoro's extortion plot to law enforcement immediately, which they did.  The United States Attorney's Office for the Southern District of New York began its investigation, which concluded with the arrest of Mr. Santoro and a co-conspirator on April 28, 2021.

290.    It was later revealed that PCDA had been monitoring Mr. Santoro's recorded conversations from PCCF prior to, during, and after the April 23, 2021 meeting between Mr. Michelen and Mr. Santoro.  On these recordings, Mr. Santoro is clear that he does not believe his communications are being monitored and repeatedly makes assertions to his co-conspirator and to other friends that are favorable and exculpatory to Mr. Krivak.  These include a detailed account of Gombert's confession; repeated assertions that Mr. Santoro's prior testimony was

entirely truthful; that Mr. Santoro would be committing perjury if he changed his prior

testimony; and that Mr. Santoro only provided his prior, truthful testimony as a good deed and

did not have any other connection to Mr. DiPippo or Mr. Krivak or any interest in the outcome of

their prosecutions.

291.    The recordings also revealed that Mr. Santoro had directed his criminal defense attorney

Joseph Tock to seek a no jail plea from Defendants Tendy and Glasser on his pending charges in

exchange for Mr. Santoro providing perjured testimony at Mr. Krivak's upcoming trial.  Mr.

Santoro informed friends that he told Tock that his prior testimony was truthful but that he would

perjure himself if necessary to get a better deal.  Mr. Santoro stated on the recordings that if Mr.

DiPippo did not pay him for his truthful testimony, he would seek this deal from PCDA.

292.    PCDA, which was monitoring Mr.Santoro's calls, knew well in advance of Mr. Santoro's

actual extortion attempt of Mr. Santoro's illegal plans and possessed the aforementioned

exculpatory recordings.  PCDA also knew from these calls that Gombert had in fact confessed to

Mr. Santoro, that Mr. Santoro's prior testimony was truthful, and that any change in his

testimony would be perjurious.   Finally, PCDA knew that Mr. Santoro had no motive to lie to

help Mr. DiPippo or Mr. Krivak, because he had not been promised any benefit and because he

had no relationship with either man or their families.

293.    PCDA suppressed these exculpatory calls from Mr. Krivak and misrepresented to Mr.

Krivak's counsel and the court the contents of the recordings.  Further, despite the new evidence

of Mr. Krivak's innocence and Gombert's guilt contained within the recordings, rather than take

any steps to investigate this new evidence of Mr. Krivak's innocence, PCDA filed a motion to

disqualify Mr. Krivak's counsel of choice on May 20, 2021. PCDA's motion to disqualify Mr.

Krivak's counsel was ultimately denied after months of litigation that delayed Mr. Krivak's trial unnecessarily.

294.    Indeed, when Mr. Krivak's counsel subpoenaed Mr. Santoro's recorded jailhouse communications to respond to PCDA's motion to disqualify, Defendants Tendy and Glasser opposed the subpoena. On information and belief, Defendants Tendy and Glasser also encouraged or directed Mr. Santoro's attorney Tock to file a motion to quash the subpoenas, which motion was denied.

295.    PCDA's suppression of exculpatory evidence and fraudulent misrepresentations about the contents of the recordings was revealed when the trial court finally ordered the release of the recordings to Mr. Krivak's counsel pursuant to Mr. Krivak's counsel's subpoena.

296.    On September 10, 2021, Mr. Santoro pleaded guilty to Travel Act Extortion in violation of Title 18, United States Code, Sections 1952(a)(3) and 2. This guilty plea was entered pursuant to a plea agreement between Mr. Santoro and the United States Attorney's Office for the Southern District of New York. In entering his guilty plea, Mr. Santoro admitted that he demanded money and a car by "telling the attorney that I will not testify if they did not meet my demands, by suggesting that I will change my testimony *from the truthful testimony that I previously provided* if they failed to meet my demands."

297.    Despite the foregoing, Defendant Glasser told reporters in a public statement that Mr. Santoro's testimony about Gombert's confession was not credible. Defendants Tendy, Glasser, and others at PCDA continued to prosecute Mr. Krivak.

298.    Further, PCDA continued to monitor Mr. Santoro's recorded prison calls, including throughout Mr. Krivak's retrial, and continued to suppress Mr. Santoro's recorded calls that were favorable to Mr. Krivak. These recordings were finally turned over on February 15, 2023, after

the defense discovered that PCDA was suppressing additional calls and demanded their

disclosure in the midst of trial.  At that time, PCDA turned over nearly 14 hours of recordings,

which Mr. Krivak's defense team was required to listen to in the middle of trial, consuming very

limited defense resources in the midst of a high stakes, contentious trial.

299.    These incidents reveal that Defendants Tendy, Glasser, Krauss, and PCDA had plainly

inadequate or unlawful policies, procedures, regulations, practices, and customs concerning their

continuing obligation to timely and fully disclose material favorable to the defense as set forth in

statutory law as well as *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 450 U.S.

150 (1972), and progeny.

**While Purportedly Reinvestigating Mr. Krivak's Case, PCDA, Tendy, Glasser, Krauss, and Cilento Instead Engaged in Witness Intimidation and Coercion to Ensure that Mr. Krivak Would Again Be Wrongly Convicted**

300.    In August 2022, Defendants Tendy and Cilento drove more than six hours to visit defense

witness Adam Wilson, who was then incarcerated at Riverview Correctional Facility in

Ogdensburg, New York on an unrelated conviction.

301.    The visit was a surprise to Mr. Wilson.  During the meeting, Defendant Tendy told Mr.

Wilson that he believed that Mr. Wilson had in fact witnessed Mr. Krivak and Mr. DiPippo rape

and kill Josette Wright.  Mr. Wilson repeated what he has maintained since his recantation in

May 1996  – that he only signed the statement Defendants Stephens, Castaldo, and Quick drafted

due to their undue pressure during his interrogation.

302.    Defendant Tendy then went on to tell Mr. Wilson that because his current conviction

arose in Putnam County, Defendant Tendy – as District Attorney of Putnam County – could

influence Mr. Wilson's chances for parole. Defendant Tendy then showed Mr. Wilson a letter he

had purportedly sent to New York State Board of Parole.  The implication was that if Mr. Wilson

continued to testify as he had previously that Defendant Tendy would oppose Mr. Wilson's release on parole.

303.     The defense learned of this visit in or about October 2022 and demanded all materials relating to the visit, which were exculpatory insofar as Mr. Wilson had told Defendants Tendy and Cilento that Defendants Stephens, Castaldo, and Quick had forced him to sign their fabricated statement and that he had never witnessed Mr. Krivak or Mr. DiPippo commit any crime against Josette Wright.  The Court ordered PCSD to disclose those materials on October 14, 2022.  PCSD insisted it had no relevant materials.

304.     During trial, on Thursday, February 16, 2023, Defendants Tendy and Glasser inadvertently disclosed that in August 2022, Defendant Cilento had sought and received a recorded prison call between Mr. Wilson and a friend in which he described the meeting with Defendants Tendy and Cilento.  This recording was exculpatory but was nevertheless suppressed by Defendants Tendy, Glasser, and Cilento.  Defendants Tendy and Glasser also falsely told Mr. Krivak's counsel and the trial court that no such material reflecting the meeting existed.

305.     The Court engaged in colloquy with Defendant Tendy about the suppression of this evidence and specifically about PCDA's protocols for reviewing and preserving evidence and meeting its discovery obligations.  In response, Defendant Tendy made clear that he and his office had plainly inadequate or unlawful policies, procedures, regulations, practices, and customs concerning their continuing obligation to timely and fully disclose material favorable to the defense as set forth in statutory law as well as *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 450 U.S. 150 (1972), and progeny.  This incident also reveals that PCDA had plainly inadequate or unlawful policies, procedures, regulations, practices, and customs concerning the duty not to create or to otherwise use false, misleading or unreliable evidence,

testimony, statements or arguments during criminal proceedings and the obligation to correct

false, inaccurate, incomplete or misleading evidence, testimony, statements and argument

whenever such misconduct is discovered to have occurred.

**PCDA Failed To Disclose Numerous Police Personnel Files That Were Impeaching and Exculpatory, In Violation of the Law and Court Orders**

306.    PCDA was required by law to turn over to Mr. Krivak, without a specific request, all

favorable material found within the personnel files of PCSD officers involved in his case.  *See*

CPL 245.20(1)(k)(iv) & (2); *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 450

U.S. 150 (1972), and progeny.

307.    In October 2021, the defense learned that Defendant Glasser had not reviewed the

personnel files for any of the PCSD officers involved in the case since prior to Mr. DiPippo's

2016 trial.  This was a significant error because in the period between Mr. DiPippo's 2016 retrial

and Mr. Krivak's retrial, the New York State legislature had significantly expanded a criminal

Defendant's right to discovery of police personnel files by both expanding the discovery statue

and repealing a statute that had previously provided for the confidentiality of certain police

personnel records.

308.    The trial court ordered Defendants Glasser and Tendy to review and disclose any relevant

documents.  In response, in November 2021, Defendants Glasser and Tendy disclosed a single

additional page from Defendant Castaldo's personnel file which contained a rebuke for having

created an inaccurate report that contained errors.

309.    The defense reiterated its request for all police personnel records prior to the testimony of

Defendant Stephens; Defendants Glasser and Tendy provided no additional material.

310.    Defendant Stephens' testimony with respect to his own personnel file was at odds with

the representations previously made by Defendants Glasser and Tendy.  As a result, on or about

February 16, 2023, Judge Prisco, the presiding judge, granted Mr. Krivak's request to conduct an *in camera* review of all of the officers' personnel files.  Judge Prisco directed Defendants Glasser and Tendy to have PCSD produce those files directly to the court.

311.    The trial court identified more than nine internal memoranda relating to Defendants Stephens and Castaldo that PCDA improperly suppressed.  Importantly, these memoranda, in part, documented Defendant Castaldo's long history of misconduct within the PCDA.

312.    During the Court's colloquy with Defendant Glasser concerning his failure to identify and/or disclose these documents, Defendant Glasser made clear that he, Defendant Tendy and PCDA had plainly inadequate or unlawful policies, procedures, regulations, practices, and customs concerning their continuing obligation to timely and fully disclose material favorable to the defense as set forth in statutory law as well as *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 450 U.S. 150 (1972), and progeny.

**PCDA Suppressed Information Relating to Defendant Castaldo's Threatening Another Suspect During an Interrogation**

313.    In October 2021, Mr. Krivak's counsel became aware that Defendant Krauss had previously testified under oath in an unrelated proceeding that she witnessed Defendant Castaldo threaten a suspect with death by hanging during an interrogation.  Mr. Krivak's counsel then sought all material relating to this incident and the case in which it occurred; the trial court ordered PCDA to produce all such material.

314.    Neither Defendants Tendy, Krauss, or Glasser produced any materials relating to Castaldo's threat or the case.  In fact, Defendants Tendy, Krauss, and Glasser falsely represented to the trial court and Mr. Krivak's counsel that no such materials existed.

315.    During Mr. Krivak's retrial, however, it became apparent that materials relating to this case did in fact exist and were in the possession of Defendants Tendy, Krauss, Glasser and others at PCDA.

316.    As a result, the trial court ordered Defendants Tendy, Glasser, and Krauss, and PCDA to disclose all relevant materials; a box of materials was then produced.  However, the belated disclosure of these materials – after the defense had rested – severely prejudiced Mr. Krivak as he could not use the materials for investigatory or impeachment purposes.

317.    As with the prior incidents, the suppression of these records revealed that Defendants Tendy, Krauss, Glasser, and PCDA had plainly inadequate or unlawful policies, procedures, regulations, practices, and customs concerning their continuing obligation to timely and fully disclose material favorable to the defense as set forth in statutory law as well as *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 450 U.S. 150 (1972), and progeny.

**PCDA Used Defendant York to Try to Improperly Influence the Trial Judge Through an Ex Parte Communication at Mr. Krivak's Retrial**

318.    At the time of Mr. Krivak's retrial, Defendant York was an attorney in private practice, duly admitted in New York State.  Prior to entering private practice, Defendant York had been PCDA's Chief Assistant District Attorney.  In that capacity he had retried Mr. DiPippo in 2012, successfully opposed Mr. DiPippo's presentation of third-party guilt evidence, and obtained a conviction which was then reversed by the Court of Appeals because Mr. DiPippo's constitutional right to present a complete defense had been infringed.

319.    Prior to serving as PCDA's Chief Assistant District Attorney, Defendant York had worked in the Westchester District Attorney's Office.  During this time, Defendant York worked with and came to know the trial judge in Mr. Krivak's retrial, Judge Robert Prisco.

320.     During Defendant York's purported reinvestigation of Mr. DiPippo's case, he threated defense witness Dominic Neglia with prosecution for perjury if he were to truthfully testify that Defendants Castaldo and Quick had coerced him to agree to fabricated statements in order to implicate Mr. Krivak and Mr. DiPippo in Ms. Wright's murder.

321.     As a result of these threats, Mr. Neglia did not testify at Mr. DiPippo's 2012 trial.  He did subsequently testify at Mr. DiPippo's 2016 trial, when Defendant York was no longer employed by PCDA.  During Defendant Glasser's 2016 cross-examination of Mr. Neglia, Defendant Glasser inquired about Mr. Neglia's 2012 meeting with Defendant York and others and sought to cast doubt on Mr. Neglia's claim that he was threatened by Defendant York with perjury.

322.     At Mr. Krivak's retrial, Mr. Neglia again testified for the defense.  On direct, counsel for Mr. Krivak elicited from Mr. Neglia Defendant York's improper threats of prosecution.

323.     Thereafter, the trial judge advised the parties that the day before Mr. Neglia testified, Defendant York had paid him a "surprise visit" at his temporary chambers in the Putnam County Courthouse, and that during that visit Defendant York, without any prompting from the Court, had told the trial judge that he disagreed with the Court of Appeals' decision vacating Mr. DiPippo's 2012 conviction.

324.     On information and belief, Defendant York was urged or directed to seek to influence the trial judge by Defendants Tendy, Glasser or others at PCSD by meeting with the trial judge privately and expressing negative views about the presentation of third-party guilt evidence and casting aspersions on the Court of Appeals' decision.  Defendants Tendy, Glasser, and York knew this meeting and discussion of the Court of Appeals' decision in Mr. Krivak's co-Defendant's case was improper and a violation of their ethical duties.

325.    As with the prior examples, this incident demonstrates that Defendants Tendy, Glasser, and PCDA had plainly inadequate or unlawful policies, procedures, regulations, practices, and customs concerning their obligations to refrain from *ex parte* communications with a presiding judge concerning the matter being adjudicated, whether directly or through an agent.

**PCDA Pressured and Harassed the Mother of a Defense Witness to Provide False Testimony, and Then Suppressed Communications with this Witness**

326.    Defendants Tendy, Glasser, and Cilento sought to improperly pressure the mother of defense witness Allyson Clokey to testify in a manner inconsistent with her own recollection, in order to advantage the prosecution and discredit Ms. Clokey.

327.    Ms. Clokey's mother repeatedly told Defendants Glasser and Cilento that while she would testify pursuant to a subpoena, she did not want to meet with them to discuss her testimony.  Defendants Glasser and Cilento nevertheless pressured her to meet with them.

328.    Defendants Tendy, Glasser, and Cilento also sought to shape this witness's testimony by misleading her about prior statements both she and her daughter – who had already testified – had made.

329.    The behavior of Defendants Tendy, Glasser, and Cilento caused Ms. Clokey's mother to inform them that she would only testify to what she remembers "not what people tell me, but what I recall."

330.    Defense counsel specifically requested from Defendants Tendy and Glasser any discoverable material from their communications with Ms. Clokey's mother, and they once again falsely stated that no such material existed.

331.    In fact, emails between Ms. Clokey's mother and Defendants Glasser and Cilento were discoverable.  These emails, which counsel for Mr. Krivak independently obtained, stated in

substance that Ms. Clokey's mother felt pressured by Glasser and others to testify as they wished her to testify.

332.   As with the prior incidents, the suppression of these records revealed that Defendants Tendy, Krauss, Glasser, and PCDA had plainly inadequate or unlawful policies, procedures, regulations, practices, and customs concerning their continuing obligation to timely and fully disclose material favorable to the defense as set forth in statutory law as well as *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 450 U.S. 150 (1972), and progeny.

**Throughout Mr. Krivak's Retrial, Tendy and Glasser Suborned Perjury, Failed to Correct False Testimony, and Made Material, False Misrepresentations to the Court and Mr. Krivak's Counsel**

333.   Throughout Mr. Krivak's retrial, Defendants Tendy and Glasser suborned perjury and failed to correct false testimony from nearly every prosecution witness, including Defendants Castaldo, Stephens, Rose, Quick, Asher, and Rees.

334.   By way of just one example, Defendant Stephens falsely testified under oath that he was unaware that Mr. Deskovic had been excluded by DNA testing as the crime's perpetrator prior to Mr. Deskovic's trial.  In fact, Defendant Stephens was well aware prior to Mr. Deskovic's trial that he had been excluded by DNA testing – a fact he conceded prior to the civil rights trial brought by Mr. Deskovic.  This fact was also established by one of the records contained in Defendant Stephens' personnel file suppressed by Defendants Tendy, Krauss, and Glasser.  Similarly, Defendant Stephens falsely testified under oath that his personnel file had been "lost".  Neither Defendant Tendy nor Defendant Glasser took any steps to correct this false testimony.  In fact, on information and belief, they conspired with Defendant Stephens to have this false testimony offered at Mr. Krivak's trial.

335.   By way of another example, Defendant Tendy elicited false testimony from Defendant Rose minimizing her history of serious drug use prior to Josette Wright going missing.  Neither

Defendant Tendy nor Defendant Glasser took any steps to correct this false testimony.  In fact, on information and belief, they conspired with Defendant Rose to have this false testimony offered at Mr. Krivak's trial.

336.    Throughout Mr. Krivak's retrial, Defendants Tendy and Glasser made material, false misrepresentations to the trial court and Mr. Krivak's counsel.

337.    As just one example, PCDA sought to call as a potential rebuttal witness Joseph Santoro's former criminal defense lawyer, Joseph Tock.  The trial court ordered that, prior to Tock's conditional testimony, Defendants Tendy and Glasser were to obtain from Tock and provide to Mr. Krivak's attorneys Tock's records concerning his representation of Mr. Santoro. Defendants Tendy and Glasser falsely represented to Mr. Krivak's counsel and the trial court that they had sought documents but that Tock did not provide them, even going so far as to tell the trial court that they were leaving the court room to reiterate the request to Tock who was waiting outside of the courtroom.  Shortly thereafter, during Tock's cross-examination by Mr. Krivak's attorneys, Tock testified that no one from PCDA had ever sought documents connected to his representation of Mr. Santoro; that Defendant Glasser had not just had a conversation with him about documents relating to his representation of Mr. Santoro; and that in fact, he did have documents which would establish dates of conversations or visits with Santoro about the deal Santoro sought with PCDA.  Defendant Glasser made no attempt to correct this testimony which established that Defendant Glasser had plainly lied to the Court and Mr. Krivak's counsel about a conversation with Tock about the documents.

338.    As with PCDA's other instances of misconduct, these instances reveal that PCDA has instituted and implemented plainly inadequate or unlawful policies, procedures, regulations, practices, and customs concerning the duty not to create or to otherwise use false, misleading or

unreliable evidence, testimony, statements or arguments during criminal proceedings and the obligation to correct false, inaccurate, incomplete or misleading evidence, testimony, statements and argument whenever such misconduct is discovered to have occurred.

***Despite These and Other Acts of Egregious Misconduct by PCDA and PCSD Beginning with the Original Investigation and Continuing through His Retrial, Mr. Krivak is Finally Acquitted, Resulting in Defendant Glasser Being Punished by Defendant Tendy***

339.    Mr. Krivak's retrial began on January 9, 2023 and concluded on February 27, 2023.  The jury deliberated for a mere six hours before returning a verdict of not guilty.  After more than 26 years of wrongful accusation, conviction, incarceration, and detention, Mr. Krivak was finally free.

340.    Following Mr. Krivak's acquittal, Defendant Tendy demoted Defendant Glasser from his previously held position as First Assistant District Attorney.  On information and belief, this demotion was a punishment for Mr. Krivak being correctly acquitted.

## DAMAGES

341.    Defendants' unlawful, intentional, willful, deliberately indifferent, reckless, and/or bad-faith acts and omissions caused Andrew Krivak to be falsely arrested and imprisoned, unfairly tried, wrongfully convicted, and forced to serve more than 24 years imprisoned and more than two years and four months on home confinement, tethered to an ankle monitor, and unable to move about freely.

342.    Mr. Krivak was falsely labeled a sex offender and was denied prison privileges such as trailer visits with family, work assignments, and educational opportunities based on this false designation.  This false label and the nature of the crime – the rape and murder of a child – made Mr. Krivak a permanent target for violence, as pedophiles and child killers are viewed by other

incarcerated people and guards as the lowest members of the prison population, deserving of violence.

343.    As a direct result of Defendants' intentional, bad faith, willful, wanton, reckless, and/or deliberately indifferent acts and omissions, Mr. Krivak sustained injuries and damages, which continue to date and will continue into the future, including: loss of freedom for more than twenty-six years; physical pain and suffering; severe mental anguish; emotional distress; the psychological burden of doing another man's time; loss of family relationships; severe psychological damage; loss of property; legal expenses; loss of income and career opportunities; humiliation, indignities and embarrassment; degradation; damage to reputation; loss of quality and enjoyment of life; permanent loss of natural psychological development; and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression, for which he is entitled to monetary relief.

344.    As a direct result of Defendants' intentional, bad faith, willful, wanton, reckless, and/or deliberately indifferent acts and omissions, Mr. Krivak was also deprived of his familial relationships.

345.    As a direct result of Defendants' intentional, bad faith, willful, wanton, reckless, and/or deliberately indifferent acts and omissions, Mr. Krivak sustained physical injuries and damages, including physical pain and suffering, personal injuries, physical illness, inadequate medical care, for which he is entitled to monetary relief.

346.    Mr. Krivak continues to suffer physical, emotional, mental, and psychological damage as a result of the Defendants' conduct.

347.    These injuries and damages to Mr. Krivak were foreseeable to Defendants at the time of their acts and omissions.

348.    All of the acts and omissions committed by Defendants were done intentionally, unlawfully, maliciously, wantonly, recklessly, negligently, and/or with bad faith, and said acts meet all of the standards for imposition of punitive damages.

### CLAIMS FOR RELIEF

### FEDERAL CAUSES OF ACTION
### COUNT I
**42 U.S.C. § 1983 Malicious Prosecution in Violation of the Fourth and Fourteenth Amendments**

349.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs.

350.    The Individual PCSD and PCDA Defendants, with malice and knowing that probable cause did not exist to arrest Andrew Krivak and prosecute him for the rape and murder of Josette Wright, acting individually and in concert, caused Mr. Krivak to be falsely arrested, charged, and prosecuted for those crimes, thereby violating Mr. Krivak 's clearly established rights under the Fourth and Fourteenth Amendments of the United States Constitution to be free of unreasonable searches and seizures and to be free of prosecution absent probable cause.

351.    Specifically, as described in detail above, Defendants, acting individually and in concert, fabricated evidence and intentionally withheld and misrepresented to Mr. Krivak's defense counsel, the court, grand jury, and Mr. Krivak's trial juries, exculpatory facts that they knew would have vitiated probable cause against Mr. Krivak and they knew would have impeached witnesses for the prosecution at trial, including but not limited to the fact that Defendants conspired to plant Ms. Wright's jewelry in Mr. Krivak's van and obtained false inculpatory statements through coercion.

352.     These Defendants also failed to conduct a constitutionally adequate investigation in light of evidence pointing to Howard Gombert's culpability and away from Mr. Krivak.

353.     Mr. Krivak is completely innocent of the rape and murder of Josette Wright.

354.     After a seven-week retrial, the prosecution finally terminated in Mr. Krivak's favor on February 27, 2023, when a jury acquitted Mr. Krivak.

355.     Defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Mr. Krivak's clearly established constitutional rights. No reasonable officer in 1995-1996 would have believed this conduct was lawful.

356.     The acts and omissions by Defendants described in the preceding paragraphs were the direct and proximate cause of Mr. Krivak's injuries because these Defendants knew, or should have known, that their conduct would result in the wrongful arrest, prosecution, conviction, and incarceration of Mr. Krivak.

### COUNT II
**42 U.S.C. § 1983 Deprivation of Liberty without Due Process of Law and Denial of Fair Trial by Fabricating Evidence, Withholding Material Exculpatory and Impeachment Evidence, and Deliberately Failing to Conduct a Constitutionally Adequate Investigation in Violation of the Fourteenth Amendment**

357.     Plaintiff hereby incorporates by reference all of the foregoing paragraphs.

358.     The Individual PCSD and PCDA Defendants, acting individually and in concert, and within the scope of their employment with the PCSD and PCDA, deprived Mr. Krivak of his clearly established constitutional right to due process of law and to a fair trial.

359.     Defendants deprived Mr. Krivak of his right to a fair trial by deliberately fabricating inculpatory evidence and using unduly suggestive interrogation procedures and/or direct suggestion and/or coercion to fabricate and obtain false witness statements inculpating Andrew

Krivak, including without limitation, fabricating the false statements of Dominick Neglia, Defendant Rose, Adam Wilson, William MacGregor, Andrew Krivak, David Chontos and others. Defendants then concealed the misconduct that had produced those statements, including but not limited to coercive and suggestive tactics used in witness interviews.

360.   These Defendants deprived Mr. Krivak of his right to a fair trial by withholding material exculpatory and impeachment evidence from prosecutors and defense, including without limitation, exculpatory statements of alleged witnesses prior to their coerced, false statements.

361.   Had Defendants' fabrications and material, exculpatory and impeachment evidence known to them been documented and/or disclosed, they would have tended to prove Mr. Krivak's innocence, cast doubt on the entire police investigation and prosecution, and impeached the critical trial testimony of Defendant Rose and other witnesses. The exculpatory and impeachment evidence withheld by Defendants undermines confidence in the verdict against Mr. Krivak, and the concealment of this evidence deprived Mr. Krivak of a fair criminal trial.

362.   These Defendants deprived Mr. Krivak of his right to a fair trial by deliberately failing to conduct a constitutionally adequate investigation, including without limitation by failing to investigate leads pointing towards other suspects and corroborating Mr. Krivak's innocence and by failing to provide information to the Carmel Police Department.

363.   Defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Mr. Krivak's clearly established constitutional rights. No reasonable officer in 1995-1996 would believe this conduct was lawful.

364.    The acts and omissions of Defendants, as described in the preceding paragraphs, were the direct and proximate cause of Mr. Krivak's injuries. These Defendants knew, or should have known, that their conduct would result in Mr. Krivak's wrongful arrest, prosecution, conviction, and incarceration.

### COUNT III
**42 U.S.C. § 1983 Failure to Intervene**

365.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs.

366.    By their conduct and under color of state law, the Individual PCSD and PCDA Defendants, acting within the scope of their employment, had opportunities to intervene on behalf of Mr. Krivak to prevent his malicious prosecution and deprivation of liberty without due process of law, but with deliberate indifference, declined to do so.

367.    These Defendants' failures to intervene violated Mr. Krivak's clearly established constitutional right not to be deprived of liberty without due process of law as guaranteed by the Fourteenth Amendment. No reasonable police or prosecutor at the times relevant to this complaint would have believed that failing to intervene to prevent these Defendants from fabricating inculpatory evidence or causing Mr. Krivak to be arrested and prosecuted without probable cause, were lawful.

368.    These Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Mr. Krivak's injuries. Defendants knew, or should have known, that their conduct would result in Mr. Krivak's wrongful arrest, prosecution, conviction, and incarceration.

### COUNT IV
**42 U.S.C. § 1983 Civil Rights Conspiracy**

369.     Mr. Krivak hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

370.     The Defendants, acting within the scope of their employment and under color of state law, and Defendant Denise Rose, agreed among themselves and with other individuals to act in concert in order to deprive Andrew Krivak of his clearly established Fourth and Fourteenth Amendment rights to be free from unreasonable searches and seizures, false arrest, false imprisonment, malicious prosecution, and deprivation of liberty without due process of law, and also deprived Mr. Krivak of his right to a fair trial.

371.     In furtherance of the conspiracy, Defendants engaged in and facilitated numerous overt acts, including, without limitation, the following:

   a.  Falsely arresting and imprisoning Andrew Krivak, knowing that they lacked probable cause;

   b.  Fabricating inculpatory evidence in reports, statements, and pretrial communications with the prosecution, including the statements of Neglia, Rose, Wilson, MacGregor, Mr. Krivak, Ms. McLaughlin, Ms. Clokey, Mr. Chontos, and others, which inculpated Andrew Krivak in the rape and murder of Josette Wright;

   c.  Planting evidence in Mr. Krivak's van for the purpose of inculpating Andrew Krivak in the rape and murder of Josette Wright;

   d.  Committing, suborning, and failing to correct perjury during hearings and trials;

   e.  Intentionally or with deliberate indifference failing to comply with their duty to disclose Brady material during the pendency of the case.

372.     Andrew Krivak is completely innocent of the rape and murder of Josette Wright. The prosecution finally terminated in Mr. Krivak's favor on February 27, 2023, when he was acquitted by a jury following a seven-week trial.

373.     As a direct and proximate result of these Defendants' actions, Andrew Krivak was wrongfully convicted, imprisoned, and otherwise detained for more than twenty-six years and suffered the other grievous and continuing damages and injuries set forth above.

## COUNT V
### 42 U.S.C. § 1983 Coercion

374.     Mr. Krivak hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

375.     Defendants Turner, Stephens, Castaldo, and Quick intentionally isolated Mr. Krivak, who was only eighteen years old and being blamed for the rape and murder of a young girl. These Defendants then engaged in, *inter alia*, a deliberate course of lies, deception, coercion, threats if he did not cooperate, and false assurances of leniency and beneficial assistance if he cooperated.

376.     As a result of these Defendants' improper and coercive tactics, Mr. Krivak's will was overborn and Defendants caused Mr. Krivak to sign a false, police-drafted "confession" that falsely incriminated himself in violation of his clearly established Fifth and Sixth Amendment right to be free from compelled self-incrimination and to be afforded access to counsel.

377.     Andrew Krivak is completely innocent of the rape and murder of Josette Wright. The prosecution finally terminated in Mr. Krivak's favor on February 27, 2023, when he was acquitted by a jury following a seven-week trial.

378.     As a direct and proximate result of these Defendants' actions, Andrew Krivak was wrongfully convicted, imprisoned, and detained for more than twenty-six years and suffered the other grievous and continuing damages and injuries set forth above.

**COUNT VI**
**42 U.S.C. § 1983 Supervisory Liability Claim**

379.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs.

380.    Defendants Stephens, Castaldo, Quick, Rees, and Asher acted with impunity in an environment in which they were not adequately supervised, disciplined, or trained by Defendants Thoubboron, Turner, and/or Stephens in this case and as a matter of practice.

381.    Defendants Thoubboron, Turner, and/or Stephens acted with gross negligence, recklessness, and/or deliberate indifference to the constitutional rights of citizens by failing to provide adequate training, supervision, and discipline of the individual PCSD Defendants, and thereby caused the individual PCSD Defendants to deprive Andrew Krivak of his clearly established constitutional rights, including his rights to be free from false imprisonment, malicious prosecution, and deprivation of liberty without due process of law, and his right to a fair trial.

382.    Had Defendants Putnam County, PCSD, Thoubboron, Turner, and Stephens not provided grossly inadequate training, supervision, and discipline of the individual PCSD Defendants, they would not have fabricated inculpatory evidence, failed to disclose exculpatory evidence, and intentionally and maliciously caused Andrew Krivak to be arrested and prosecuted without probable cause. Defendants Thoubboron, Turner, and Stephens were directly involved in the investigation of Andrew Krivak and directly supervised the specific investigative acts taken by the individual PCSD Defendants in this case.

383.    The grossly negligent, reckless, and/or deliberately indifferent conduct of Defendants Thoubboron, Turner, and Stephens under color of state law violated their duty, which had been clearly established by 1995-1996, to supervise Defendants Castaldo, Quick, Rees, Asher, and Stephens, and no reasonable police supervisor by 1995-1996 would have believed that grossly

negligent, reckless, and/or deliberately indifferent supervision in the face of actual or constructive notice of misconduct by their subordinate officers was lawful.

384.    As a direct and proximate result of Defendants' actions, Andrew Krivak was wrongly convicted, imprisoned, and detained for more than twenty-six years and suffered the other grievous and continuing damages and injuries set forth above.

## COUNT VII
### 42 U.S.C. § 1983 Monell Claim
*Against Defendant Putnam County for the Acts and Omissions of PCDA*

385.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs, and further alleges as follows:

386.    Beginning on or about July 1, 1996, members of the PCDA, including District Attorney Kevin Wright, District Attorney Robert Tendy, Assistant District Attorneys Christopher York, Larry Glasser, and Chana Krauss, and District Attorney Investigator Ralph Cilento violated Mr. Krivak's constitutional rights and his resultant injuries were directly, foreseeably, proximately, and substantially caused by conduct chargeable to a de facto policy, custom or practice on the part of the Defendant Putnam County, amounting to deliberate indifference to the constitutional rights of persons, including Mr. Krivak, subject to prosecution by the PCDA, namely:

    a.  PCDA's institution and implementation of plainly inadequate or unlawful policies, procedures, regulations, practices, and customs concerning:

        i.  The duty not to initiate a criminal prosecution that is not based on probable cause;

        ii. The duty not to create or to otherwise use false, misleading or unreliable evidence, testimony, statements or arguments during criminal proceedings;

iii. The obligation to correct false, inaccurate, incomplete or misleading evidence, testimony, statements and argument whenever such misconduct is discovered to have occurred;

iv. The continuing obligation to timely and fully disclose material favorable to the defense as set forth in *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 450 U.S. 150 (1972), and progeny;

v. Knowingly making false and misleading arguments during summation;

vi. The duty to refrain from making extrajudicial statements about a pending matter that have a substantial likelihood of heightening public condemnation of the accused and exercise reasonable care to prevent those assisting or associated with the prosecutor in a criminal case from making similar extrajudicial statements.

b. PCDA's deliberate indifference to the need (of which it has failed) to adequately instruct. train, supervise, and discipline its employees with respect to such matters.

387.    The aforesaid deliberate or de facto policies, procedures, regulations, practices and customs, including the failure to properly instruct, train, supervise, and discipline employees with regard thereto, were implemented or tolerated by policymaking officials for Defendant County, including the Putnam County District Attorney and his delegates, who knew:

a. To a moral certainty that such policies, procedures, regulations, practices and customs concern issues that regularly arise in the investigation and prosecution of criminal cases;

99

b.  That such issues present employees with difficult choices of the sort that instruction, training, supervision, and discipline will make correct choices less difficult and incentivize making correct choices;

c.  That the making of wrong choices by municipal employees concerning such issues will frequently cause the deprivation of the constitutional rights of an accused and cause him or her constitutional injury; and

d.  That employees of the PCDA had a long history of making wrong choices in such matters.

388.    The aforementioned policymaking officials had the knowledge and the notice alleged in the preceding paragraph, based upon:

a.  Numerous credible allegations that the PCDA employees had:

i.  Participated in the manufacturing of false testimony or evidence;

ii.  Presented or failed to correct false or misleading testimony and argument;

iii.  Failed to disclose information favorable to the defense that was required to be disclosed by the Constitutions and the laws of the United States and of the State of New York; and

b.  The inherent obviousness of the need to train, supervise, and discipline ADAs in their aforementioned constitutional obligations to counteract the inherent pressure on prosecutors to obtain convictions.

389.   At the time of Mr. Krivak's prosecutions, the Putnam County District Attorney's indifference to the aforementioned types of prosecutorial misconduct was evidenced by his failure to:  conduct internal disciplinary investigations; discipline the prosecutors who were

known to engage in such misconduct; or refer such individuals for possible discipline by the

Appellate Division's Disciplinary or Grievance Committees.

390.   Instead of disciplining such prosecutors for the aforementioned types of prosecutorial

misconduct, the PCDA's policy, custom, or practice was to give them raises, promotions and

commendations, based in part on their record of securing indictments, winning at trial and

extracting guilty pleas, even in weak cases or cases (like Mr. Krivak's) where reasonable

grounds did not exist to believe the defendant committed the offense charged.

391.   Thus, prosecutors were incentivized to violate the constitutional rights of criminal

defendants, since they knew they were likely to be rewarded for winning but would suffer no

negative consequences if it ever became known that they were violating the rights of the

Defendants they were prosecuting.

392.   Further encouraging prosecutors to win at any cost was their knowledge that the PCDA

had no employee handbook or other published procedure for disciplining prosecutors who

violated rules of behavior for criminal prosecutions.

393.   Indeed, prosecutors were emboldened to violate basic constitutional provisions protecting

criminal defendants' constitutional right to a fair trial by their knowledge that the Putnam

County District Attorney was willing to pursue or tolerate policies, customs, and practices that

brazenly violated criminal defendants' fundamental constitutional rights.

394.   Evidence of the PCDA's deliberate indifference to prosecutorial misconduct violative of a

criminal defendants' constitutional rights, including the making of false or misleading

arguments to a jury, and withholding information favorable to the defense was uncovered

during the civil rights litigation in *DiPippo v. County of Putnam, et al.,* 20-cv-09025-AT-RWL

(S.D.N.Y.) and *William Haughey v. County of Putnam, et al.,* 18-CV-2861 (KMK) (S.D.N.Y.).

395.   Further evidence of the PCDA's deliberate indifference to prosecutorial misconduct was uncovered in the companion lawsuits from the cases cited above which also involved the knowing use of false evidence and argument and committing Brady violations by the PCDA. Counsel in these cases reviewed personnel files for PCDA cases where prosecutor misconduct had been found from between 1989 through 2006 and did not discover any documentary evidence of disciplinary action ever being taken against the prosecutors.

396.   The Putnam County District Attorney's policy, custom and practice of approval and/or ratification of, toleration and/or acquiescence in, or deliberate indifference to violations of his Office's constitutional obligations foreseeably encouraged such violations to continue and was a substantial cause of the violations of Mr. Krivak's constitutional rights beginning with the initiation of a criminal prosecution against him without probable cause and continuing throughout his criminal proceedings and trials.

397.   The aforesaid policies, procedures, regulations, practices, and customs of Defendant County were collectively and individually a substantial factor in bringing about the aforesaid violations of Mr. Krivak's rights under the Constitution and Laws of the United States and in causing his damages.

398.   Under the principles of municipal liability for federal civil rights violations, the Putnam County District Attorney (or his authorized delegates) has final managerial responsibility for training, instructing, supervising, and disciplining attorneys and other employees in his office regarding their conduct in the prosecution of criminal matters, including but not limited to, their obligations not to elicit or manufacture false or unreliable "evidence," to make timely disclosure of exculpatory evidence to the defense, to refrain from offering false or misleading evidence,

testimony mad argument during pretrial and trial proceedings, and to correct such false or misleading evidence, testimony, and argument when they become aware of it.

399.   The Putnam County District Attorney, personally and/or through his authorized delegates, at all relevant times had final authority to promulgate and implement administrative and managerial policies and procedures, including policies and procedures as to personnel hiring, training, supervision, and discipline with respect to his Office's performance of its duties.

400.   The Putnam County District Attorney, at all relevant times, was and is an elected officer of Putnam County.

401.   The Putnam County District Attorney was and is designated a "local officer," rather than a "state officer," under New York Public Officers Law § 2; New York as provided by statute (New York County Law §§ 53, 941) and hence Defendant County has liability for torts committed by County officers and employees, such as the Putnam County District Attorney and his assistants, and Defendant County represents such officers and employees in judicial proceedings and indemnifies them because they are County officials.

402.   The Putnam County District Attorney personally and/or through his authorized delegates, at all relevant times, had final authority and constituted a County policymaker for whom the County is liable, with respect to the above-mentioned areas.

403.   During all times material to this Complaint, the County, through its policymakers, owed a duty to the public at large and to Mr. Krivak, which such policymakers knowingly and intentionally breached, or to which they were deliberately indifferent, to implement policies, procedures, customs, and practices sufficient to prevent, deter, and avoid conduct by their subordinates violating the aforementioned constitutional rights of criminal suspects or Defendants and of other members of the public.

404.    By virtue of the foregoing, Defendant County is liable for having substantially caused the foregoing violations of Mr. Burton's constitutional rights and his resultant injuries.

**COUNT VIII**
*42 U.S.C. § 1983 Monell Claim*
*Against Defendant Putnam County for the Acts and Omissions of PCSD*

405.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs.

406.    Defendant County of Putnam was at all times relevant to this Complaint responsible for the policies, practices, and customs of the Putnam County Sheriff's Department.

407.    Defendant County of Putnam by and through its final policymakers, had in force and effect during the Josette Wright investigation and for years beforehand, a policy, practice, or custom of unconstitutional misconduct in serious felony investigations, including in particular the encouragement and use of, and reliance on, improper interrogation and interview techniques to obtain false and inculpatory witness statements; the fabrication of incriminating statements from witnesses, suspects, and arrestees by feeding nonpublic facts about the crime that only the police and the true perpetrator would know; the encouragement and use of, and reliance on witness statements that law enforcement knew or should have known were false; the fabrication of inculpatory evidence; the suppression of exculpatory and/or impeachment evidence; ignoring evidence that suggests the innocence of law enforcement's suspects; and the intentional failure to conduct adequate investigations of crimes.

408.    Defendant County of Putnam by and through its final policymakers had no established training and supervision of police personnel; no police academy; no police training manual; no written policies and procedures in place for interrogation of suspects; no training on basic constitutional rights; no training on proper handling of evidence and crime scenes; and was otherwise negligent in its training and supervision of police personnel.

104

409.    Defendant County of Putnam by and through its final policymakers, had in force and effect during the Josette Wright investigation and for years beforehand, a policy, practice, or custom of failing to adequately supervise, discipline and train officers investigating serious felonies.

410.    Final policymakers for Putnam County had actual or constructive notice of, but repeatedly failed to make any meaningful investigation into charges that PCSD officers were using the misconduct described above to close cases. Final policymakers for Putnam County also had actual or constructive notice that widespread failures to supervise or discipline officers for misconduct committed during the course of serious felony investigations enabled officers to engage in misconduct without repercussion. The continued adherence to these unconstitutional municipal customs, practices and/or policies amounted to deliberate indifference to the constitutional rights of criminal defendants like Mr. Krivak.

411.    Putnam County, through the PCSD, had no police academy; no training officers; and no regular training of its officers and investigators in the proper collection and maintenance of evidence; the taking and recording of witness statements; the taking, recording and preservation of exculpatory evidence; the taking, recording and preservation of material that would be discoverable to the defense under *Brady* and/or *Giglio*, and progeny; and the law regarding warrantless and warranted searches.

412.    Such unconstitutional municipal customs, practices and/or policies were the moving force behind Mr. Krivak's arrest, prosecution, and more than twenty-four years of incarceration and more than two years and four months of home confinement, as well as all the other grievous injuries and damages set forth above.

## STATE CAUSES OF ACTION

## COUNT IX
### Malicious Prosecution Under New York State Law

413.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs.

414.    Defendants initiated or continued proceedings against Mr. Krivak without probable cause, with malice, and the proceedings ultimately terminated in Mr. Krivak's favor on February 27, 2023, when a jury acquitted Mr. Krivak and he was released from prison after more than twenty-four years of wrongful incarceration and detention.

415.    As a direct and proximate result of this malicious prosecution, Mr. Krivak sustained the injuries set forth above.

416.    On or about April 6, 2023, Mr. Krivak served a notice of claim upon all Defendants.

417.    More than ninety (90) days have elapsed since service of the notice of claim and Defendants have not requested a 50-H examination of Mr. Krivak.

418.     More than ninety (90) days have elapsed since service of the notice of claim and the matter has not been adjusted or settled.

419.    Mr. Krivak has therefore met with all conditions precedent to the filing of this action.

## COUNT X
### Respondeat Superior Liability
*Against Defendant Putnam County*

420.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs.

421.    Defendants were at all times material to this complaint employees of the Putnam County Sheriff's Office and Putnam County's District Attorney's Office, and acted within the scope of their employment in committing the misconduct described above.

422.    Defendants' tortious conduct was undertaken while carrying out routine investigative functions. The conduct was reasonably expected by, and in fact foreseen by, Defendants' employer.

423.    Defendant Putnam County is liable as principal for all intentional and negligent torts committed by its agents.

**WHEREFORE**, Plaintiff Andrew Krivak prays as follows:

   a.   That the Court award compensatory damages to Plaintiff and against all Defendants, jointly and severally, in an amount to be determined at trial;

   b.   That the Court award punitive damages to Plaintiff, and against all individual Defendants in their individual capacity, in an amount to be determined at trial, that will deter such conduct by Defendants in the future;

   c.   For a trial by jury;

   d.   For pre-judgment and post-judgment interest and recovery of Plaintiff's costs, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 for all 42 U.S.C. §1983 claims; and

   e.   For any and all other relief to which Plaintiff may be entitled.

Dated August 8, 2023

s/ Karen A. Newirth                 s/Oscar Michelen                  s/Jeffrey Deskovic

NEWIRTH LAW PLLC         CUOMO LLC                       JEFFREY DESKOVIC
BY: KAREN A. NEWIRTH    BY: OSCAR MICHELEN      BY: JEFFREY DESKOVIC
43 West 43rd Street             200 Old Country Road         3148 East Tremont Avenue
Suite 160                             Mineola, NY 11501              Bronx, NY 10465
New York, New York 10036