UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------X
ANDREW KRIVAK, JR.,

                Plaintiff,

      -against-

PUTNAM COUNTY; Putnam County Sheriff's Department
Sheriff ROBERT THOUBBORON, in his individual capacity;
Putnam County Sheriff's Department Officers HAROLD
TURNER, DANIEL STEPHENS, PATRICK CASTALDO,
WILLIAM QUICK, JOHN DANIEL REES, WILLIAM
ASHER in their individual capacities; Putnam County District
Attorneys ROBERT V. TENDY and KEVIN WRIGHT, in
their individual capacities; Putnam County Assistant District
Attorneys LARRY GLASSER; CHANA KRAUSS; and
CHRISTOPHER YORK, in their individual capacities;
District Attorney Investigator RALPH CILENTO in his
individual capacity; and DENISE ROSE,

                Defendants.
-------------------------------------------------------------------------X


**MEMORANDUM OF LAW IN SUPPORT OF THE PUTNAM COUNTY DISTRICT
ATTORNEY DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S COMPLAINT
PURSUANT TO FED. R. CIV. P. 12(b)(6)**


                                    PORTALE RANDAZZO LLP
                                    *Attorneys for Defendants Putnam County,*
                                    *Robert Thoubboron, Harold Turner, Daniel*
                                    *Stephens, Patrick Castaldo, William Quick,*
                                    *John Daniel Rees, William Asher, Robert V.*
                                    *Tendy, Kevin Wright, Larry Glasser, Chana*
                                    *Krauss, Christopher York, and Ralph*
                                    *Cilento*
                                    245 Main Street, Suite 605
                                    White Plains, New York 10601
                                    (914) 359-2400

By:    James A. Randazzo
        Drew W. Sumner

## Table of Contents

*PRELIMINARY STATEMENT* ............................................................................................*1*

*STATEMENT OF FACTS* ...............................................................................................*2*

*ARGUMENT* ...............................................................................................................*12*

    **I.    THE PUTNUM COUNTY DISTRICT ATTORNEY DEFENDANTS ARE SHIELDED BY ABSOLUTE PROSECUTORIAL IMMUNITY** ..........................................................................**12**

    **II.    A FAILURE TO INVESTIGATE CLAIM IS NOT COGNIZABLE UNDER THE DUE PROCESS CLAUSE** ...............................................................................................**27**

*CONCLUSION* .............................................................................................................*28*

# Table of Authorities

## Cases

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ................................................................................ 23

*Barbera v. Smith*, 836 F.2d 96, 100 (2d Cir. 1987) ...................................................................... 15

*Barrett v. United States*, 798 F.2d 565, 573 (2d Cir. 1986) ......................................................... 16

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) ................................................................. 23

*Bernard v. County of Suffolk*, 356 F.3d 495, 502 (2d Cir. 2004) ..................................... 2, 12, 19

*Buari v. City of New York*, 530 F. Supp. 3d 356, 381 (S.D.N.Y. 2021) ............................. 2, 16, 21

*Buckley v. Fitzsimmons*, 20 F.3d 789, 794-795 (7th Cir. 1994) ................................................... 19

*Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993) ............................................................. passim

*Ciambriello v. County of Nassau*, 292 F.3d 307, 325 (2d Cir. 2002) .......................................... 26

*D'Alessandro v. City of New York*, 713 Fed. Appx. 1, 7 (2d Cir. 2017) ...................................... 14

*Dorman v. Higgins*, 821 F.2d 133, 139 (2d Cir. 1987) ................................................................ 20

*Dory v. Ryan*, 25 F.3d 81, 83 (2d Cir. 1994) ..................................................... 2, 16, 17, 19

*Giraldo v. Kessler*, 694 F.3d 161, 166 (2d Cir. 2012) ......................................................... passim

*Hampton v. Chicago*, 484 F.2d 602, 608 (7th Cir. 1973) ............................................................ 13

*Hill v. City of New York*, 45 F.3d 653, 660-661 (2d Cir. 1995) ........................................... passim

*Imbler v. Pachtman*, 424 U.S. 409, 430-431 (1976) ............................................... 2, 12, 13, 16

*Kalina v. Fletcher*, 522 U.S. 118, 127 (1997) ............................................................................. 19

*Malley v. Briggs*, 475 U.S. 335, 342 (1986) ................................................................................ 19

*Newton v. City of New York*, 566 F. Supp. 2d 256, 278 (S.D.N.Y. 2008) ................................... 27

*Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999) ........................................................... 26

*Parkinson v. Cozzolino*, 238 F.3d 145, 152 (2d Cir. 2001) ................................................... 2, 17

*Rich v. New York,* No. 21-cv-3835 (AT), 2022 U.S. Dist. LEXIS 60779 at *15 (S.D.N.Y. March 31, 2022) ........................................................................................................................................ 20

*Scalpi v. Town of E. Fishkill*, No. 14-cv-2126 (KMK), 2016 U.S. Dist. LEXIS 24694 at *13 (S.D.N.Y. Feb. 28, 2016) ........................................................................................................... 26

*Van de Kamp v. Goldstein*, 555 U.S. 335, 348-349 (2009) .................................................. 20, 21

*Warney v. Monroe County*, 587 F.3d 113 (2d Cir. 2009) ..................................................... 2, 16, 17

## PRELIMINARY STATEMENT

Plaintiff Andrew Krivak brings this 42 U.S.C. § 1983 action against Defendants seeking redress for alleged violations of his civil rights stemming from his prosecution and conviction in 1997 for the rape and murder of 12-year-old Josette Wright. A jury acquitted Plaintiff after his re-trial in February 2023. Plaintiff claims that the Defendants collectively violated his constitutional rights by maliciously prosecuting him and depriving him of due process by denying him a fair trial and fabricating evidence. Plaintiff asserts failure to intervene, civil rights conspiracy, supervisory liability, and *Monell* claims based upon his malicious prosecution and due process causes of action. Plaintiff also brings a pendent state law claim of malicious prosecution. Lastly, Plaintiff alleges that Putnam County is liable under *Monell* for the alleged constitutional violations committed by both the Putnam County Sheriff's Department and the Putnam County District Attorney's Office ("PCDAO"), while also being liable on the state law claim under a theory of respondeat superior.

Defendants Putnam County District Attorneys Robert V. Tendy and Kevin Wright, and Putnam County Assistant District Attorneys Larry Glasser, Chana Krauss, and Christopher York (the "PCDA Defendants") move to dismiss Plaintiff's Complaint against them pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief may be granted as they are shielded by absolute prosecutorial immunity. Plaintiff's malicious prosecution and due process claims against the PCDA Defendants stem from their alleged conduct relating to the prosecutions of Plaintiff in 1996-1997 and 2023. Plaintiff alleges that the PCDA Defendants "committed fraud; fabricated evidence; suborned perjury; withheld and concealed evidence; misrepresented or ignored exculpatory evidence; and failed to conduct a constitutionally adequate investigation…" *See* Randazzo Decl., Exh. "A," Plaintiff's Complaint at ¶ 18.

As set forth herein, the PCDA Defendants are protected by absolute immunity for their conduct "when they function as advocates for the state in circumstances 'intimately associated with the judicial phase of the criminal process.'" *Bernard v. County of Suffolk*, 356 F.3d 495, 502 (2d Cir. 2004) *quoting Imbler v. Pachtman*, 424 U.S. 409, 430-431 (1976); *see also Hill v. City of New York*, 45 F.3d 653, 660-661 (2d Cir. 1995). Further, prosecutorial immunity shields the PCDA Defendants for their conduct related to post-trial proceedings, including direct and collateral attacks, and of course, re-trial. *See Giraldo v. Kessler*, 694 F.3d 161, 166 (2d Cir. 2012); *Warney v. Monroe County*, 587 F.3d 113 (2d Cir. 2009); *Parkinson v. Cozzolino*, 238 F.3d 145, 152 (2d Cir. 2001); *Buari v. City of New York*, 530 F. Supp. 3d 356, 381 (S.D.N.Y. 2021). Though Plaintiff styles his allegations against the PCDA Defendants as related to their investigatory function, and thus not protected by absolute immunity, the allegations demonstrate that they truly are related to the PCDA Defendants' roles as advocates, and "[t]he application of immunity is not limited to the duties a prosecutor performs in the courtroom." *Dory v. Ryan*, 25 F.3d 81, 83 (2d Cir. 1994).

For these reasons, Plaintiff's Complaint should be dismissed against the PCDA Defendants.

## **STATEMENT OF FACTS**

Plaintiff served more than twenty-four years in prison after his 1997 conviction for the rape and murder of 12-year-old Josette Wright. *See* Randazzo Decl., Exh. "A" at ¶¶ 1, 275[1]. On October 4, 1994, Josette's mother reported to the Putnam County Sheriff's Department ("PCSD") that Josette did not return home the day before (¶¶ 81-82). Over a year later, a deer hunter discovered

---

[1] All references to ¶ herein refer to the ¶ numbers of Plaintiff's Complaint, unless otherwise stated. For purposes of this motion the PCDA Defendants accept Plaintiff's pleadings and factual allegations as true, as required.

human remains in the woods off of Fields Lane in Patterson, New York, that police soon identified as Josette Wright's (¶¶ 89-90).

Josette's murder shocked the local community and attracted significant public interest and media coverage (¶ 96). The PCSD assumed the role of the lead investigating agency into Josette's murder (¶¶ 93, 97). PCSD Investigators Patrick Castaldo and William Quick were assigned as co-lead investigators (¶¶ 100-101). Plaintiff alleges, in a conclusory manner, that Kevin Wright, the Putnam County District Attorney at the time, and the PCDAO "were involved in the Josette Wright investigation prior to" Plaintiff's arrest, received updates concerning "all major investigatory developments" and directed Investigators Castaldo and Quick to arrest Plaintiff "despite the fact the he knew or should have known that all evidence that appeared to inculpate Mr. Krivak was false and fabricated, planted, and/or coerced" (¶ 103). There are no allegations that any other individual PCDA Defendant participated in the investigation prior to Plaintiff's arrest and indictment for the murder of Josette Wright.

Officers from the PCSD arrested Plaintiff and Anthony DiPippo on November 25, 1995 for possession of narcotics following a traffic stop (¶ 119). Dominick Neglia, Plaintiff and DiPippo's friend, was a passenger in the vehicle at the time of the traffic stop. *Id.* Plaintiff alleges that Neglia, to avoid being charged with felony drug possession, told PCSD officers that Plaintiff and DiPippo "had been talking about the newspaper account of Ms. Wright's remains being found days earlier." *Id.* Plaintiff alleges that the PCSD investigation then "focus[ed] exclusively on Mr. Krivak and Anthony DiPippo as the perpetrators of this crime…" (¶ 120). Plaintiff does not allege any involvement by the PCDAO or PCDA Defendants during this time, as "[f]rom that moment on, Defendants Thoubboron, Turner, Stephens, Castaldo, Quick, Rees, and Asher's tunnel vision focused only on Mr. DiPippo and Mr. Krivak…" (¶ 122).

After the traffic stop, PCSD officers, not the PCDA Defendants, coerced Neglia into becoming an informant against Plaintiff and DiPippo, and, over a course of months Investigators Castaldo and Quick "harassed, threatened, and pressured Mr. Neglia" (¶¶ 127, 129).

The PCSD investigators allegedly improperly influenced and coerced Denise Rose to make inculpatory statements against Plaintiff and DiPippo, and, together, PCSD investigators and Rose fabricated a narrative that included identifying other purported eyewitnesses to Ms. Wright's rape and murder (¶¶ 135-155). Plaintiff does not plead any facts establishing the personal involvement of the PCDA Defendants in fabricating evidence and/or coercing Ms. Rose to fabricate evidence.

After obtaining the names of purported eyewitnesses from Denise Rose, PCSD investigators allegedly coerced statements from Adam Wilson and William MacGregor that further inculpated Plaintiff and DiPippo (¶¶ 158-162, 170-175). Wilson recanted his false statement the day after meeting with PCSD investigators and testified during grand jury proceedings and trial that he did not witness any rape or murder of Josette Wright and that PCSD Investigators Dan "Stephens, Castaldo, and Quick coerced him into signing a statement they fabricated blaming Mr. Krivak and Mr. DiPippo for Ms. Wright's death" (¶ 169). In 2010, prior to DiPippo's first re-trial, that occurred in 2012, MacGregor recanted his statement and testified in DiPippo's 2012 and 2016 re-trials, as well as Plaintiff's 2023 re-trial, "that he never witnessed any crime against Josette Wright and that he only signed the false, fabricated police-drafted statement implicating Mr. Krivak because he was coerced to do so by the improper tactics of Defendants Castaldo, Quick and others" (¶ 176).

PCSD investigators also allegedly coerced other witnesses, including Gary Kempter and Lisa Murphy, "to falsely corroborate the fabricated version of events manufactured by Defendants Stephens, Castaldo, and Quick" (¶ 177). Additionally, on May 11, 1995, PCSD Investigator

William Asher "purportedly found two rings" during an inventory search of Plaintiff's van (¶ 180) and that PCSD investigators coerced other witnesses, namely Tara and Catherine Duffy, to falsely identify the rings as belonging to Josette Wright (¶ 189). Plaintiff's Complaint, for the first time, alleges specific facts concerning any PCDA Defendant's personal involvement, particularly that of Defendant Kevin Wright, by alleging that Wright disputed the cause of certain marks on one of the rings purportedly found in Plaintiff's van that witnesses relied upon in identifying the ring as belonging to Ms. Wright (¶ 191). Specifically, Plaintiff alleges that Defendant Wright believed that a mark on one of the rings was not from a dog bite, but a sizing mark. *Id.* Plaintiff alleges that Defendant Wright "allowed the Duffy witnesses to testify before the Grand Jury, but did not elicit any testimony about the dog bite." *Id.*

In January and March 1996, PCSD investigators allegedly conducted two illegal searches of Plaintiff's van (¶ 193). There are no factual allegations linking any of the PCDA Defendants to the alleged illegal searches or fabrication of evidence stemming from the illegal searches, in fact, Plaintiff alleges that it was Defendant Turner who "directed [Defendant] Rees to conduct an illegal, warrantless search of the van" in January 1996 (¶ 194). Plaintiff alleges that PCSD Investigators "Castaldo, Quick, Rees or another PCSD employee" planted evidence inside the van "for the purpose of fabricating evidence against Mr. Krivak" (¶ 196). Castaldo and Quick allegedly coerced another witness, David Chontos, to identify two items of jewelry found during the January 1996 search of Plaintiff's van as belonging to Ms. Wright (¶ 199). Chontos allegedly informed Defendants Tendy and Glasser in 2022, prior to Plaintiff's re-trial, that "he had been coerced to identify the earring by the 'awful cops' who had interrogated him, meaning Defendants Castaldo and Quick." *Id.* Again, there are no factual allegations tying any of the PCDA Defendants to the underlying searches or fabrication of evidence through Chontos in 1996.

Defendants Castaldo and Quick arrested Plaintiff on July 1, 1996 for the rape and murder of Josette Wright (¶ 207). Plaintiff alleges that Defendant Wright directed Castaldo and Quick to arrest him, based upon the fabricated evidence and statements that had been gathered to date (¶ 207). On July 1, 1996, prior to Plaintiff's arraignment, PCSD Investigators Stephens, Castaldo, and Quick interrogated Plaintiff and coerced him to falsely confess to raping and murdering Ms. Wright (¶ 209-229). No facts are plead establishing the involvement of any PCDA Defendant in securing Plaintiff's false confession.

Plaintiff was convicted in 1997 for the rape and murder of Josette Wright and sentenced to imprisonment for 25 years to life (¶ 237). Krivak and DiPippo's direct appeals were denied (¶ 239). In 2011, the Appellate Division, Second Department, granted DiPippo's motion "for a new trial based upon an actual conflict of interest involving his trial lawyer, Robert Leader" who "previously represented Howard Gombert [who Plaintiff purports is the actual perpetrator of Ms. Wright's rape and murder], a fact never disclosed to Mr. DiPippo or Mr. Krivak" (¶ 240). DiPippo was convicted a second time at the conclusion of the 2012 re-trial (¶ 241).

Plaintiff alleges, inconsistently with the specific facts he himself presents, that the PCDAO, led by District Attorney Adam Levy, "decided to reexamine [DiPippo's] case […] [i]n light of Defendant Castaldo's indictment" in February 2015 and (inconsistently) "[o]n or about October 7, 2014, DA Levy formally requested the assistance of the Conviction Review Bureau (CRB) of the Office of the New York Attorney General (OAG) to reinvestigate Mr. DiPippo and Mr. Krivak's convictions collaboratively with his office" (¶ 242, 245-246). During the collaborative review of the cases, new facts were learned that demonstrated that Investigators Castaldo and Quick improperly influenced and fabricated evidence to implicate Plaintiff and DiPippo (¶¶ 248-254). In "November 2015, DA Levy had agreed, based on the foregoing, to vacate Mr. DiPippo's

conviction and consent to a hearing for a new trial for Mr. DiPippo under CPL § 440.10" (¶ 256). Implicitly, Plaintiff admits that DiPippo sought to vacate his conviction via § 440.10 prior to DA Levy indicating he would consent to a hearing for a new trial in November 2015.

Defendant Robert Tendy won the election for Putnam County District Attorney and took office, replacing former DA Levy, on January 2, 2016 (¶ 257). Prior to taking office, but after winning the election, DA Tendy met with the OAG CRB team, ADA Chana Krauss, and DiPippo's appellate counsel to discuss the findings from the CRB/PCDAO's review of DiPippo's case (¶ 258). DA Tendy did not commit to continuing the review of the DiPippo case "or consent to a 440.10 hearing as Mr. Levy had planned to do." *Id.*

On March 29, 2016, the New York Court of Appeals vacated DiPippo's conviction and held "that the trial court had violated his right to present a complete defense by precluding evidence of Howard Gombert's third party guilt" (¶ 259).

On or about March 31, or April 1, 2016, DA Tendy terminated the CRB/PCDAO review of DiPippo's and Krivak's convictions and the "PCDA immediately began its re-prosecution of Mr. DiPippo, based in part on the continuing misrepresentations of Defendants Stephens, Castaldo, Asher and others" (¶¶ 260-261).

A jury acquitted DiPippo following the second re-trial in 2016 (¶ 262). DiPippo brought a § 1983 lawsuit "alleging claims including malicious prosecution and due process violations of evidence fabrication, suppression of favorable evidence, and deliberately failing to conduct a constitutionally adequate investigation, as well as pattern and practice claims against PCSD," Putnam County and individual investigators of the PCSD (¶ 263). "Through this litigation, previously suppressed and hidden favorable and exculpatory evidence was revealed, including but not limited to…Defendant [Kevin] Wright did not believe the Duffy's claim that their dog had

marked one of the rings found in Mr. Krivak's van and he asked Defendant Turner to instead report that the mark was in fact a sizing mark; Defendant Rose admitted to Defendant [Larry] Glasser that she perjured herself during her sworn deposition in Mr. DiPippo's civil rights case and that Defendant Glasser falsely denied having any *Brady* evidence relating to Defendant Rose's credibility when asked for it and hid this information from Mr. Krivak's counsel and courts for months…" (¶ 265).

"Based in part on evidence developed by Mr. DiPippo during his civil rights litigation, on January 23, 2019, the Second Department reversed the trial court's summary dismissal of Mr. Krivak's motion for a new trial pursuant to CPL § 440.10(1)(g) and (h) and remanded the case…" (¶ 266). A hearing on the 440.10 motion was scheduled for May 9, 2019 (¶ 267). Plaintiff alleges that on May 2, 2019, Defendant Glasser falsely represented that he was unaware of *Brady* material related to Defendant Rose (¶ 268). "Nevertheless, on May 19, 2019, Judge Zuckerman vacated Mr. Krivak's conviction…" and the PCDAO "appealed the vacatur decision" (¶¶ 272-273). The Second Department affirmed Judge Zuckerman's decision vacating Plaintiff's conviction in September 2020 (¶ 274). "In December 2020, the Court of Appeals denied PCDA's request for leave to appeal the Second Department's decision." *Id.*

"Defendants Tendy and Glasser opposed bail for Mr. Krivak from the time his conviction was vacated in 2019…even though Defendants Tendy and Glasser had offered Mr. Krivak a plea agreement prior to his 440 hearing that would have allowed him to be released from prison without any form of correctional supervision upon a guilty plea to a lesser offense" (¶ 275). On October 23, 2020, the PCDAO and Plaintiff agreed to a bail package. *Id.*

Critical to this motion, and the application of prosecutorial immunity, Plaintiff admits that "Defendants Tendy, Glasser, Krauss and others within PCDA began its pattern of violating Mr.

Krivak's rights, including by suppressing new, favorable and exculpatory evidence, prior to Mr. Krivak's 440 hearing, when PCDA suppressed Defendant Rose's confession that she had intentionally perjured herself in her 2019 sworn deposition in Mr. DiPippo's civil rights case" (¶ 276). Plaintiff alleges that Rose made this confession to Defendant Glasser during a meeting in February 2019 (¶ 269). Plaintiff alleges that Defendant Glasser made false statements to the Court and Plaintiff's criminal defense attorneys that prevented Plaintiff from "exploring evidence of Defendant Rose's lack of credibility prior to his retrial" (¶¶ 270-271). Plaintiff alleges that the "pattern and practice of violating Mr. Krivak's constitutional rights in an effort to secure, once again, Mr. Krivak's wrongful conviction continued unabated between May 9, 2019, when Mr. Krivak's conviction was vacated, January 9, 2023, when Mr. Krivak's retrial began, and February 27, 2023, when the jury returned a verdict of not guilty" (¶ 277).

DA Tendy allegedly issued a press release after Putnam County settled DiPippo's § 1983 suit and made "demonstrably false factual representations concerning the validity of Mr. DiPippo's claims, the litigation of Mr. DiPippo's civil rights case, and the evidence adduced prior to and during the litigation" (¶ 281). Plaintiff alleges in a conclusory manner that DA Tendy's press release was intended "to undermine Mr. Krivak's right to a fair and impartial jury" (¶ 280). Plaintiff fails to allege specifically what "demonstrably false representations" that DA Tendy made in the press release. Further, there are no allegations connecting Defendants Glasser or Krauss to DA Tendy's press release. It is undisputed that Defendant Wright and York were no longer employed by the PCDAO at this time.

Plaintiff alleges further prosecutorial misconduct related to suppression of exculpatory evidence, particularly evidence that Joseph Santoro, who testified at DiPippo's 2016 re-trial and Plaintiff's 440 hearing, heard Howard Gombert confess to murdering Josette Wright (¶ 284).

Plaintiff alleges that the PCDAO suppressed evidence gathered during Santoro's incarceration at the Putnam County Correctional Facility (said incarceration beginning on or about December 1, 2020) including recordings of Santoro's statements to others that were "favorable and exculpatory to Mr. Krivak." (¶¶ 286, 290). Plaintiff further alleges that the PCDAO "filed a motion to disqualify Mr. Krivak's counsel of choice on May 20, 2021 that unnecessarily delayed Plaintiff's re-trial for several months (¶ 293). The PCDAO's motion was ultimately denied. *Id.* The PCDAO also opposed Plaintiff's subpoena for the jailhouse audio recordings of Santoro and directed Santoro's attorney to also move to quash the subpoenas (¶ 294). The Court denied the motions to quash. *Id.* Defendant Glasser allegedly "told reporters in a public statement that Mr. Santoro's testimony about Gombert's confession was not credible" (¶ 297). Plaintiff alleges that Defendant Tendy, Glasser, and Krauss's conduct demonstrate that the PCDAO "had plainly inadequate or unlawful policies, procedures, regulations, practices, and customs concerning their continuing obligation to timely and fully disclose material favorable to the defense as set forth in statutory law as well as…" *Brady*, *Giglio*, and their progeny (¶ 299).

Plaintiff alleges additional instances of misconduct by DA Tendy related to an in-person interview of Adam Wilson in August 2022, followed by suppression of exculpatory evidence in the form of recorded statements by Adam Wilson in which he spoke with a friend about his meeting with DA Tendy and Defendant PCDAO Investigator Ralph Cilento (¶¶ 300-304). DA Tendy allegedly made admissions in open court during Plaintiff's re-trial that "he and his office had plainly inadequate or unlawful policies, procedures, regulations, practices, and customs concerning their continuing obligation to timely and fully disclose material favorable to the defense…" (¶ 305).

Moreover, Plaintiff alleges that the PCDAO failed to disclose *Brady* and *Giglio* material found in the PCSD investigators' (who were involved in the Josette Wright investigation) personnel files (¶¶ 306-311). Plaintiff alleges that Defendant Glasser made admissions in open court during Plaintiff's re-trial that "he, Defendant Tendy and PCDA had plainly inadequate or unlawful policies, procedures, regulations, practices, and customs concerning their continuing obligations" to disclose *Brady* and *Giglio* material (¶ 311).

Among the information that Plaintiff asserts should have been disclosed by the PCDAO were materials relating to Defendant Krauss's prior testimony in an unrelated matter "that she witnessed Defendant Castaldo threaten a suspect with death by hanging during an interrogation" (¶¶ 313-314). "Defendants Tendy, Krauss, and Glasser falsely represented to the trial court and Mr. Krivak's counsel that no such material existed" (¶ 314). Ultimately, the PCDAO produced "a box of materials" after the Court ordered such production, but said production occurred after Krivak's defense counsel rested (¶ 316).

Further, Plaintiff alleges that during his re-trial, Defendants Tendy, Glasser, and York conspired to improperly influence the presiding judge in Plaintiff's re-trial by arranging for a "surprise visit" by York to the judge's temporary chambers (¶ 323). During that "surprise visit," York allegedly "told the trial judge that he disagreed with the Court of Appeals' decision vacating Mr. DiPippo's 2012 conviction" (¶ 323). The following day, Dominick Neglia testified in Plaintiff's re-trial and revealed that, prior to DiPippo's 2012 re-trial, Defendant York threatened him with prosecution for perjury if he testified that "Castaldo and Quick had coerced him to agree to fabricate statements in order to implicate Mr. Krivak and Mr. DiPippo in Ms. Wright's murder" (¶¶ 320, 322). Neglia did not testify during the 2012 trial, but did testify in DiPippo's 2016 trial, including about alleged coercion, after Defendant York left the employ of the PCDAO (¶ 321).

Plaintiff also alleges that Defendants Tendy and Glasser "sought to improperly pressure the mother of defense witness Allyson Clokely to testify in a manner inconsistent with her own recollection" prior to Plaintiff's re-trial, and then suppressed information about their communication with Ms. Clokey's mother from Plaintiff's defense counsel (¶¶ 330-332).

Plaintiff challenges Defendants Tendy and Glasser's conduct during Plaintiff's re-trial, alleging that they "suborned perjury and failed to correct false testimony from nearly every prosecution witness, including Defendants Castaldo, Stephens, Rose, Quick, Asher, and Rees" and "made material, false misrepresentations to the trial court and Mr. Krivak's counsel" (¶¶ 333, 336).

A jury acquitted Plaintiff on February 27, 2023 (¶ 339). Plaintiff filed this § 1983 action on August 8, 2023.

## ARGUMENT

### I. THE PUTNUM COUNTY DISTRICT ATTORNEY DEFENDANTS ARE SHIELDED BY ABSOLUTE PROSECUTORIAL IMMUNITY

Plaintiff's Complaint should be dismissed as against the PCDA Defendants as absolute prosecutorial immunity bars Plaintiff's claims against them. "In initiating a prosecution and in presenting the State's case, the prosecutor is immune from a civil suit for damages under § 1983." *Imbler, supra.* at 431. "Such official is also immune for conduct in preparing for those functions; for example, evaluating and organizing evidence for presentation at trial or to a grand jury, or determining which offenses are to be charged. *Hill, supra.* at 661 (internal citations omitted). "Absolute immunity is reserved for officials who perform 'special functions' and deserve absolute protections from damages liability. Among these are prosecutors, and persons working under their direction, when they function as advocates for the state in circumstances 'intimately associated with the judicial phase of the criminal process.'" *Bernard, supra.* at 502 *quoting Imbler, supra.* at

430-431 (1976); *see also Hill, supra.* at 660-661. Here, Plaintiff's claims against each individual Putnam County District Attorney Defendant challenge their conduct in circumstances 'intimately associated with the judicial phase of the criminal process." *Imbler, supra.* at 430-431.

While absolute immunity does not attach to "[a] prosecutor's administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings" it does protect the prosecutors for their "professional evaluation of the evidence assembled by the police and appropriate preparation for its presentation at trial or before a grand jury after a decision to seek an indictment has been made." *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993). In *Buckley*, the Supreme Court reasoned that "[t]here is a difference between the advocate's role in evaluating evidence and interviewing witnesses as he prepares for trial, on the one hand, and the detective's role in searching for the clues and corroboration that might give him probable cause to recommend that a suspect be arrested, on the other hand. When a prosecutor performs the investigative functions normally performed by a detective or police officer, it is 'neither appropriate nor justifiable that, for the same act, immunity should protect the one and not the other.'" *Id. quoting Hampton v. Chicago*, 484 F.2d 602, 608 (7th Cir. 1973) *cert. denied* 415 U.S. 917 (1974). Plaintiff's myriad allegations in his Complaint clearly establish that each prosecutor's conduct related to their advocacy role, not an investigative role, as Plaintiff alleges no facts establishing the personal involvement of any Putnam County District Attorney Defendants' personal involvement in due process violations during the PCSD investigation into Josette Wright's murder, from the discovery of Ms. Wright's remains in November 1995 through the date of Plaintiff's arrest on July 1, 1996. Moreover, there are no facts plead that establish any involvement in coercing a confession from Plaintiff, which undoubtedly

was powerful evidence of Plaintiff's guilt before the grand jury and at Plaintiff's first criminal trial.

In *Buckley*, the Supreme Court held that prosecutors were acting in an investigatory function "when they were endeavoring to determine whether the bootprint at the scene of the crime had been made by petitioner's foot" because their challenged conduct occurred "before they convened a special grand jury to investigate the crime…" *Buckley* at 274. The prosecutor defendants in *Buckley* did "not contend that they had probable cause to arrest petitioner or to initiate judicial proceedings during that period." *Id.* As such, the Court held that the prosecutors were not entitled to absolute immunity because "[a] prosecutor neither is, nor should consider himself to be, an advocate before he has probable cause to have anyone arrested." *Id.* Here, probable cause existed to arrest Plaintiff, based upon the totality of evidence gathered by the police. Upon Defendant Kevin Wright marshaling and evaluating said evidence, he issued a directive to arrest and charge Krivak. "The Supreme Court has identified evaluating evidence and interviewing witnesses as falling on the absolute immunity side of the line, leaving searching for the clues and corroboration that might lead to a recommendation for an arrest on the qualified immunity side." *Giraldo, supra.* at 166 (internal quotations omitted). "Specifically, if a prosecutor evaluates evidence and interviews witnesses for the purpose of being an 'effective advocate of a case already assembled,' rather than investigating for the purpose of helping the police identify a suspect and make an arrest, then her conduct is protected by absolute immunity." *D'Alessandro v. City of New York*, 713 Fed. Appx. 1, 7 (2d Cir. 2017). Based upon the allegations in Plaintiff's Complaint, the PCDA Defendants' "investigation," including interviewing witnesses, was "reasonably related to a decision whether or not to begin or carry on a particular criminal prosecution, or to defend a conviction" and thus, they are shielded by absolute immunity. *Giraldo* at 166; *see also*

*D'Alessandro, supra.* Further, the fact that prosecutors may uncover new information, not previously obtained by police investigators, while preparing for the judicial phase does not result in the loss of absolute immunity because "not every interview, interrogation, or other act by a prosecutor with the potential of revealing new information is an investigative act entitled to only qualified immunity." *Giraldo, supra.* at 166. In fact, the Supreme Court has "noted in particular that an out-of-court 'effort to control the presentation of a witness' testimony' was entitled to absolute immunity because it was 'fairly within the prosecutor's function as an advocate.'" *Buckley*, at 272-273.

Prosecutors' pre-litigation actions may also be protected by absolute immunity, depending on the function of the prosecutor at the time of the alleged conduct. "As we see it, the pre-litigation function that a prosecutor performs has at least two aspects: (1) the supervision of and interaction with law enforcement agencies in acquiring evidence which might be used in a prosecution, and (2) the organization, evaluation, and marshalling of this evidence into a form that will enable the prosecutor to try a case or to seek a warrant, indictment, or order. While both of these categories of activities occur before the commencement of formal legal proceedings, and therefore may be loosely termed 'investigative,' we believe that the first category consists of actions that are of a police nature and are not entitled to absolute protection." *Barbera v. Smith*, 836 F.2d 96, 100 (2d Cir. 1987). There are no facts in Plaintiff's Complaint suggesting that any PCDA Defendant supervised or interacted with law enforcement "in acquiring evidence," rather, each factual, and non-conclusory, allegation establishes that the PCDA Defendants organized, evaluated, and marshaled evidence gathered by police in preparation for seeking an indictment, opposing post-conviction relief, and preparing for re-trials.

Further, the Second Circuit has instructed that "[t]he application of absolute immunity is not limited to the duties a prosecutor performs in the courtroom…[and] protects a prosecutor from § 1983 liability for virtually all acts, regardless of motivation, associated with his function as an advocate. This would even include, for purposes of this case, allegedly conspiring to present false evidence at a criminal trial. The fact that a conspiracy is certainly not something that is properly within the role of a prosecutor is immaterial, because 'the immunity attaches to his function, not to the manner in which he performed it.'" *Dory v. Ryan*, 25 F.3d 81, 83 (2d Cir. 1994) *quoting Barrett v. United States*, 798 F.2d 565, 573 (2d Cir. 1986).

Absolute immunity also extends to egregious examples of prosecutorial misconduct, such as: conspiring to present falsified evidence, the falsification of evidence, suborning perjury, withholding exculpatory evidence, deliberately suppressing *Brady* material, coercing witnesses to falsely implicate the criminal defendant, and intimidating witnesses from offering exculpatory testimony favorable to the criminal defendant. *See Imbler, supra.* at 416 (affirming § 1983 claims against the prosecutor for suborning false testimony of a trial witness in Imbler's murder trial, continuing prosecution of the plaintiff despite knowledge that a lie detector test 'cleared' the plaintiff, and during the criminal trial presenting a police artist's sketch of the suspect that allegedly had been altered to resemble the Plaintiff after the investigation focused on Imbler as a suspect); *Hill, supra.* (holding that the defendant prosecutors enjoyed absolute immunity from claims that they (1) maliciously prosecuted the plaintiff, (2) conspired to present falsified evidence to, and to withhold exculpatory evidence from, a grand jury; and (3) deliberately suppressed *Brady* material; and that allegations of conspiracy were immaterial to the prosecutors' absolute immunity for their conduct before a jury); *Warney, supra.* at 115 (granting absolute immunity to prosecutors upon Plaintiff's claims that they failed to promptly disclose exculpatory evidence, specifically post-trial

DNA testing that "ultimately showed [plaintiff] did not commit" the murder for which he was convicted and imprisoned, and in fact matched DNA of a convicted murderer who was serving a life sentence, "conducted by the district attorney's office while defending habeas and other initiatives"); *Buari, supra.* at 378  (granting absolute immunity to prosecutors who allegedly falsified evidence, coerced and intimidated witnesses, deliberately withheld exculpatory information, made false and defamatory statements in judicial proceedings, and conspired to present false evidence at the criminal trial); *Dory, supra.* at 83 (holding that a "prosecutor was immune from § 1983 liability for knowingly presenting false testimony").

Prosecutorial immunity extends to post-conviction proceedings such as direct and collateral attacks, including re-investigation work performed by Conviction Integrity Units concerning and preparing for CPL § 440 proceedings, and to defend a conviction at re-trial. *See Giraldo* at 166 (holding that "investigative acts reasonably related…to defend a conviction, are shielded by absolute immunity); *Parkinson, supra.* at 151-152 ("holding that absolute immunity covers prosecutors' actions after the date of conviction while a direct appeal is pending…[because] [t]here can be little doubt that conduct taken with the goal of affirming a conviction on appeal or obtaining a new conviction on re-trial falls within the traditional adversarial function of a prosecutor. Appeal and re-trial require prosecutors to perform duties that are intimately associated with the judicial phase of the criminal process."); *Warney, supra.* at 115 (holding that absolute immunity extends to actions taking while working on direct appeals). The Second Circuit in *Warney* noted that "[d]rawing this line between 'advocacy' and 'investigative' functions is vexed, perhaps no more so than in the post-conviction context. For once a conviction becomes final, there is no longer a pending adversarial criminal proceeding; the 'judicial phase' is technically finished. Yet, by the nature of their office, prosecutors will necessarily remain involved in criminal cases:

opposing civil habeas petitions (or other forms of collateral relief); amending restitution orders; pursuing parole violations; or resolving disputes over a prisoner's projected release date. These functions may be somewhat administrative, and may not always relate to in-court advocacy, yet often they are integral to an ongoing 'judicial phase' of a prosecution." *Id.* at 115.

Plaintiff's factual allegations concerning Defendants Tendy, Glasser, Krauss, and, in part, York, relate to their advocacy function in the post-conviction context, i.e., opposing DiPippo's and Plaintiff's direct appeals, opposing the multiple 440 motions by DiPippo and Krivak seeking vacatur of their convictions, DiPippo's re-trials in 2012 and 2016, collaborating with the OAG and CRB inquiry into the DiPippo and Krivak convictions in 2014-2015, and Plaintiff's re-trial in 2023. In fact, Defendants Tendy, Glasser, Krauss, and York were not even employed by the PCDAO during the pre-litigation phase prior to the empaneling of a grand jury in 1996 and the grand jury's indictment dated July 19, 1996. *See* Randazzo Decl., Exh. "B"; *compare* Randazzo Decl., Exh. "A" at ¶ 49 (Since 2016, ROBERT TENDY has been the duly elected District Attorney of Putnam County…"; *Id.* at ¶ 63 ("From 2016 until his demotion and subsequent departure in 2023, LARRY GLASSER was an Assistant District Attorney of Putnam County…"); *Id.* at ¶ 69 ("Beginning in 2007, CHANA KRAUSS was an Assistant District Attorney of Putnam County"). As such, these three defendants' involvement relates solely and exclusively to post-conviction proceedings for which they are absolutely immune. "Good prosecutors may – usually should – perform acts reasonably characterized as investigative at all phases of a criminal proceeding. The investigative acts that are entitled to only qualified immunity are those undertaking the phase of law enforcement that involves the gathering and piecing together of evidence for indications of criminal activities and determination of the perpetrator." *Giraldo at* 166.

"Prosecutorial immunity from § 1983 liability is broadly defined, covering 'virtually all acts, regardless of motivation, associated with the prosecutor's function as an advocate." *Hill, supra.* at 661. The Supreme Court in *Kalina v. Fletcher*, recognized that its earlier decisions concerning prosecutorial immunity are "not grounded in any special 'esteem for those who perform these functions, and certainly not from a desire to shield abuses of office, but because any lesser degree of immunity could impair the judicial process itself.'" *Kalina v. Fletcher*, 522 U.S. 118, 127 (1997) *quoting Malley v. Briggs*, 475 U.S. 335, 342 (1986). The Second Circuit has echoed this sentiment: "As much as the idea of a prosecutor conspiring to falsify evidence disturbs us…we recognize that there is a greater societal goal in protecting the judicial process by preventing perpetual suits against prosecutors for the performance of their duties." *Dory* at 83. Moreover, to the extent that Plaintiff claims any PCDA Defendant violated his rights by coercing witnesses to testify against him, the claim fails because "[c]oercing witnesses to speak, rather than loosening their tongues by promises of reward, is a genuine constitutional wrong, but the persons aggrieved would be Cruz and Hernandez [the witnesses] rather than Buckley [the criminal defendant]. Overbearing tactics violate the right of the person being interrogated to be free from coercion. Buckley cannot complain that prosecutors may have twisted Cruz's arm, any more than he can collect damages because they failed to read Cruz *Miranda* warnings or searched Cruz's house without a warrant. Rights personal to their holders may not be enforced by third parties." *Buckley v. Fitzsimmons*, 20 F.3d 789, 794-795 (7th Cir. 1994).

Once a defendant has established that they are entitled to absolute immunity, as they were engaged in advocative functions under the "functional approach, looking to the function being performed rather than to the office or identify of the defendant" (*Hill*, at 660), they "will be denied absolute immunity only if he acts without any colorable claim of authority. The appropriate

inquiry, thus, is not whether authorized acts are performed with a good or bad motive, but whether the acts at issue are beyond the prosecutor's authority." *Bernard, supra.* at 504. Where, as here, "a prosecutor's charging decisions are not accompanied by any such unauthorized demands [such as for bribes or sexual favors], the fact that improper motives may influence his authorized discretion cannot deprive him of absolute immunity." *Id., see also Dorman v. Higgins*, 821 F.2d 133, 139 (2d Cir. 1987) (holding that allegations of bad faith or malice cannot defeat a claim of absolute immunity). Plaintiff's allegations establish that each PCDA Defendant was authorized to perform the acts complained of as they related to pursuing and defending Plaintiff's criminal conviction for the rape and murder of Josette Wright. "[I]f the Court finds that the conduct at issue is covered by absolute immunity, then the actor is shielded from liability for damages no matter how erroneous the act and how injurious its consequences." *Rich v. New York,* No. 21-cv-3835 (AT), 2022 U.S. Dist. LEXIS 60779 at *15 (S.D.N.Y. March 31, 2022).

Plaintiff also claims that the PCDAO and individual PCDA Defendants failed to institute policies and procedures with "respect to the treatment of witnesses…handling of evidence…the discovery process…[and to make sure] that there was probable cause in commencing and maintaining prosecutions [] and…that there was sufficient reliable and credible evidence to find a person guilty beyond a reasonable doubt" and failed to properly supervise others within the PCDAO. *See* ¶¶ 55, 61, 67, 73. Absolute immunity shields the individuals from these claims, too. The Supreme Court in *Van de Kamp v. Goldstein* held that absolute immunity shielded prosecutors from claims of constitutionally inadequate supervision, training, or information-system management that resulted in the failure to disclose *Giglio* impeachment material. "[T]he absence of an information system is relevant here, if and only if, a proper system would have included information about the informant Fink. Thus, were this claim allowed, a court would have to review

the office's legal judgments, not simply about whether to have an information system but also about what kind of system is appropriate, and whether an appropriate system would have included *Giglio*-related information about one particular kind of trial informant. Such decisions – whether made prior to or during a particular trial – are intimately associated with the judicial phase of the criminal process." *Van de Kamp v. Goldstein*, 555 U.S. 335, 348-349 (2009). Thus, the Supreme Court held that "where a § 1983 plaintiff claims that a prosecutor's management of a trial-related information system is responsible for a constitutional error at his or her particular trial, the prosecutor responsible for the system enjoys absolute immunity just as would the prosecutor who handled the particular trial itself." *Id.; see also Buari, supra.* at 382 ("Supervisory prosecutors are immune in a suit directly attacking their actions related to an individual trial").

When considering the application of absolute immunity to the PCDA Defendants, the Court "must examine the role played by each…defendant to determine whether he or she performed a function for which absolute immunity is required." *Buari,* at 379. The PCDA Defendants submit that each action complained of occurred during and in furtherance of their advocative function and, thus, they are shielded from suit by absolute immunity.

A.    Defendant Kevin Wright

Plaintiff's sole allegation of DA Wright's involvement concerning the police investigation prior to Plaintiff's arrest, is the alleged "dispute" concerning the genesis of a marking found on a ring that the Duffy witnesses identified as belonging to Josette Wright because they recognized the mark to be allegedly caused by a dog bite. Plaintiff points to the deposition testimony of PCSD Investigator Harold Turner in connection with DiPippo's § 1983 lawsuit to demonstrate this "dispute." However, as Turner's testimony demonstrates, the "dispute" arose in the course of DA Wright's marshaling of evidence. Turner testified, in sum and substance, that he and Wright both

recognized that the mark on the ring was the result of sizing (i.e., cutting and soldering the ring), but that witnesses (Catherine and Tara Duffy) stated that they recognized the ring based upon the marking, which they, incorrectly in the minds of Turner and Wright, was caused by a dog bite. Specifically, Turner testified that "I could see it was a sizing mark, but I was saying [to DA Wright] how the girl identified her ring and it didn't change anything in her identification of the right. Whatever made the mark, it was there. Whatever she thought was it she thought." *See* Randazzo Decl., Exh. "C" at 141:13-21.

DA Wright's inquiry of Inv. Turner about the Duffys' identification of the ring is purely an advocative function; Wright was uninvolved in the gathering of said evidence. Instead, he sought additional information from Inv. Turner to prepare for the judicial process, including presentation to the grand jury. Further, Plaintiff admits that the genesis of the mark was not elicited from the witnesses during presentation to the grand jury. These facts fail to state a claim against DA Wright as he is shielded by absolute immunity.

B.    Defendant Robert Tendy

Plaintiff admits that DA Tendy's involvement in these matters began in late 2015, after he won the general election but before taking office, when he met with the OAG CRB team, ADA Krauss, and others to discuss the CRB's review of the DiPippo and Krivak convictions. It is undisputed that during this time (and through the date of Plaintiff's acquittal in February 2023), DA Tendy was engaged in defending the convictions of DiPippo and Krivak against collateral and direct attacks preparing for DiPippo's re-trial in 2016 and Plaintiff's re-trial in 2023, and his direct participation in Plaintiff's 2023 re-trial. As such, DA Tendy's conduct relates to post-conviction proceedings for which he enjoys absolute immunity.

Plaintiff also claims that DA Tendy deprived him of a right to a fair trial by seeking to improperly taint the jury pool by issuing a press release that "contained a number of demonstrably false factual representations concerning the validity of Mr. DiPippo's claims, the litigation of Mr. DiPippo's civil rights case, and the evidence adduced prior to and during the litigation." (¶ 281). Though a prosecutor's statements to the press are not protected by absolute immunity (*see Buckley, supra.*), Plaintiff fails to identify any of those statements that are purportedly "demonstrably false," thus lacking factual support for his conclusory allegation. As such, the Court should dismiss this claim "[b]ecause the plaintiffs here have not nudged their claims across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but is has not 'shown' – 'that the pleader is entitled to relief.'" *Id.* at 679 (internal citation omitted).

C.  Defendant Larry Glasser

Similarly, Plaintiff's allegations against Defendant Glasser relate to his conduct in performing an advocative function in response to post-conviction proceedings and the 2016 re-trial of DiPippo and Plaintiff's 2023 re-trial, with the exception of the allegation that Defendant Glasser "told reporters in a public statement that Mr. Santoro's testimony about Gombert's confession was not credible" (¶ 297). Plaintiff fails to re-produce Defendant Glasser's actual statement, and fails to cite any news articles, video or audio recordings, that contained Defendant

Glasser's alleged statement. As such, this conclusory allegation, absent any factual support, fails to state a due process claim against Defendant Glasser.

Moreover, the sum and substance of Defendant Glasser's alleged statement to the press differs from the press conference statements made by the prosecutor in *Buckley*. Here, Defendant Glasser allegedly expressed his subjective belief that he found Mr. Santoro's testimony about Gombert's confession to be incredible, this is distinct from the statements at issue in *Buckley* "that numerous pieces of evidence, including the bootprint evidence, tied Buckley to a burglary ring that committed the Nicarico murder…[and] 'these false and prejudicial statements inflamed the populace of DuPage County against' him…thereby defaming him, resulting in deprivation of his right to a fair trial, and causing the jury to deadlock rather than acquit." *Buckley, supra.* at 276-277. Defendant Glasser's alleged statements clearly do not carry the same weight or impact as they did not falsely incriminate Plaintiff, and were of a general nature (absent specific facts as to why Santoro is incredible) such that a jury would not be improperly influenced. Moreover, questioning the credibility of an adverse witness is commonplace as fodder for cross-examination and comment during summation. Because a prosecutor's argument about which witnesses a jury should credit, or not, does not violate clearly established law, Defendant Glasser enjoys qualified immunity for his alleged public statement to reporters and all claims against Defendant Glasser must be dismissed.

D.    Defendant Chana Krauss

Plaintiff's well-pleaded factual allegations against Defendant Krauss are even more sparse than his allegations against Defendants Tendy and Glasser. It is undisputed that Defendant Krauss joined the PCDAO in 2008, approximately twelve years after Plaintiff was arrested and charged with raping and murdering Ms. Wright.

Plaintiff alleges that Defendant Krauss participated in the OAG CRB/PCDAO review of the DiPippo and Krivak convictions under former DA Adam Levy, but refused to continue with the review after Defendant Tendy took office (¶ 70). Plaintiff also alleges that DA Tendy "terminated" the collaborative review commenced by DA Levy in conjunction with the OAB CRB, and instead "immediately began its re-prosecution of Mr. DiPippo" (¶¶ 260-261). As such, Defendant Krauss could not have continued working on review of the DiPippo and Krivak convictions because DA Tendy terminated the effort and refocused on preparing for DiPippo's third trial in 2016.

Further, Defendant Krauss enjoys absolute immunity for her work in the CRB/PCDAO review because DiPippo's 440 motion seeking vacatur of his conviction was pending and DA Levy requested the CRB's assistance to review the matters in advance of any decision on DiPippo's 440 motion, and before a potential third criminal trial of DiPippo for the rape and murder of Josette Wright.

E.     Defendant Christopher York

Plaintiff alleges that Defendant York was the lead prosecutor in Mr. DiPippo's 2012 re-trial (¶ 75). There are no allegations that Defendant York was a member of the PCDAO during the police investigation into Ms. Wright's murder from the discovery of her body in November 1995, through Plaintiff's arrest on July 1, 1996 and his conviction in 1997. While Plaintiff claims that Defendant York intimidated Dominick Neglia by threat of prosecution such that Neglia did not testify for DiPippo in 2012, he is shielded by absolute immunity as his interview of Neglia was performed in furtherance of his advocative function while preparing for DiPippo's 2012 re-trial.

Plaintiff also brings § 1983 claims against Defendant York related to his allegedly improper communication in 2023 with the judge presiding over Plaintiff's re-trial (¶ 323-324). However,

Plaintiff admits that Defendant York was not a state actor, he was an attorney in private practice, and thus is not directly liable to him under § 1983. Perhaps recognizing this, Plaintiff styles his § 1983 claim against York as a civil rights conspiracy. Plaintiff alleges that York and Defendants Tendy and Glasser conspired for York to influence the trial judge by "meeting…privately and expressing negative views about the presentation of third-party guilt evidence and casting aspersions on the Court of Appeals' decision" (¶ 324). These conclusory allegations and surmise, absent specific facts establishing a conspiracy, fail to state a cognizable § 1983 claim. "To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999). "Complaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive plaintiff of his constitutional rights are properly dismissed." *Ciambriello v. County of Nassau*, 292 F.3d 307, 325 (2d Cir. 2002). "Allegations of a conspiracy to violated civil rights must be pleaded with specificity, and an otherwise invalid § 1983 claim cannot survive a motion to dismiss merely by mentioning the word 'conspiracy.'" *Scalpi v. Town of E. Fishkill*, No. 14-cv-2126 (KMK), 2016 U.S. Dist. LEXIS 24694 at *13 (S.D.N.Y. Feb. 28, 2016). Here, Plaintiff alleges no specific facts about any agreement between Defendants York, Tendy and Glasser to seek to influence the trial judge, instead, advancing his allegation "[o]n information and belief…" (¶ 324). This is insufficient to state a § 1983 conspiracy claim and same must be dismissed against Defendant York.

Further, Plaintiff's specific factual allegations concerning the existence of a long-standing relationship between York and the trial judge (Judge Robert Prisco) do not plausibly support an

inference of § 1983 conspiracy. Instead, Plaintiff's factual allegations seem to plausibly suggest that Defendant York, who secured DiPippo's conviction in the 2012 re-trial, harbors sentiments concerning the Court of Appeals overturing the conviction and, perhaps albeit improperly, shared those sentiments with Judge Prisco, a former colleague from the Westchester County DA's office (¶¶ 318-319, 323).

## II. A FAILURE TO INVESTIGATE CLAIM IS NOT COGNIZABLE UNDER THE DUE PROCESS CLAUSE

Plaintiff alleges in his Second Cause of Action that the PCDA Defendants failed to conduct an adequate investigation and thereby violated his right to due process (among other due process claims such as evidence fabrication and suppression of exculpatory and impeachment evidence). Specifically, Plaintiff alleges that Defendants violated his right to a fair trial "by deliberately failing to conduct a constitutionally adequate investigation, including without limitation by failing to investigate leads pointing towards other suspects and corroborating Mr. Krivak's innocence and by failing to provide information to the Carmel Police Department" (¶ 362). A failure to investigate claim does not lie in the due process clause and there is no constitutionally protected right to an adequate investigation. *See Newton v. City of New York*, 566 F. Supp. 2d 256, 278 (S.D.N.Y. 2008). Plaintiff's purported due process claim based upon the failure to conduct an adequate investigation and failure to investigate must be dismissed against the PCDA Defendants (in addition and separately from the PCDA Defendants absolute immunity from suit).

## CONCLUSION

Based on the foregoing, the Putnam County District Attorney Defendants request that the

Court grant their motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) in its entirety, and for such

other relief the Court may deem necessary.

Dated: January 19, 2024
       White Plains, New York

                                    PORTALE RANDAZZO LLP


                                      _/s/ James A. Randazzo_____
                                      James A. Randazzo
                                      Drew W. Sumner
                                      *Attorneys for Defendants Putnam County,*
                                      *Robert Thoubboron, Harold Turner, Daniel*
                                      *Stephens, Patrick Castaldo, William Quick,*
                                      *John Daniel Rees, William Asher, Robert V.*
                                      *Tendy, Kevin Wright, Larry Glasser, Chana*
                                      *Krauss, Christopher York, and Ralph*
                                      *Cilento*
                                      245 Main Street, Suite 605
                                      White Plains, New York 10601
                                      (914) 359-2400


To:    Counsel of record via ECF.