```
UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------X
ANTHONY DiPIPPO,


        Plaintiff,

                              Case No.
                              17-cv-7948(NSR)
        -against-

COUNTY OF PUTNAM; Putnam County
Sheriff's Department Sheriff ROBERT
THOUBBORON in his individual capacity;
Putnam County Sheriff's Department's
Investigators DAN STEPHENS, PATRICK
CASTALDO, BILL QUICK, and Putnam
County Sheriff's Department Officer
VICTOR NESTOR, in their individual
capacities,

        Defendants.
-----------------------------------------X
        January 15, 2020
        10:02 a.m.
```

      Deposition of Non-Party Witness, HAROLD TURNER, taken by Plaintiff, pursuant to Notice, held at the offices of Neufeld Scheck & Brustin, 99 Hudson Street, Eighth Floor, New York, New York 10013, before CHARISSE ROMEO, a Registered Professional Reporter and Notary Public within and for the State of New York.



A P P E A R A N C E S:

NEUFELD SCHECK & BRUSTIN, LLP

Attorneys for Plaintiff

     99 Hudson Street

     Eighth Floor

     New York, New York 10013

BY:   NICK BRUSTIN, ESQ.

     RICK SAWYER, ESQ.

     212-965-9081


PORTALE RANDAZZO LLP

Attorneys for Defendants

     245 Main Street

     White Plains, New York 10601

BY:   JAMES A. RANDAZZO, ESQ.

     DREW SUMNER, ESQ.

     914-359-2400

     jrandazzo@portalerandazzo.com


ALSO PRESENT:

EMMA FREUDENBERGER, ESQ.

AVINASH SAMARTH, ESQ.

TY PARKS - Paralegal



```
 1                     H. Turner
 2         Q.    In other words, he testified
 3   he had no reason to believe that there
 4   were other people doing investigations
 5   that he didn't know about; any reason
 6   to dispute that?
 7              MR. RANDAZZO:  Objection.
 8         A.    No.  I would hope he would know,
 9   yes.
10         Q.    And he testified that within
11   a few weeks after the body was found he
12   and Quick were the only investigators
13   on the case, no one else was helping;
14   any reason to dispute that?
15              MR. RANDAZZO:  Objection.
16         A.    No.
17         Q.    But that would be up to
18   Stephens; you wouldn't know one way or
19   the other?
20              MR. RANDAZZO:  Objection.
21         A.    Correct.
22         Q.    Do you recall being present
23   for any meetings with the DA on this
24   case?
25         A.    I don't recall any.
```



```
1                     H. Turner
2          Q.    You don't recall -- would it
3   be fair to say, to the best of your
4   recollection, you were not or you are
5   not sure?
6          A.    I'm not sure.  I'm not sure.  I'm
7   sure I had some words with the DA over this
8   case.
9          Q.    When was that?
10         A.    I don't remember when.
11         Q.    Okay.  Tell me about that.
12  Which DA did you have words with?
13         A.    There was only one DA, Kevin
14  Wright.
15         Q.    And approximately when did
16  you have words with Kevin Wright about
17  this case?
18         A.    I don't remember.
19         Q.    Was it before trial?
20         A.    It might have been even before the
21  arrest.
22         Q.    Before the arrest?
23         A.    Might have been.
24         Q.    Okay.  Where did that
25  conversation take place?
```



```
 1                    H. Turner
 2        A.    In the district attorney's office.
 3        Q.    And who was present?
 4        A.    Myself, I think the sheriff was
 5   there, and Eddie Johnson.  Investigator might
 6   have been there, I don't know.  I don't
 7   remember.
 8        Q.    And you think it was before
 9   the arrests were made?
10        A.    Yes.
11        Q.    And what did he say and what
12   did you say?
13        A.    I don't know.  It was over the
14   ring, the identification of the ring.
15        Q.    And what was the dispute
16   about?
17        A.    There was a mark on the ring.  You
18   know about that, right?
19        Q.    Go ahead.
20        A.    All right.  The girl, Josette
21   Wright, had identified that mark as being made
22   by her dog.  He had the ring in his mouth and
23   she marked up her ring; she told one of her
24   friends that.
25        Q.    Josette Wright told one of
```



1                    H. Turner
2    her friends that?
3         A.    Yes.
4         Q.    Okay.
5         A.    When we identified the ring, I
6    believe it was that mark.  They identified it
7    as hers; that's what made it different.  Kevin
8    was telling me that if you look at the ring,
9    it was sized, it was cut and soldered.  I said
10   yeah, I knew that, but you are saying the dog
11   made it.  No, I'm saying the dead girl said
12   the dog made it and I'm not changing the
13   verbiage.  That's what it was about.
14        Q.    It sounds like, correct me
15   if I'm wrong, that Kevin Wright was
16   questioning whether the dog story
17   itself was accurate based on how the
18   ring looked?
19        A.    No.  He wanted us to have
20   identified the ring, the mark, as having been
21   sized.
22        Q.    It sounds like he was
23   suggesting the mark wasn't made by a
24   dog?
25        A.    Yes, it was made by the ring being



1                    H. Turner
2    sized.
3        Q.    He was questioning whether
4    the story you heard from Josette
5    Wright's friend was accurate?
6        A.    No.
7        Q.    So what was the dispute
8    about it?
9        A.    Because we said this mark here,
10   Josette said it was made by her dog, he said
11   it wasn't made by her dog; he said it was by
12   the ring being sized.  I'm not putting words
13   in her mouth.  The dead girl identified the
14   ring by that mark; she thought her dog did it
15   and I don't know.
16       Q.    He was asking you to say in
17   the reports that it didn't happen that
18   way?
19       A.    That the dog didn't make it, it
20   was sized.  But I'm not changing her
21   statement; she's dead.
22       Q.    It was Kevin Wright asking
23   you to change the statement?
24       A.    He didn't ask me to change it.  We
25   were just arguing over the verbiage we used.



```
 1                    H. Turner
 2        Q.    He was asking you --
 3        A.    He didn't ask me to do anything.
 4        Q.    Let's be clear, sir.
 5        A.    I am being clear.
 6        Q.    You had a dispute about what
 7   a witness reported?
 8              MR. RANDAZZO:  Objection.
 9        A.    We had a dispute of what made the
10   mark on her ring.
11        Q.    But you had a statement
12   you're claiming from a witness?
13        A.    Not a statement, but that's what
14   was said; that's what I was told was said.
15        Q.    Who were you told by.  One
16   of her friends?
17        A.    No.  Castaldo, Wright, Stephens,
18   somebody.
19        Q.    They told you they learned
20   from a friend --
21        A.    -- that she identified the ring by
22   the mark the dog made.
23        Q.    So there must have been a
24   report of that interview, correct?
25              MR. RANDAZZO:  Objection.
```



1                    H. Turner
2        A.    I doubt it.
3        Q.    You just think it is
4    something they heard?
5        A.     They said about the ring, this is
6    a ring and then they seen the mark on the
7    ring.
8        Q.    Let me make sure I
9    understand the circumstances.
10       A.    Go ahead.
11       Q.    Castaldo, Quick, or Stephens
12   reported to you that a witness had told
13   Castaldo or Quick that the mark on her
14   ring had been made by a dog, correct?
15       A.    That's correct.
16       Q.    They reported to you that
17   the witness said that Josette had told
18   her that the mark was made by a dog?
19       A.    Yes.
20       Q.    You don't believe that was
21   ever documented, correct?
22       A.    I don't know.  I have no idea.
23       Q.    You don't know one way or
24   the other?
25       A.    No.



```
1                  H. Turner
2       Q.    And you were discussing that
3   with the DA?
4       A.    Yes.
5       Q.    And the DA was telling you
6   based on the way the ring looked, it
7   didn't appear the mark was made by a
8   dog?
9       A.    Right, it was made by sizing the
10  ring.
11      Q.    What specifically was the
12  dispute; what was the DA asking you to
13  do?
14            MR. RANDAZZO:  Objection.
15      A.    He wasn't asking me to do
16  anything.
17      Q.    Well, you told me you had a
18  dispute that you had with the DA you
19  recall, you had words?
20      A.    He's like saying to me, you should
21  have known the dog didn't make it or whatever.
22  That's how I took it.
23      Q.    Okay.
24      A.    I said the girl said this and
25  that's what I'm going with.
```



```
 1                    H. Turner
 2        Q.    Would it be fair to say your
 3   understanding what he was telling you,
 4   it would be best not to present that
 5   witness because of the way the ring
 6   looked?
 7              MR. RANDAZZO:  Objection.
 8        A.    Absolutely not.  It had nothing to
 9   do with witnesses.  It was just a thing over
10   what made that mark.
11        Q.    You told us you were
12   insistent with going with what the girl
13   told you?
14        A.    Right.
15        Q.    Going where with it?
16        A.    When I'm talking about it.
17        Q.    Putting it in a report?
18        A.    I don't make reports.  We were
19   talking about it.  I said it was identified by
20   her that the dog made it and he said the dog
21   didn't make it.  It wasn't a dispute.
22        Q.    Did you talk about that
23   being an inconsistency in the evidence?
24        A.    No.
25        Q.    Did you talk with the DA in
```



```
 1                    H. Turner
 2   this homicide case about the fact that
 3   inconsistency might suggest that that
 4   witness wasn't telling the truth?
 5         A.    No.
 6         Q.    Okay.  You've described the
 7   entire communication?
 8         A.    Basically.
 9         Q.    How did it resolve?
10         A.    How did it resolve?  I got mad and
11   went out, went back to my office.
12         Q.    What were you mad about?
13         A.    The fact that he's saying -- he's
14   trying to say that I think the mark was made
15   by the dog because the girl said it.  No, I
16   could see it was a sizing mark, but I was
17   saying how the girl identified her ring and it
18   didn't change anything in her identification
19   of the ring.  Whatever made the mark, it was
20   there.  Whatever she thought was it she
21   thought.
22         Q.    And, to the best of your
23   recollection, you don't recall there
24   ever being any documentation on that;
25   fair to say?
```



```
1                    H. Turner
2        A.    I have no idea.
3        Q.    All right.
4              MR. BRUSTIN:  Let's take a
5        minute break.
6        A.    Documentation on what, the meeting
7   or --
8        Q.    No, the documentation of the
9   witness interview.
10       A.    Oh, I have no idea.
11             (Whereupon, a brief recess
12       was taken from 12:01 p.m. until
13       12:08 p.m.
14             MR. BRUSTIN:  Back on.
15       Q.    One of the things Castaldo
16  testified to was that if a witness
17  asked for a favor, help with a criminal
18  charge, something of that nature, he
19  wouldn't necessarily write it down.
20  Now, I take it that based on your
21  understanding of the rules and
22  regulations, he wasn't required to
23  write that down; fair to say?
24             MR. RANDAZZO:  Objection.
25       A.    I don't know what you are talking
```

