```
UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
------------------------------------------X
ANTHONY DiPIPPO,


          Plaintiff,

                              Case No.
                              17-cv-7948(NSR)
          -against-

COUNTY OF PUTNAM; Putnam County
Sheriff's Department Sheriff ROBERT
THOUBBORON in his individual capacity;
Putnam County Sheriff's Department's
Investigators DAN STEPHENS, PATRICK
CASTALDO, BILL QUICK, and Putnam
County Sheriff's Department Officer
VICTOR NESTOR, in their individual
capacities,

          Defendants.
------------------------------------------X
          January 15, 2020
          10:02 a.m.
```

          Deposition of Non-Party Witness,

HAROLD TURNER, taken by Plaintiff, pursuant to

Notice, held at the offices of Neufeld

Scheck & Brustin, 99 Hudson Street, Eighth

Floor, New York, New York 10013, before

CHARISSE ROMEO, a Registered Professional

Reporter and Notary Public within and for the

State of New York.



A P P E A R A N C E S:


NEUFELD SCHECK & BRUSTIN, LLP

Attorneys for Plaintiff

    99 Hudson Street

    Eighth Floor

    New York, New York 10013

BY:  NICK BRUSTIN, ESQ.

    RICK SAWYER, ESQ.

    212-965-9081


PORTALE RANDAZZO LLP

Attorneys for Defendants

    245 Main Street

    White Plains, New York 10601

BY:  JAMES A. RANDAZZO, ESQ.

    DREW SUMNER, ESQ.

    914-359-2400

    jrandazzo@portalerandazzo.com


ALSO PRESENT:

EMMA FREUDENBERGER, ESQ.

AVINASH SAMARTH, ESQ.

TY PARKS - Paralegal



<a>

```
 1                  H. Turner
 2   this homicide case about the fact that
 3   inconsistency might suggest that that
 4   witness wasn't telling the truth?
 5        A.   No.
 6        Q.   Okay.  You've described the
 7   entire communication?
 8        A.   Basically.
 9        Q.   How did it resolve?
10        A.   How did it resolve?  I got mad and
11   went out, went back to my office.
12        Q.   What were you mad about?
13        A.   The fact that he's saying -- he's
14   trying to say that I think the mark was made
15   by the dog because the girl said it.  No, I
16   could see it was a sizing mark, but I was
17   saying how the girl identified her ring and it
18   didn't change anything in her identification
19   of the ring.  Whatever made the mark, it was
20   there.  Whatever she thought was it she
21   thought.
22        Q.   And, to the best of your
23   recollection, you don't recall there
24   ever being any documentation on that;
25   fair to say?
```


</a>

```
 1                     H. Turner
 2        Q.    You just told us --
 3        A.    Yeah.
 4        Q.    -- that you learned she
 5   identified the ring before she talked
 6   about the bite mark?
 7        A.    I said somebody did.  I didn't say
 8   she did.  Read it back.
 9        Q.    Oh, you are not saying she
10   did?
11        A.    No.  Read it back.  I said
12   somebody identified that ring --
13        Q.    Fair enough.
14        A.    -- as Josette's, so then they
15   followed up on it, and this is what they got.
16        Q.    So no question that this
17   witness was saying she was only able to
18   identify it through the bite mark?
19        A.    She didn't say only.
20        Q.    The only rationale given
21   here?
22        A.    That is the only rational given,
23   yes.
24        Q.    You don't believe you talk
25   to Castaldo and Quick about it?
```



1                    H. Turner
2       A.    About?
3       Q.    About the inconsistency
4    between the bite mark and the ring
5    measurement?
6             MR. RANDAZZO:   Objection.
7       A.    No.
8       Q.    But you did speak to the
9    actual DA of Putnam County about it?
10      A.    Yes, I did.
11      Q.    You've already told us you
12   weren't reading reports in the case?
13      A.    Right.
14      Q.    So you must have learned
15   about the bite mark from talking to
16   Castaldo and Quick, correct?
17      A.    Or Stephens.
18      Q.    Or Stephens?
19      A.    Or John Rees, the ID man.  I don't
20   know who I talked to.
21      Q.    Well, John Rees, the ID man,
22   wouldn't know about this witness'
23   statement?
24            MR. RANDAZZO:   Objection.
25      A.    Why not?



```
 1                    H. Turner
 2        Q.    Why would he?
 3        A.    He handled the evidence.
 4        Q.    Why would he know about the
 5   witness statement?
 6        A.    Because I could have been talking
 7   to the two of them about the evidence.  We
 8   were a small department; we didn't keep
 9   secrets.
10        Q.    Fair enough.
11              The way you learned about
12   the bite mark information was either
13   through talking to Stephens, Castaldo,
14   Quick, or even possibly Rees?
15        A.    Yes.
16        Q.    And you have no memory of
17   having that conversation?
18        A.    No.  Just I remember the
19   conversation over the dog bite mark, but I
20   don't remember who with.
21        Q.    And then you went and --
22   were you meeting with the DA about this
23   issue --
24        A.    No, no.
25        Q.    -- or did it just come up?
```



```
 1                    H. Turner
 2         A.    It just came up.
 3         Q.    What else were you talking
 4   about?
 5         A.    I have no idea.  I was with the
 6   sheriff, him and Wright, the DA, had a
 7   meeting.
 8         Q.    So you, the sheriff, the DA,
 9   and potentially others are meeting?
10         A.    Well, it was in the hall, it
11   wasn't in a meeting room, yeah.
12         Q.    And you were talking for
13   some period of time in the hall?
14         A.    I didn't say that.
15         Q.    I'm asking you.
16         A.    It was not some period of time.
17         Q.    How long was it?
18         A.    I don't know.  When this came up,
19   I went back to my office.  I thought it was
20   ridiculous.
21         Q.    What did you think was
22   ridiculous?
23         A.    The fact that the girl identified
24   the bite mark and he's arguing with me that it
25   wasn't a bite mark, it was a sizing so she
```



```
 1                    H. Turner
 2   couldn't identify it.  I'm not putting words
 3   in the witness' mouth.
 4        Q.    So what was happening was
 5   the DA was telling you this witness
 6   wasn't credible --
 7        A.    No, he was telling me --
 8              MR. RANDAZZO:  You have to
 9        let him finish the question.
10        Q.    Sir, you have to let me
11   finish the question.  It is important.
12        A.    It is, okay.
13        Q.    The DA was telling you that
14   she wasn't -- in substance what he was
15   suggesting to you is that this witness
16   wasn't reliable because there was no
17   bite mark and that's why she said she
18   identified it, correct?
19              MR. RANDAZZO:  Objection.
20        A.    No.  That's why I don't want you
21   to finish, because you are putting all BS into
22   it.
23        Q.    You still need to wait for
24   me to finish.
25        A.    But you are still putting BS.
```



```
 1                    H. Turner
 2        Q.    Still, let me finish.
 3        A.    He was just breaking chops because
 4   we did that.
 5        Q.    Did what?
 6        A.    Broke chops back and forth.
 7        Q.    He was breaking your chops
 8   because you did what?
 9        A.    Because I was calling it a bite
10   mark and it wasn't a bite mark, I shouldn't
11   be calling it a bite mark.
12        Q.    That was the only thing --
13        A.    Only thing.
14        Q.    -- that you were upset
15   about?
16        A.    Only thing that came up, yes.
17        Q.    What did he say to you, to
18   the best of your recollection?
19        A.    Harold, that was no bite mark,
20   that was sizing the ring, anybody could see
21   that.  Sure, I wasn't -- I could see it, but I
22   wasn't going to say it.
23        Q.    But he was suggesting to
24   you, sir -- as a man of common sense if
25   he's saying to you that she didn't
```



```
 1                    H. Turner
 2    identify it through the bite mark, what
 3    he had to be suggesting is she isn't
 4    reliable if she's relying on the bite
 5    mark?
 6              MR. RANDAZZO:  Objection.
 7         A.   He wasn't talking about the
 8    witness.  He was talking to me.
 9         Q.   What was he suggesting you
10    do differently?
11              MR. RANDAZZO:  Objection.
12         A.   He's saying I shouldn't refer to
13    it as a bite mark, I should refer to it as
14    sizing when I talk about it.
15         Q.   When you put it in reports?
16         A.   I didn't put it in reports.
17         Q.   When you talk about it with
18    who?
19         A.   Him.
20         Q.   Was he afraid you were going
21    to talk about sizing and bite marks
22    down the road?
23         A.   Ask him.  He was telling me
24    Harold, obviously it is not a bite mark, it is
25    a sizing, okay.
```



```
 1                     H. Turner
 2        Q.    What he was suggesting to
 3   you is going forward with this witness,
 4   if this witness was going to be used in
 5   the case it should be referred to her
 6   as recognizing a sizing mark as opposed
 7   to a bite mark?
 8        A.    Do you know Kevin Wright, do you
 9   know him?
10             MR. RANDAZZO:  You have to
11        answer the question.
12             THE WITNESS:  Well, how does
13        he know what he was telling me,
14        what was in his mind?
15        Q.    What did you think was in
16   his mind?
17        A.    That if they talk to me about it,
18   call it a sizing.
19        Q.    Was one of the reasons you
20   were upset -- and, remember, this is
21   because you were thinking that he was
22   suggesting you should say that to other
23   people, too --
24        A.    So.
25        Q.    -- is that what you
```



```
 1                    H. Turner
 2    understood?
 3         A.    No, he wanted me to refer to it
 4    from then on as a sizing.  And anybody I
 5    talked to, whether it be Thoubboron, Quick,
 6    Castaldo, Rees, anybody, I refer to it as a
 7    bite mark because that's what the witness
 8    referred to that mark as.
 9         Q.    All right.  Let's switch --
10    slightly switch topics a little bit.
11                Now, you understood that
12    given that there was no -- given that
13    what she referred to as a bite mark you
14    believed was in fact a sizing mark --
15         A.    That's true.
16         Q.    -- you would expect that any
17    competent defense lawyer if they
18    noticed the same thing would
19    cross-examine her on that, right?
20                MR. RANDAZZO:  Objection.
21         A.    I don't know what it has to do
22    with it.  She --
23         Q.    Just answer my question.
24         A.    I can't answer that question.
25         Q.    Of course you can.
```

